UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES :

v. : Crim. No. 21-85 (CRC)

JOHN STRAND :

**DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER VENUE**

Defendant, John Strand, through undersigned counsel, Stephen F. Brennwald, Brennwald & Robertson, and in reply to the government's opposition to defendant's motion to transfer venue, states as follows:

## ARGUMENT

### 1. The District of Columbia's Jury Pool Has Been Irreparably Prejudiced[1]

In early May, 2022, the President of the United States commented that the "MAGA crowd" is the "most extreme political organization that's existed."[2]

The President, and many others, have also called the events of January

[1] At the outset, undersigned counsel notes that he intends to speak honestly and frankly about the matters at issue here. Some of the statements herein may not of the type that attorneys usually say out loud, or put in writing, but counsel will make every effort to present defendant's arguments respectfully, if candidly. In short, counsel intends to acknowledge that there is an elephant in the room, the elephant being the reality that "MAGA-supporting" citizens see the world very differently than many other citizens of this country, and jurors in the District of Columbia see the world very differently than citizens in many other States in this country. This reality obviously affects people's ability to judge others' actions fairly and dispassionately.

[2] Brooke Singman, *Biden says 'MAGA crowd' is most extreme political organization that existed in recent American history* (May 4, 2022). www.foxnews.com/politics/biden-maga-most-extreme-political-organization.

6, 2021, "[t]he worst attack[3] on our democracy since the Civil War."[4]

Whatever one's politics, there is no question that what happened on January 6, 2021, has never happened in the lifetime of anyone living today.

The actions undertaken by hundreds or thousands of people, both inside and outside the Capitol on that day represented, in the view of the vast majority of residents of this city, from whom a jury pool would be chosen, a violent and direct attack on our country, and on American democracy.

Because of that reality, this case – and indeed, the totality of all "January 6" cases – are unlike any other criminal case that has been brought in the history of our republic.

As citizens of this country, it would be hard for any of us to fathom a more troubling, or politically polarizing, allegation.[5]

One would ordinarily think that murder, rape, kidnapping, or international terrorism would represent the most severe form of (mis)conduct that one can imagine.

But the allegations here, that Mr. Strand, and perhaps thousands of others, tried to stop the peaceful transfer of power, and essentially engaged in what has often been labeled "domestic terrorism," have shaken millions of American to their core, and none more so than those living in this district.

---

[3] The United States was attacked by Japan at Pearl Harbor, in Hawai'i, on December 7, 1941. This was also an attack on our democracy, but one that was not, according to the President's statement, as severe as the attack on the Capitol on January 6, 2021.

[4] State of the Union Address (April 22, 2022).

[5] The government has repeatedly argued over the course of the past year and a half that these cases are extraordinary, such that repeated exclusions of time under the Speedy Trial Act were required. Now, ironically, for the purposes of opposing Mr. Strand's venue motion, the government claims that this case is rather ordinary in that finding an unbiased jury will not present any undue challenges.

For without a peaceful transition of power following an election, the United States would no longer be a democracy, but a dictatorship or a country run by a cabal of strongmen.

The visceral reactions of the overwhelming majority of citizens of this city to the events of that day, even now, are so strong that it is asking too much to believe that they will be able to put their feelings aside, and decide this case solely on the evidence presented in court. Jurors who would be examined during voir dire would undoubtedly believe that they can be fair to Mr. Strand, because people almost uniformly believe that they are "fair-minded."[6] But the reality, if we are honest about the matter, is that some undertakings are a bridge too far. This is one of those undertakings.

Undersigned counsel has lived in this city for many of his 63 years, and has developed acquaintances and friendships with literally hundreds of people who live all over the city, from far Northwest to far Southeast. Unlike many of the "outside" attorneys representing January 6 defendants in this courthouse, undersigned counsel knows this city, and its citizens, very well. He has engaged in thousands of hours of conversations about politics and other matters over the years, both before and after January 6, 2021, with at least hundreds of people who live in all four quadrants of the city.

And while he well knows that anecdotal evidence, even involving conversations with a great number of people, will not convince anyone of the

---

[6] In psychological terms, this is known as the "false consensus effect," or "consensus bias." This bias causes people to "see their own … judgments as relatively common and appropriate to existing circumstances." Ross, Greene, and House, "*The 'false consensus effect': An egocentric bias in social perception and attribution processes.*" Journal of Experimental Social Psychology 13 (3), 279-301.

extreme unlikeliness of finding enough truly unbiased citizens to permit Mr. Strand to receive a fair trial, he also cannot pretend not to know what he knows, and that is that jurors in this city see the world, and interpret events, very differently than potential jurors in many more conservative jurisdictions in throughout the country.

To deny this reality would be tantamount to believing that so-called "MAGA supporters" view various significant political issues the same way that Biden voters do. Elections clearly show us that that is not the case.[7] Indeed, many of counsel's friends have said to him, in good humor but entirely sincerely (and counsel paraphrases here): "As your friend, I don't want you to lose cases, but I hope you lose all of your January 6 cases."

What is even more telling is that these friends' comments have been made without them knowing *anything* about the particulars of a specific January 6 case, because the details do not matter. If the defendant was at the Capitol on January 6, 2021, they are guilty, at the very least of "trespassing," but also very probably, as surveys have shown, of obstruction and/or insurrection and/or treason.

It is not a coincidence, therefore, that every single attorney representing January 6 defendants in every case set for trial has reached a professional judgment that their client cannot receive a fair trial in this jurisdiction.[8] This

---

[7] One need not go back any further than a few days ago to confirm this, for that is when many "election deniers" won a high number of primary elections in Arizona and other states. That would never happen in the District, because, again, citizens (from whose ranks the jury would be chosen) here see things very differently than their fellow citizens in conservative jurisdictions. This is true even in neighboring Virginia, where a far-right Republican candidate won the governorship less than a year ago. Had that candidate run for mayor or any other political office in the District, he would have received no more than 5% of the popular vote.

[8] To be clear, this is not a judgment on the honesty or integrity of the citizens of the District of Columbia. It is

is because they understand that despite jurors' best intentions, both during voir dire and during trial, jurors' underlying beliefs, views, and biases cannot help but impact the way they view each defendant, and the evidence presented against that defendant.

For example, one of Mr. Strand's charges accuses him of obstruction of an official proceeding. In considering his guilt on that charge, the jury will have to decide whether Mr. Strand acted "corruptly." Defendant submits that this is one specific example where jurors' backgrounds and views will necessarily influence their opinion of his guilt. Whereas jurors in some locales, like the District, would see entering the Capitol as obviously obstructing the proceedings, citizens of other jurisdictions might view his actions as constituting a form of protest. The term "corruptly," and the question whether someone acted corruptly, are fluid concepts that do not lend themselves to a clear or easy resolution. In the face of such ambiguity, one's personal views and judgments will control one's jury vote.

The government has cited caselaw indicating that the way to avoid an unfair trial is through "adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992)(italics omitted).

Indeed, four and a half pages of the government's opposition discuss the voir dire process undertaken in five of the seven January 6 jury trials that have taken place to date. The government opposition lists the number of

simply an acknowledgment that some events are so dramatic and shocking that in some contexts, affected populations will be unable to separate their own pre-existing thoughts and feelings on a matter from their decisions regarding those events.

jurors struck for a variety of reasons, including what the government terms a "professed inability to be impartial," "unavailability," "anxiety and views on guns" (something that would almost never come up in a state like Wyoming or Montana, for example), medical reasons, and prior knowledge of facts. *Gov. Opp*, at 25 n. 3.

It concludes that because 12 jurors (plus alternates) who claimed they could be impartial were ultimately seated in the various trials, those jurors were fair and unbiased in their evaluation of the evidence and the defendants. And while we all (judges, litigants, and sometimes the parties) accept the fiction that jurors (who, after all, are people, and therefore fallible) are able to recognize their hidden and subjective biases, and put those biases aside when deciding a person's guilt or innocence, the reality is far different.

This is shown by what the government does not discuss in its opposition, and that is that in ***all seven*** of the jury trials held so far, ***every single defendant*** has been ***found guilty of every single count*** lodged against him, including misdemeanor charges.

By contrast, in the only two non-jury trials conducted so far, one involving one defendant, and the other involving two defendants, the two co-defendants were ***found not guilty of five of six charges***, and the lone defendant in the second case was found ***not guilty of all four charges***.

Defendant submits that the stark differences in these outcomes is not a coincidence, or simply, somehow, the result of a remarkable divergence in evidence. Rather, the differences stem from sometimes radically-differing

worldviews, and the impact those views have on how one would view often similar evidence.[9]

It is also no coincidence that the not guilty verdicts in the two non-jury trials, resulting in near total acquittals, were rendered by a judge who demonstrably holds different views in many respects than the vast majority of the citizens of the District of Columbia.[10]

While the foregoing does not prove that the seven juries did not render a fair judgment, it also does not support the proposition that the similar results in all seven jury trials are merely a coincidence.

The government contends that "January 6 is now more than a year in the past."[11] Following this reasoning, the residents of this city should have almost forgotten about that day by now.

What its opposition does not confront is that the events of January 6, 2021, are more at the forefront of District residents' minds now than perhaps at any time since that date. That is because a congressional committee[12] has been conducting regular, compelling, hearings for several months, playing videos of agitated people at a loud volume, presenting testimony of tearful and traumatized law enforcement officers, and otherwise creating an atmosphere that has outraged, infuriated and reminded many viewers about

[9] Defendant is not arguing that the evidence against *all* defendants who chose a jury trial was similar to the evidence against all three of the defendants in the two non-jury trials, but much of the evidence was similar in many respects.
[10] Counsel has learned, over the years, that it is a fool's errand to try to ascribe motivations to people's actions and decisions, although we all do this many times a day in many different contexts, as do juries, by definition (when they decide, for example, a person's intent in a particular situation). However, no one can argue with the record, and that record is clear with respect to counsel's statement in this regard.
[11] *Gov. Opp*, at 5 (ECF No. 81).
[12] The committee is formally called "The Select Committee to Investigate the January 6th Attack on the United States Capitol."

the events that occurred on January 6, 2021.

In *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court upheld the denial of the defendant's request to change venue, noting that 1) Houston, where the trial would be held, was the fourth largest city in the United States, such that it would be hard to fathom that twelve fair jurors could not be found in the city; 2) although there many news stories about the defendant before the trial, none contained "blatantly prejudicial information…;" and 3) over four years had elapsed between Enron's bankruptcy and the start of Skilling's trial.

Critically, the Supreme Court wrote that "of prime significance, Skilling's jury acquitted him of nine insider-trading counts…. It would be odd for an appellate court to presume prejudice in a case in which jurors' actions ran counter to that presumption." *Id*. at 361.

As noted above, not a single January 6 defendant who has been tried by a jury in the District has been acquitted of a single count against him.

As to the other *Skilling* factors, only a year and a half has elapsed here since the events of January 6, 2021. Second, and more importantly, news stories covering the January 6 committee's hearings, indeed, the committee hearings themselves, are at a fever pitch at this very time, and will continue to be so for some time, with sensational new allegations and evidence being "dumped" on the public on a regular basis. And third, the information that has been disclosed has been very prejudicial to the January 6 defendants.

In its opposition, the government did not address *Delaney v. United*

*States*, 199 F.2d 107 (1st Cir. 1952), which held that the trial court abused its discretion when it denied a request for a lengthy continuance in light of prejudicial congressional committee hearings. That ruling implicitly recognized that congressional or other highly visible hearings will infect a jury pool, no matter how many people live in a particular city (in *Delaney*, the city was Boston).

The District of Columbia Circuit distinguished *Delaney* in its holding denying defendant's appeal in *United States v. Ehrlichman*, 546 F.2d 910 (D.C. Cir. 1976). In *Ehrlichman*, appellant argued that the trial judge had denied him a fair trial, in light of prejudicial pretrial publicity, when it refused to dismiss the indictment, continue the trial, change the trial's venue, or conduct adequate voir dire to eliminate "possibly prejudiced jurors." *Id*. at 916.

The court admitted that "[a] pattern of bitter prejudice throughout the community can render the voir dire an unsatisfactory device for selection of an impartial jury," *id*., at n.8 (*citing Irvin v. Dowd*, 366 U.S. 717 (1961) and *Sheppard v. Maxwell*, 384 U.S. 33 (1966)). However, it concluded that voir dire was the proper avenue to test the prejudices of any juror in appellant's case. It noted that "few of the jurors selected had more than a faint awareness of the Fielding-Ellsburg matter, and none expressed any particular interest in Watergate." *Id*.

That is obviously not the case here, as one would have had to have been dead, or a non-English speaker, not to have heard, repeatedly, about the

events of January 6 up to this very day.

The *Ehrlichman* court also noted that a continuance was not warranted, as the congressional hearings concerning Watergate had ended about a year before the trial began. *Id*. As pointed out above, the congressional hearings relating to the alleged activities of Mr. Strand and other January 6 defendants (and others) are ongoing. And though he and Dr. Gold may not be referenced specifically in those hearings, images and sounds of the crowd he was in have stunned almost everyone who has watched that video footage.

***2. Juror Bias Matters***

The government's opposition fails to convincingly counter Mr. Strand's citation to *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996)(summarily finding that a trial of Oklahoma City bombing suspects in federal court in Oklahoma City (Western District of Oklahoma) would be constitutionally unfair).

The *McVeigh* court observed that "[t]here is no disagreement among the parties with Judge Alley's concern about a trial in Oklahoma City. The effects of the explosion on that community are so profound and pervasive that no detailed discussion of the evidence is necessary." Id. at 1470 (emphasis added). In *McVeigh*, even the government recognized that there was no way to hold a fair trial in Oklahoma City, and it did not contest the defendant's motion to transfer venue.

Here, while there were not 168 deaths, as was the case in the Oklahoma City bombing, judges who have sentenced defendants have repeatedly pointed

to the deaths of five people in connection with January 6, as well as to the non-lethal injuries to many more people and law enforcement officers, and the extensive damage to the Capitol itself.

More than that, however, while the Oklahoma City bombing was undoubtedly a political act on the part of the defendant in that case, it hardly rose to the level of an alleged insurrection.

Politically speaking, there could hardly be a more shocking event than a violent attempt to keep a president who has lost an election in power through force. In the United States, and in 2020, no less.

The government cites the Sixth Amendment as guaranteeing the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed." It also cites Article III, Section 2, and Clause 3 for the proposition that "[t]he trial of all Crimes … shall be held in the State where the said Crimes shall have been committed."

It recognizes, of course, that the purpose of "[t]hese provisions [is to] provide 'a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place,'" *United States v. Cores*, 356 U.S. 405, 407 (1958). It also acknowledges, as it must, that transfer to another district would be required if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." *Skilling*, *supra*, 561 U.S. at 378.

But it does not believe that trials involving "the worst attack on our democracy since the Civil War" create "so great a prejudice against the

defendant … that the defendant cannot obtain a fair and impartial trial [here].”

Under this reasoning, there is literally ***no set of facts or circumstances*** that would lead the government to conclude that a defendant could not receive a fair trial in this city, even where the accusations involve an attack on the capital of the United States and on the form of government we have known and cherished for hundreds of years.

With respect to the constitutional provisions just referenced, the presumption is that a defendant committed a crime in the jurisdiction in which he or she lived. That is clear from the language in *Cores*, which discusses prosecution in a “remote place.” But what was remote when this provision was written[13] is no longer remote today.

Here, Mr. Strand did not live in Washington, D.C. when the alleged crimes were committed, and any hardship that might exist would result from requiring him to travel ***to*** the District for trial.

On January 6, 2021, Mr. Strand was a resident of California. He has since relocated to Florida, and for purposes of federal jurisdiction, he lives in the Middle District of Florida.

Despite this living situation, he has also proposed having his trial held in the Eastern District of Virginia, if it cannot be held in the Middle District of Florida.

[13] This particular constitutional provision was ratified on February 7, 1795, when the primary mode of travel for the average citizen was walking. People back then rarely traveled for pleasure. Those who could afford more would ride a horse. Thus, the provision that a trial should be held where the crime was committed followed the conclusion that most crimes were committed close to a person’s home, and that requiring them to travel to another area would constitute a hardship to them.

Transferring the case to Virginia would a) limit the inconvenience to the Court; b) eliminate any burden on witnesses that might be occasioned by holding a trial in Florida; c) result in a jury pool with more diverse views than those held by the majority of the citizens of the District of Columbia; and d) enhance Mr. Strand's chances for a fair trial.

If the government[14] truly believes that the average juror in the District of Columbia who is biased will a) recognize those biases and b) inform the Court and the parties of those biases so that the juror can be struck for cause, it shouldn't have any objection to holding a trial in the Eastern District of Virginia, perhaps as a test case, to determine whether the venue of Mr. Strand's trial is truly irrelevant to the outcome of a "typical" January 6 trial.

Certainly, jurors in the Commonwealth would be just as able as a District of Columbia juror to recognize their biases and honestly inform the Court and the parties of those biases. Moreover, the courthouse in the Eastern District is located a mere 9.3 miles from "our" courthouse. Thus, no hardship to any party or witness would result as a consequence of relocating the trial to that courthouse.

Most significantly, as the data submitted by Mr. Strand has shown, the jury pool in the Eastern District of Virginia is far less predisposed to believe in the guilt of January 6 defendants than is the jury pool in the District.

"The Supreme Court has stressed repeatedly that the touchstone of the guarantee of an impartial jury is a protection against juror bias." *United States*

[14] Defendant, when referring to the "government" here, is not speaking of the two prosecutors who are representing the United States in Mr. Strand's case, but to the "government" writ large.

*v. Boney*, 977 F.2d 624, 633, citing *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984). In *Boney*, the court was confronted with a situation where a felon somehow was allowed to serve on the jury, despite statutory bars to such a person serving on a jury. Rather than grant a new trial, the court found that the larger question concerned any alleged *bias* the juror may have possessed, rather than his status as a felon.

And that is exactly what Mr. Strand is contending here. He is not claiming that jurors in the District will be unable to say that they could be fair. Of course most jurors will believe that they will be fair, and their belief will be sincere. That is because the average person sees herself or himself as being fair. It is simply one of many biases from which we all suffer.

Mr. Strand is arguing, however, that based on the surveys and polls presented in his motion to change venue, as well as on common sense, and despite their best efforts, jurors will be so affected by their world views about this case, especially when combined with the trauma that they suffered as residents of the Nation's Capital, that they will bring with them unknown or unacknowledged biases to the deliberation process, depriving Mr. Strand of a fair trial.

Again, this is not to indict an entire city or jury pool. It is simply a fact of life. The same, or more accurately, reverse biases would exist if a "liberal" were charged with, for example, destroying property in the name of environmental concerns, and tried in a deep-red state. There is no question that many jurors in that deep-red state would say, and believe, that they could judge

that person fairly, and without prejudice or bias. But the reality would be very different, given pre-existing views and beliefs.

While all of the judges who have decided these change of venue motions to date have denied them, defendant submits that it is because we have all been asking the wrong question. The question to ask is not "can a juror tell the Court that he or she will be fair?" Of course a juror can say that. And mean it. The real question is "will a juror who is impermissibly biased against a defendant recognize that bias, and inform the Court of that bias, so that a decision whether to strike that juror can be made," whether by the government or the defendant (as is done with respect to the "law enforcement bias" question during voir dire).

A denial of the reality of juror bias in this politically-charged case would be tantamount to a denial that the majority of citizens in "red states" view particular issues very differently than the majority of citizens in "blue states." And there is no bluer "state" in the country than the District of Columbia.

Defendant submits, and has no doubt whatsoever, that jurors in deep red states like West Virginia and Wyoming would evaluate the evidence presented at this trial far differently than jurors in the District of Columbia or in other "blue" jurisdictions. Moreover – and no one seems to have mentioned this yet (unless counsel missed it) - the District of Columbia is the most partisan jurisdiction in the entire country when it comes to politics.

As anyone who follows politics even remotely knows, more than 90%

of the residents of the city voted "against" the presidential nominee of the Republican party in 2020 – a nominee supported by virtually every January 6 defendant.

In fact, in the 2020 election, while the "reddest state," Wyoming, voted for the former president by 69.9 percent to 26.6 percent (for Biden), 92.1 percent of the voters in the District of Columbia voted for President Biden, while a mere 5.4 percent voted for his opponent.

In other words, the trial of Mr. Strand's case could hardly be held in a more partisan jurisdiction than the District of Columbia. Again, this is not to say that the jurors in this city hold views that are not correct, legitimate, or fact-based. It is merely to point out that it is virtually impossible for people who have a worldview that is the complete opposite, literally, of those of the defendant and the vast majority of other January 6 defendants, to view the evidence dispassionately. Just about every Democratic voter who follows politics closely (and that would be the overwhelming majority of the District's very informed residents) holds his or her views about the former president and his followers very strongly.

And their feelings and views about the events of January 6 generate an incredible amount of passion whenever the topic is discussed. T***here is nothing wrong with that***, except where those same citizens are called upon to pass judgment on people whose beliefs these citizens hold in contempt, and often horror.[15]

[15] These words are not hyperbolic, as anyone who speaks about January 6 with an informed District resident can attest.

It would be naïve, and disingenuous, to cast the events of January 6 as non-political in nature. They were all about politics – perhaps scorched earth politics, or the politics of delusion or disinformation - but about politics nonetheless.

At its core, the defendant's argument boils down to this: Mr. Strand, by facing a trial in the District of Columbia, would not be judged by his peers, but by his political foes. And while those foes are overwhelmingly good and decent people who sincerely want to be fair and impartial, the reality is that their feelings and views are too inflamed and passionate to judge Mr. Strand impartially.[16]

## CONCLUSION

The government has charged Mr. Strand in one of a series of criminal cases that are the most politically-charged cases ever brought in the history of this country. And it is seeking to have him judged on those charges in a jurisdiction whose citizens' beliefs are diametrically opposed to his. All of the studies and surveys submitted to the Court prove that in these circumstances, it will be impossible for Mr. Strand to receive a fair trial, no matter how well-intentioned the chosen jurors believe they will be.

To be clear, he is not seeking a transfer to a different venue to achieve an unfair advantage at trial. On the contrary, he is seeking a transfer to the Eastern District of Virginia in a desperate attempt at somewhat of a level playing field.

---

[16] Counsel once saw a cartoon where a dog was on trial, and the jury was composed of twelve cats. The caption read "a jury of his peers?"

WHEREFORE, for the foregoing reasons, as well as for such other reasons as may appear to this Court, defendant prays that the trial of this matter be held in the Eastern District of Virginia pursuant to Federal Rule of Criminal Procedure 21(a).

Respectfully submitted,

*Stephen F. Brennwald*

Stephen F. Brennwald, Esq.
Bar No. 398319
Brennwald & Robertson, LLP
922 Pennsylvania Avenue, SE
Washington, D.C. 20003
(301) 928-7727
(202) 544-7626 (facsimile)
sfbrennwald@cs.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing motion was sent by ECF, this 6th day[17] of August, 2022, to all parties of record.

*Stephen F. Brennwald*

Stephen F. Brennwald

[17] Undersigned counsel intended to submit this motion on Friday, August 5, 2022. However, because some of the statements he has included in this filing are typically unspoken, or politely avoided in most filings, he thought it wiser to "sleep on it" and review the motion multiple times the next day to ensure that unduly inflammatory and controversial material was left out of the document. He hopes he has succeeded in that regard. He certainly means no disrespect to anyone by his inclusion of certain statements and arguments. And he asks that the Court accept this filing as having been timely filed despite its filing on August 6, 2022, given the controversial nature of this topic.