```
 1                   IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2
        - - - - - - - - - - - - - - - x
 3      THE UNITED STATES OF AMERICA,
                                             Criminal Action No.
 4                     Plaintiff,           1:21-cr-00085-CRC
                                            Monday, September 26, 2022
 5      vs.                                  9:36 a.m.

 6      JOHN HERBERT STRAND,

 7                     Defendant.
        - - - - - - - - - - - - - - - x
 8

 9      _____

10                        TRANSCRIPT OF JURY TRIAL
             HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                     UNITED STATES DISTRICT JUDGE
        _____
12      APPEARANCES:
        For the United States:      APRIL HOLLY AYERS-PEREZ, ESQ.
13                                  U.S. ATTORNEYS OFFICE
                                    Southern District of Texas
14                                  11204 McPherson Road
                                    Suite 100a
15                                  Laredo, TX 78045
                                    (956) 723-6523
16
                                    JASON MANNING, ESQ.
17                                  DOJ-CRM
                                    1400 New York Avenue NW
18                                  Washington, DC 20005
                                    (202) 514-6256
19                                  jason.manning@usdoj.gov

20      For the Defendant:          STEPHEN F. BRENNWALD, ESQ.
                                    BRENNWALD & ROBERTSON, LLP
21                                  922 Pennsylvania Avenue, SE
                                    Washington, DC 20003
22                                  (301) 928-7727

23      Court Reporter:             Lisa A. Moreira, RDR, CRR
                                    Official Court Reporter
24                                  U.S. Courthouse, Room 6718
                                    333 Constitution Avenue, NW
25                                  Washington, DC  20001
                                    (202) 354-3187
```

```
1                    P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Your Honor, we're back on

3    the record for Criminal Case 21-85-1, United States of

4    America vs. John Herbert Strand.

5              THE COURT:  Okay.  Good morning, everybody.

6              MR. BRENNWALD:  Good morning.

7              THE COURT:  Okay.  Provided I can read the

8    instructions in about 45 minutes, we'll probably just go

9    straight to the government's closing.

10             Ms. Ayers-Perez, are you going to be doing it?

11             MS. AYERS-PEREZ:  I will, Your Honor.

12             THE COURT:  Okay.  We'll see how long it takes,

13   and if they need a break, I'll take a short break.

14             And just follow along.  If you note any typos or

15   misstatements, just let us know so that we can correct them

16   before we make the 12 copies.

17             (Jury enters courtroom)

18             THE COURT:  All right.  Please be seated.

19             Good morning, ladies and gentlemen.

20             JURY IN UNISON: Good morning.

21             THE COURT:  Everyone have a nice weekend?

22             JURY IN UNISON: Yes.

23             THE COURT:  Good.  Rested?  Recharged?  Ready to

24   go?

25             All right.  Well, as I said on Friday afternoon,
```

1    we're now ready to proceed with jury instructions, and then

2    we will move to the closing arguments in the case.  All

3    right?

4            I am required by law to read these instructions to

5    you so bear with me.  It should take about 45 minutes, maybe

6    a little longer, but as I said, you will each have a copy, a

7    written copy, of the instructions in the jury room when you

8    deliberate.  All right?

9            So here we go.

10           Ladies and gentlemen, you have now heard all of

11   the evidence in the case.  Before you begin your

12   deliberations, I am going to instruct you on the law.  I

13   will start with some general rules of law and then talk

14   about the specific charges alleged here and some of the

15   specific issues in this case.  Some of these rules will

16   repeat what I told you in my preliminary instructions.

17           I will provide each of you with a copy of the

18   instructions.  During your deliberations, you may, if you

19   want, refer to these instructions.  While you may refer to

20   any particular portion of the instructions, you are to

21   consider them as a whole, and you may not follow some and

22   ignore others.  If you have any questions about the

23   instructions, you should feel free to send me a note.

24   Please leave your instructions in the jury room when you

25   conclude your deliberations.

1          As I said at the outset of the case, my function

2     is to conduct this trial in an orderly, fair, and efficient

3     manner; to rule on questions of law; and to instruct you on

4     the law that applies in the case.  It is your duty to accept

5     the law as I instruct you.  You should consider all the

6     instructions as a whole.  You may not ignore or refuse to

7     follow any of them.

8          Your function as the jury is to determine what the

9     facts are in this case.  You are the sole judges of the

10    facts.  While it is my responsibility to decide what is

11    admitted as evidence during the trial, you alone decide what

12    weight, if any, to give that evidence.  You alone decide the

13    credibility or believability of the witnesses you've heard

14    from.

15         You should determine the facts without prejudice,

16    fear, sympathy, or favoritism.  You should not be improperly

17    influenced by anyone's race, ethnic origin, or gender.

18    Decide the case solely from a fair consideration of the

19    evidence.

20         You may not take anything that I may have said or

21    done during the trial as indicating how I think you should

22    decide this case.  If you believe I have expressed or

23    indicated any such opinion, you should ignore it.  The

24    verdict in this case is your responsibility alone.

25         If any reference by me or the attorneys to the

1     evidence is different from your own memory of the evidence,

2     it is your memory that should control your deliberations.

3          During the trial, I have permitted those jurors

4     who wanted to do so to take notes.  You may take your

5     notebooks with you to the jury room and use them during your

6     deliberations, if you wish.  As I told you previously, your

7     notes are only to be an aid to your memory.  They are not

8     evidence in the case, and they should not replace your own

9     memory of the evidence.  Those jurors who have not taken

10    notes should rely on their own memory.  The notes are

11    intended to be for the note-taker's personal use.

12         During your deliberations you may consider only

13    the evidence properly admitted in this trial.  The evidence

14    in the case consists of the sworn testimony of the

15    witnesses, the exhibits that were admitted into evidence,

16    and the facts and testimony stipulated by the parties.

17         During the trial you were told that the parties

18    had stipulated -- that is, agreed -- to certain facts.  You

19    should consider any stipulation of fact to be undisputed

20    evidence.

21         When you consider the evidence, you are permitted

22    to draw, from the facts that you have found to be proven,

23    any reasonable inferences that you feel are justified in

24    light of your experience.  You should give any evidence the

25    weight that you think it is fairly entitled to receive.

1       The statements and arguments of the lawyers are

2    not evidence.  They are only intended to assist you in

3    understanding the evidence.  Likewise, the questions of the

4    lawyers are not evidence.

5       As I've explained, the defendant was charged in

6    this case via an indictment.  An indictment is merely the

7    formal way of accusing a person of a crime.  You must not

8    consider the indictment as evidence of any kind.  You may

9    not consider it as evidence of Mr. Strand's guilt or draw

10   any inference of guilt from it.

11      Every defendant in a criminal case is presumed to

12   be innocent.  This presumption of innocence remains with the

13   defendant throughout the trial unless and until the

14   government has proven he is guilty beyond a reasonable

15   doubt.  This burden never shifts throughout the trial.  The

16   law does not require Mr. Strand to prove his innocence or to

17   produce any evidence at all.  If you find that the

18   government has proven beyond a reasonable doubt every

19   element of an offense with which Mr. Strand has been

20   charged, it is your duty to find him guilty of that offense.

21   On the other hand, if you find the government has failed to

22   prove any element of an offense beyond a reasonable doubt,

23   you must find Mr. Strand not guilty of that offense.

24      The government has the burden of proving

25   Mr. Strand guilty beyond a reasonable doubt.  Some of you

1    may have served as jurors in civil cases, where it is only

2    necessary to prove that a fact is more likely true than not,

3    or, in some cases, that its truth is highly probable.  In

4    criminal cases such as this one, the government's proof must

5    be more powerful than that.  It must be beyond a reasonable

6    doubt.

7           Reasonable doubt, as the name implies, is a doubt

8    based on reason -- a doubt for which you have a reason based

9    on the evidence or lack of evidence in the case.  If, after

10   careful, honest, and impartial consideration of all the

11   evidence, you cannot say that you are firmly convinced of

12   the defendant's guilt, then you have a reasonable doubt.

13          Reasonable doubt is the kind of doubt that would

14   cause a reasonable person, after careful and thoughtful

15   reflection, to hesitate to act in the graver or more

16   important matters in life.  However, it is not an imaginary

17   doubt, nor a doubt based on speculation or guesswork; it is

18   a doubt based on reason.  The government is not required to

19   prove guilt beyond all doubt, or to a mathematical or

20   scientific certainty.  Its burden is to prove guilt beyond a

21   reasonable doubt.

22          There are two types of evidence from which you may

23   determine what the facts are in this case:  direct evidence

24   and circumstantial evidence.  When a witness, such as an

25   eyewitness, asserts actual knowledge of a fact, that

1    witness's testimony is direct evidence.  On the other hand,

2    evidence of facts and circumstances from which reasonable

3    inferences may be drawn is circumstantial evidence.

4         As an example, assume a person looked out a window

5    and saw that snow was falling.  If he later testified in

6    court about what he had seen, his testimony would be direct

7    evidence that snow was falling at the time that he saw it

8    happen.  But now assume that he looked out a window and saw

9    no snow on the ground, and then went to sleep and saw snow

10   on the ground the following morning.  His testimony about

11   what he had seen would be circumstantial evidence that it

12   had snowed while he was asleep.

13        The law says both direct and circumstantial

14   evidence are acceptable means of proving a fact.  The law

15   does not favor one form over the other.  It is for you to

16   decide how much weight to give any particular evidence,

17   whether direct or circumstantial.  You are permitted to give

18   equal weight to both.  Circumstantial evidence does not

19   require a greater degree of certainty than direct evidence.

20   In reaching a verdict in this case, you should consider all

21   of the evidence presented, both direct and circumstantial.

22        One of the questions you were asked when we were

23   selecting this jury was whether the nature of the charges

24   themselves would affect your ability to reach a fair and

25   impartial verdict.  I asked you that question because you

1    must not allow the nature of a charge to affect your

2    verdict.  You must consider only the evidence that has been

3    presented in this case in reaching a fair and impartial

4    verdict.

5            The weight of the evidence is not necessarily

6    determined by the number of witnesses testifying for each

7    side.  Rather, you should consider all the facts and

8    circumstances in evidence to determine which of the

9    witnesses you believe.  You may find that the testimony of a

10   smaller number of witnesses on one side is more believable

11   than the testimony of a greater number of witnesses on the

12   other, or you might find the opposite.

13           In determining whether the government has proved

14   the charges against the defendant beyond a reasonable doubt,

15   you must consider the testimony of all the witnesses who

16   have testified.

17           You are the sole judges of the credibility of the

18   witnesses.  You alone determine whether to believe any

19   witness and the extent to which a witness should be

20   believed.  Judging a witness's credibility means evaluating

21   whether the witness has testified truthfully and also

22   whether he or she accurately observed, recalled, and

23   described the matter about which he or she testified.

24           You may consider anything that in your judgment

25   affects the credibility of any witness.  For example, you

1    may consider the demeanor and the behavior of the witness on

2    the witness stand; the witness's manner of testifying;

3    whether the witness impresses you as a truthful person;

4    whether the witness impresses you as having an accurate

5    memory and recollection; whether the witness has any motive

6    for not telling the truth; whether the witness has had a

7    full opportunity to observe the matters about which he or

8    she has testified; whether the witness has any interest in

9    the outcome of the case, or friendship or hostility toward

10   other people involved in the case.

11          In evaluating the accuracy of a witness's memory

12   you may consider the circumstances surrounding the event,

13   including any that would impair or improve the witness's

14   ability to remember the event, the time that elapsed between

15   the event and any later recollection of it, and the

16   circumstances under which the witness was asked to recall

17   details of the event.

18          Inconsistencies or disparities in the testimony of

19   a witness, or between the testimony of different witnesses,

20   may or may not cause you to discredit such testimony.  Two

21   or more persons witnessing an incident or transaction may

22   see it or hear it differently; an innocent misrecollection,

23   like a failure of recollection, is not an uncommon

24   experience.  In weighing the effects of the inconsistency or

25   discrepancy, always consider whether it pertains to a matter

1    of important or unimportant detail, and whether the

2    inconsistency or discrepancy results from innocent error or

3    intentional falsehood.

4         You may consider the reasonableness or

5    unreasonableness, the probability or improbability, of the

6    testimony of a witness in determining whether to accept it

7    as true and accurate.  You may consider whether the witness

8    has been contradicted or supported by other evidence that

9    you credit.

10        If you believe that any witness has shown himself

11   to be biased or prejudiced, for or against either side, you

12   may consider and determine whether such bias or prejudice

13   has colored the testimony of the witness as to affect the

14   desire and capability of that witness to tell the truth.

15        Again, you should give the testimony of each

16   witness, like all evidence, such weight as in your judgment

17   it is fairly entitled to receive.

18        You've heard testimony in the case from officers

19   of the United States Capitol Police, the Federal Bureau of

20   Investigation, and the United States Secret Service.  A law

21   enforcement officer's testimony should be evaluated by you

22   just as any other evidence in the case.  In evaluating the

23   officer's credibility, you should use the same guidelines

24   that you apply to the testimony of any witness.  In no event

25   should you give either greater or lesser weight to the

1   testimony of any witness merely because he or she is a law

2   enforcement officer.

3          The lawyers in the case sometimes objected when

4   the other side asked a question, made an argument, or

5   offered evidence that the objecting lawyer believed was not

6   proper.  You must not hold such objections against the

7   lawyer who made them or the party he or she represents.  It

8   is the lawyers' responsibility to object to evidence that

9   they believe is not admissible.

10          If, during the course of the trial, I sustained an

11   objection to a lawyer's question, you should ignore the

12   question, and you must not speculate as to what the answer

13   would have been.  If, after a witness answered a question, I

14   ruled that the answer should be stricken, you should ignore

15   both the question and the answer, and they should play no

16   part in your deliberations.

17          A defendant has the right to become a witness in

18   his own behalf.  His testimony should not be disbelieved

19   merely because he is the defendant.  In evaluating the

20   defendant's testimony, however, you may consider the fact

21   that he has a vital interest in the outcome of the trial.

22   As with the testimony of any other witness, you should give

23   the defendant's testimony as much weight as, in your

24   judgment, it deserves.

25          Okay.  Now, let's move to the specific charges in

1     the case.

2            The indictment in this case contains five counts.

3            Count 1 is obstruction of an official proceeding

4     and aiding and abetting with respect to Congress's

5     certification of the Electoral College vote; Count 2 is

6     entering or remaining in a restricted building or grounds;

7     Count 3 is disorderly or disruptive conduct in a restricted

8     building or grounds; Count 4 is disorderly conduct in a

9     Capitol building; and Count 5 is parading, demonstrating, or

10    picketing in a Capitol building.

11           So starting with Count 1, corruptly obstructing an

12    official proceeding, which is a violation of federal law.

13    Count 1 also charges the defendant with attempt to obstruct

14    or impede an official proceeding, and aiding and abetting

15    others to commit that offense.  I will first explain the

16    elements of the substantive offense along with its

17    associated definitions.  I will then explain how to

18    determine whether the defendant attempted the offense and

19    whether he aided and abetted the offense.

20           In order to find the defendant guilty of corruptly

21    obstructing an official proceeding, you must find that the

22    government has proved each of the following four elements

23    beyond a reasonable doubt:

24           First, that the defendant attempted to or did

25    obstruct or impede an official proceeding.

1          Second, the defendant acted with the intent to

2    obstruct or impede the official proceeding.

3          Third, the defendant acting knowingly, meaning

4    with awareness, that the natural and probable effect of his

5    conduct would be to obstruct or impede the official

6    proceeding.

7          And fourth, that the defendant acted corruptly.

8          And I will now define some of those terms.

9          The term "official proceeding" includes a

10    proceeding before the Congress.  The official proceeding

11    need not be pending on or about -- need not be pending or

12    about to be instituted at the time of the offense.  If the

13    official proceeding was not pending or about to be

14    instituted, the government must prove beyond a reasonable

15    doubt that the official proceeding was reasonably

16    foreseeable to the defendant.  As used in Count 1, the term

17    "official proceeding" means Congress's Joint Session to

18    certify the Electoral College vote.

19          A person acts "knowingly" if he realizes what he

20    is doing and is aware of the nature of his conduct and does

21    not act through ignorance, mistake, or accident.  In

22    deciding whether the defendant acted knowingly, you may

23    consider all of the evidence, including what the defendant

24    did or said.

25          To act "corruptly," the defendant must use

1  unlawful means or act with an unlawful purpose, or both.

2  The defendant must also act with "consciousness of

3  wrongdoing."  "Consciousness of wrongdoing" means with an

4  understanding or awareness that what the person is doing is

5  wrong.

6          Not all attempts to obstruct or impede an official

7  proceeding involve acting corruptly.  For example, a witness

8  in a court proceeding may refuse to testify by invoking his

9  constitutional privilege against self-incrimination, thereby

10  obstructing or impeding the proceeding, but he does not act

11  corruptly.  In contrast, an individual who obstructs or

12  impedes a court proceeding by bribing a witness to refuse to

13  testify in that proceeding, or by engaging in other

14  independently unlawful conduct, does act corruptly.

15          While the defendant must act with intent to

16  obstruct the official proceeding, this need not be his sole

17  purpose.  A defendant's unlawful intent to obstruct an

18  official proceeding is not negated by the simultaneous

19  presence of another purpose for his conduct.  However, the

20  fact that the defendant's mere presence may have had the

21  unintended effect of obstructing or impeding a proceeding

22  does not establish that he acted with the intent to obstruct

23  or impede that proceeding.

24          In Count 1, the defendant is also charged with

25  attempt to commit the crime of obstruction of an official

1    proceeding.  An attempt to commit obstruction of an official

2    proceeding is a crime even if the defendant did not actually

3    complete the crime of obstruction of an official proceeding.

4             In order to find the defendant guilty of attempt,

5    you must find that the government has proved beyond a

6    reasonable doubt each of the following two elements.

7             First, that the defendant intended to commit the

8    crime of obstruction of an official proceeding, as I have

9    defined that offense above.

10            And second, that the defendant took a substantial

11   step toward committing obstruction of an official proceeding

12   which strongly corroborates or confirms that he intended to

13   commit that crime.

14            With respect to the first element of attempt, you

15   may not find the defendant guilty of attempt to commit

16   obstruction of an official proceeding merely because he

17   thought about it.  You must find that the evidence proved

18   beyond a reasonable doubt that his mental state passed

19   beyond the stage of thinking about the crime to actually

20   intending to commit it.

21            With respect to the substantial step element, you

22   may not find the defendant guilty of attempt to commit

23   obstruction of an official proceeding merely because he made

24   some plans or some preparation for committing that crime.

25   Instead, you must find that the defendant took some firm,

1    clear, undeniable action to accomplish his intent to commit

2    obstruction of an official proceeding.  However, the

3    substantial step element does not require that the

4    government prove that the defendant did everything except

5    the last act necessary to complete the crime.

6           The government further alleges that the defendant

7    aided and abetted others in committing obstruction of an

8    official proceeding as charged in Count 1.  A person may be

9    guilty of an offense if he aided and abetted another person

10   in committing that offense.  A person who has aided and

11   abetted another person in committing an offense is often

12   called an accomplice.  The person whom the accomplice aids

13   and abets is known as the principal.  It is not necessary

14   that all the people who committed the crime be caught or

15   identified.  It is sufficient if you find beyond a

16   reasonable doubt that the crime was committed by someone and

17   that the defendant knowingly and intentionally aided and

18   abetted in committing the crime.

19          In order to find the defendant guilty of

20   obstruction of an official proceeding because he aided and

21   abetted others in committing this offense, you must find

22   that the government has proved beyond a reasonable doubt the

23   following five requirements:

24          First, that others committed obstruction of an

25   official proceeding by committing each of the elements of

1    the offense charged, as I have explained above.

2            Second, that the defendant knew that obstruction

3    of an official proceeding was going to be committed or was

4    being committed by others.

5            Third, that the defendant performed an act or acts

6    in furtherance of the offense.

7            Fourth, that the defendant knowingly performed

8    that act or those acts for the purpose of aiding, assisting,

9    soliciting, facilitating, or encouraging others in

10   committing the offense of obstruction of an official

11   proceeding.

12           And fifth, that the defendant did that act or

13   those acts with the intent that others commit the offense of

14   obstruction of an official proceeding.

15           To show that the defendant performed an act or

16   acts in furtherance of the offense charged, the government

17   needs to show some affirmative participation by the

18   defendant which at least encouraged others to commit the

19   offense.  That is, you must find that the defendant's act or

20   acts did, in some way, aid, assist, facilitate, or encourage

21   others to commit the offense.  The defendant's act or acts

22   need not further aid, assist, facilitate, or encourage every

23   part or phase of the offense charged; it is enough if the

24   defendant's act or acts further aid, assist, facilitate, or

25   encourage only one or some parts or phases of the offense.

1   Also, the defendant's acts need not themselves be against

2   the law.

3           In deciding whether the defendant had the required

4   knowledge and intent to satisfy the fourth requirement for

5   aiding and abetting, you may consider both direct and

6   circumstantial evidence, including the defendant's words and

7   actions and other facts and circumstances.  However,

8   evidence that the defendant merely associated with persons

9   involved in a criminal venture or was merely present or was

10  merely a knowing spectator during the commission of the

11  offense is not enough for you to find the defendant guilty

12  as an aider and abettor.  If the evidence shows that the

13  defendant knew that the offense was being committed or was

14  about to be committed, but does not also prove beyond a

15  reasonable doubt that it was the defendant's intent or

16  purpose to aid, assist, encourage, facilitate or otherwise

17  associate himself with the offense, you may not find him

18  guilty of obstruction of an official proceeding as an aider

19  and abettor.  The government must prove beyond a reasonable

20  doubt that the defendant in some way participated in the

21  offense committed by others as something the defendant

22  wished to bring about and to make succeed.

23          Count 2 of the indictment charges the defendant

24  with entering or remaining in a restricted building or

25  grounds.  In order to find the defendant guilty of entering

1    or remaining in a restricted building or grounds, you must

2    find that the government has proved each of the following

3    elements beyond a reasonable doubt.

4              First, that the defendant entered or remained in a

5    restricted building without lawful authority to do so.

6              And second, that the defendant did so knowingly.

7              The term "restricted building" means any posted,

8    cordoned off, or otherwise restricted area of a building

9    where a person protected by the Secret Service is or will be

10   temporarily visiting.

11             The term "person protected by the Secret Service"

12   includes the vice president of the United States and the

13   immediate family of the vice president.

14             The term "knowingly" has the same meaning as that

15   described for Count 1.  A person acts "knowingly" if he

16   realizes what he is doing and is aware of the nature of his

17   conduct, and does not act through ignorance, mistake, or

18   accident.  In deciding whether the defendant knowingly

19   entered or remained in a restricted building, you may

20   consider all of the evidence, including what the defendant

21   did or said.

22             A person who enters a restricted area with a good

23   faith belief that he is entering with lawful authority is

24   not guilty of the offense.  Thus, you cannot find the

25   defendant guilty of Count 2 unless you are convinced beyond

1    a reasonable doubt that he did not have a good faith belief

2    of his lawful authority to enter or remain in the restricted

3    building.

4            The parties have stipulated to certain facts with

5    respect to the definition of the "Capitol building and

6    grounds," which are evidence in the case.

7            Count 3 of the indictment charges the defendant

8    with disorderly or disruptive conduct in a restricted

9    building or grounds.

10           In order to find the defendant guilty of that

11   offense, you must find that the government proved each of

12   the following elements beyond a reasonable doubt.

13           First, that the defendant engaged in disorderly or

14   disruptive conduct in or in proximity to any restricted

15   building.

16           Second, that he did so knowingly and with the

17   intent to impede or disrupt the orderly conduct of

18   government business or official functions.

19           And third, that his conduct, in fact, impeded or

20   disrupted the orderly conduct of government business or

21   official functions.

22           "Disorderly conduct" occurs when a person is

23   unreasonably loud and disruptive under the circumstances, or

24   interferes with another person by jostling against or

25   unnecessarily crowding that person.

1    "Disruptive conduct" is a disturbance that

2    interrupts an event, activity, or the normal course of a

3    process.

4          The term "restricted building" has the same

5    meaning as described in Count 2.

6          And the term "knowingly" has the same meanings as

7    described in the instructions for Count 1.

8          The same stipulation I referred to in Count 2 with

9    respect to the "Capitol building and grounds" applies to

10   Count 3.

11         Count 4 of the indictment charges the defendant

12   with disorderly or disruptive conduct in a Capitol building,

13   which is a violation of federal law.

14         In order to find the defendant guilty of this

15   offense, you must find that the government proved each of

16   the following elements beyond a reasonable doubt.

17         First, that the defendant engaged in disorderly or

18   disruptive conduct in any of the U.S. Capitol buildings.

19         Second, that he did so with the intent to impede,

20   disrupt, or disturb the orderly conduct of a session of

21   Congress or either house of Congress.

22         Third, that the defendant acted willfully and

23   knowingly.

24         The term "United States Capitol buildings"

25   includes the United States Capitol located at First Street,

1   Southeast, in Washington, D.C.

2           The term "disorderly or disruptive conduct" has

3   the same meaning described in the instructions for Count 3

4   defining "disorderly conduct" and "disruptive conduct."

5           A person acts "willfully" if he acts with the

6   intent to do something that the law forbids, that is, to

7   disobey or to disregard the law.  "Willfully" does not,

8   however, require proof that the defendant be aware of the

9   specific law or rule that his conduct may be violating.

10          The term "knowingly" has the same meaning as that

11  described in the instructions for Count 1.

12          Count 5 of the indictment charges the defendant

13  with parading, demonstrating, or picketing in a Capitol

14  building, which is also a violation of federal law.

15          In order to find the defendant guilty of this

16  offense, you must find that the government proved each of

17  the following three elements beyond a reasonable doubt:

18          First, that he paraded, demonstrated, or picketed

19  in any of the United States Capitol buildings.

20          And second, that he acted willfully and knowingly.

21          The terms "parade" and "picket" have their

22  ordinary meanings.

23          The term "demonstrate" refers to conduct that

24  would disrupt the orderly business of Congress by, for

25  example, impeding or obstructing passageways, hearings, or

1    meetings, but does not include activities such as quiet

2    praying.

3          The term "United States Capitol buildings" has the

4    same meaning as in the instruction for Count 4 defining

5    "United States Capitol buildings."

6          The term "knowingly" has the same meaning as that

7    described in the instructions for Count 1.

8          And the term "willfully" has the same meaning as

9    that described in the instructions for Count 4.

10         With respect to all of the charges, someone's

11   intent or knowledge ordinarily cannot be proved directly,

12   but there is no way of knowing what a person is actually

13   thinking.  I'm sorry, let me start that again.

14         Counsel's intent or knowledge ordinarily cannot be

15   proved directly because there is no way of knowing exactly

16   what a person is thinking, but you may infer someone's

17   intent or knowledge from the surrounding circumstances.  You

18   may consider any statement made or acts done by the

19   defendant and all other facts and circumstances received in

20   evidence which indicate his intent or knowledge.

21         You may infer, but you are not required to infer,

22   that a person intends the natural and probable consequences

23   of acts that he intentionally did or did not do.  It is

24   entirely up to you, however, to decide what facts to find

25   from the evidence received during the trial.  You should

1    consider all of the circumstances in evidence that you think

2    are relevant in determining whether the government has

3    proved beyond a reasonable doubt that the defendant acted

4    with the necessary state of mind.

5            Finally, each count of the indictment charges a

6    separate offense.  You should consider each offense, and the

7    evidence which applies to it, separately, and you should not

8    return separate verdicts as to each count.  I'm sorry, you

9    should return separate verdicts as to each count.  The fact

10   that you may find the defendant guilty or not guilty on any

11   one count of the indictment should not influence your

12   verdict with respect to any other count of the indictment.

13           Okay.  Everything all right?

14           Ms. Ayers-Perez, are you ready?

15           MS. AYERS-PEREZ:  I am, Your Honor.

16           THE COURT:  All right.  We will now proceed to the

17   government's closing argument.  Ms. Ayers-Perez will deliver

18   the closing followed by Mr. Brennwald, and then the

19   government will be entitled to a brief rebuttal argument

20   after that.

21           MS. AYERS-PEREZ:  Good morning.

22           JURY IN UNISON: Good morning.

23           MS. AYERS-PEREZ:  On November 7, 2020, the

24   defendant said to a friend, "This is the beginning of a

25   civil war.  Perhaps not a 'hot war' with bullets (yet) but a

1    definitive conflict nonetheless."

2              On this day is the day that most of the major

3    networks declared the 2020 presidential election for

4    President Joe Biden.  And the defendant was angry.

5              Over the course of the next two months, the

6    defendant grew more and more agitated, more and more angry,

7    and did more and more planning.

8              On December 1st he, again, talks about war.  "No,

9    seriously.  This is LITERALLY what the I act" -- the

10   Insurrection Act -- "is for.  THIS. IS. WAR."

11             A little more than a month later, he's standing

12   five feet away from the House Chamber door inside the U.S.

13   Capitol surrounded by a mob of people, most of them behind

14   him because he's always at the front of that mob.

15             There are congressmen and women inside the House

16   Chamber.  They are on the ground, scared for their lives.

17   They'd been told to take cover.

18             Kyle Jones is on the ground scared for his life.

19   They are donning gas masks on the floor of the House

20   Chamber.

21             And all they were trying to do that day is what we

22   have done in every election, a peaceful transfer of power.

23             It is surreal that those words can be said.  It is

24   surreal that almost 20 months ago this happened in our

25   nation's capital.

1          But it is the reality of where we are, and the

2     defendant, he was at the forefront of what happened January

3     6th.

4          Look what he said the day before.

5          "There's no doubt about the truth of the 2020

6     election.  The only question is:  will you act upon that

7     truth?  WILL YOU STAND FIRM?  This moment will define our

8     country, our generation, & our national destiny.  It's now,

9     or never.  #StopTheSteal."

10          And let's remember what "Stop the Steal" means.

11     The steal is what the defendant believes is a stolen

12     presidential election, and stopping the steal is January

13     6th, the transfer of power, the congressional proceeding of

14     the counting of the Electoral College votes.

15          Every single -- almost every single Tweet we've

16     seen last week from the defendant ending with #StopTheSteal

17     is in reference to what he will do along with his fellow

18     rioters on January 6th of 2021.

19          Let's go through the defendant's day.

20          1:45 p.m. on the 6th.  Here we are on the east

21     front.  We talked about the east front almost exclusively

22     last week.  There's already a barrier, a police barrier,

23     there.  We're already inside the restricted area, and

24     rioters have already stopped there at that police barrier.

25          1:58, 13 minutes later, there's the Vice

1    President's motorcade.  They're about to leave the image

2    because, as we heard testimony, there are too many rioters

3    who have gathered.  They have to relocate.

4            We know that Strand was in that area because of

5    Strand's own photo he took there at the bottom of the East

6    Rotunda stairs looking up still behind a barricade.

7            He told us last week that he saw the officers

8    there.  He saw them, and he continued to go forward,

9    continued to make choice after choice that would lead him to

10   the House Chamber.

11           There are those officers that he has told us he

12   saw that day.

13           And there, 1:59 p.m., the rioters have broken

14   through the first barricade.

15           2:00 p.m., one minute later, they and Strand are

16   at the second barricade.  We heard from Captain Mendoza that

17   second barricade involved chains on those East Rotunda

18   steps.  Right there.  And that will stop them for a few

19   minutes.

20           2:06 p.m., six minutes later, the rioters have

21   overtaken their second police barrier.  They have moved up

22   the East Rotunda steps, and Strand is with them.  You can

23   see Strand right there.  There are a lot of rioters behind

24   him, but there are a lot of rioters in front of him.  But as

25   you've heard the testimony, that won't last long, and the

1  reason that won't last long is because John Strand has a

2  talent for getting to the front of this mob.  Whether it's

3  at the East Rotunda doors, Statuary Hall, or the House

4  Chamber, we will see him throughout the course of the day

5  continuing to move past other rioters, continuing to move

6  past the violence and getting to the front.

7          Here is Strand again.  This time outside the East

8  Rotunda doors.  And he's made progress.  There aren't as

9  many rioters in front of him now as there just was.

10         And there's Strand again, and there's Officer

11 Pollitt.  We heard from Officer Pollitt this week -- last

12 week, and he went through a nightmare.  You heard that he

13 went to help a fellow officer when he was brought down by

14 the mob, and Strand is right there.

15         And what did Strand say?  "I thought he tripped."

16 He's right there.

17         Does he render aid?  No.  Does he look over to

18 make sure that Officer Pollitt is okay?  He's on the ground

19 in a mob of people.  No.  He uses it as a tool to move

20 further ahead and closer to the door because that's what

21 John Strand did on January 6th.  He took every opportunity

22 he could to get closer to the front of the crowd.

23         2:27 p.m., Strand and Gold have entered the

24 Capitol building.  Now, Strand told us last week he was just

25 looking to get Gold away from the chaos.  But look, there's

1    an empty bench right there.  If you're looking for a police

2    officer to help you, go sit down.  Sit down and wait for

3    somebody to help you.

4           Another empty bench, another one, an almost empty

5    stairwell, another empty stairwell, and an almost empty

6    hallway.

7           There are six opportunities in this one corridor

8    for the defendant to make a better choice than what he did.

9    He doesn't even look that way.  He claims to be a security

10   guard aware of his surroundings, but he only looks towards

11   one area, and that area is the House Chamber.

12          Strand and Gold are now inside the Rotunda.  The

13   Rotunda, if you haven't been in it, which Strand told us he

14   hasn't been there since a child, most people are like the

15   individuals we see here at the bottom of the screen.

16   They're looking up.  They're taking pictures.  They're

17   stopping.  They're taking it in.

18          John Strand spent 12 seconds in the Rotunda

19   getting to the House Chamber.  12 seconds.

20          There are three other exits to the Rotunda.  He

21   didn't even look at them.  He immediately went to the left.

22          And if you heard him last week, he said to us:

23   Well, I came in to the Capitol, and I just wanted to go

24   straight.  I just wanted to go straight to get out of the

25   chaos.

 1          But ladies and gentlemen, Officer Brockwell showed

 2    us what would happen if Strand went straight.  He would go

 3    out here to a stairwell.  That would lead him out of the

 4    Capitol.

 5          He did not do that.  He did not look that

 6    direction.  He did not attempt to do that.  He went

 7    immediately to the left because he knew where he was going.

 8          And look what the Rotunda has.  Empty benches

 9    again.  He says he doesn't want to be part of the chaos.  He

10    says he wants somebody to lead him out of the Capitol.  One,

11    two, three, four, five, six, seven, eight different options

12    that John Strand did not take that day.  Eight different

13    options that in the 12 seconds that Strand was inside the

14    Rotunda he did not even look at.

15          He made a beeline for what we see here.  Here we

16    are outside the police line between Statuary Hall and the

17    House Chamber.

18          And look what happens.  John Strand does inside

19    the Capitol what he did outside the Capitol.  Within three

20    minutes, from 2:30 p.m. to 2:33 p.m., John Strand has gone

21    from the back of the crowd to the front of the crowd.  For a

22    person claiming to not want to be part of chaos, he always

23    sticks himself right in the middle of chaos.  Right in the

24    middle of the mob.  Five minutes, they are stopped by that

25    police line.

1         And we heard from Sergeant Vargas about that.  We

2    saw the video with Sergeant Vargas.  We heard him trying to

3    calm the rioters down, trying to stop them because he knows

4    the House Chamber is behind him.  He knows congressmen are

5    still inside.  He knows that they have to protect that House

6    Chamber.

7         But what does Strand and the mob as a whole do?

8    They overtake Sergeant Vargas.

9         We heard what happened to Sergeant Vargas.  He's

10   mowed down by the mob.  He's pushed into the vestibule right

11   outside the House Chamber doors.  He hits his head on a

12   statue right outside the House Chamber door.

13        And who's right next to that statue?  That's John

14   Strand right there.  Part of the group that's now inside the

15   vestibule.

16        There are hallways on either side.  He could have

17   gone to the right.  He could have gone to the left.  Empty

18   hallways.  He chose not to do that.  Just like he made

19   choice after choice that day, he chose not to go down those

20   hallways.

21        So for 18 minutes John Strand sits outside that

22   House Chamber door.  He watches as another rioter takes a

23   flagpole and smashes through the window to the House

24   Chamber.

25        We heard from Officer Brockwell.  He's there while

1      Officer Brockwell and other Capitol Police officers inside

2      the House Chamber are yelling at them, negotiating with them

3      to turn around and leave.  He does not do that.

4           He's in there while a flagpole smashes the

5      window to the House Chamber, and he does not leave.

6           He's in there while Sergeant Pitts walks in and

7      screams at them to leave -- you heard Sergeant Pitts.  He

8      thought they didn't speak English because they ignored him.

9      They ignored his instructions.  They ignored the Capitol

10     Police inside the House Chamber.  They ignored the

11     congressmen inside the House Chamber.  And they sat in wait

12     outside that House Chamber where the congressional

13     proceeding was supposed to be taking place, where the

14     counting of the Electoral College votes was supposed to be

15     taking place.

16          And we know that Strand knew that because that's

17     all he had talked about in his Tweets and his texts leading

18     up to January 6th.  Stop the Steal.  Well, he's now right

19     there when the steal is taking place.

20          It took the Metropolitan Police Department showing

21     up -- we saw them; they were in the bright yellow jackets --

22     before they finally left.  And why did that happen?  Because

23     it's a numbers game.  And we heard that from every single

24     officer who testified:  Captain Mendoza, Officer Pollitt,

25     Sergeant Vargas, Sergeant Pitts, Officer Brockwell, Officer

 1    McGoff.  It was a numbers game, and they were outnumbered.

 2         Remember Officer Pollitt?  We were outnumbered 100

 3    to one.  Imagine that.  And see, that's how this happens.

 4    That's how January 6th happens.  Because that group of

 5    people gets together as a mob, and they outnumber law

 6    enforcement.  And we saw this.

 7         We heard from Officer Brockwell.  We know what

 8    inside the House Chamber looked like.  And more importantly,

 9    we know that John Strand knew what inside the House Chamber

10    looked like because this photo came from Strand's phone.

11    This photo was downloaded by Strand in the days after

12    January 6th.

13         So what does he do after he's told explicitly by

14    officer after officer and a congressman to leave?  What do

15    they do?  They go to Statuary Hall where Simone Gold makes a

16    speech.  And it's not just a speech.  It's what happens with

17    the speech.

18         We heard from Officer McGoff.  Officers had been

19    through hell at that point.  They're trying to get people

20    into the Rotunda.  We heard from Captain Mendoza:  Get

21    people in the Rotunda so we can get them out of the Capitol.

22         And what happens?  While Gold is making a speech,

23    Strand is filming her making a speech, and now people are

24    stopping to watch the speech.  They are stopping instead of

25    going to the Rotunda, which officers are trying to move them

1    to because Gold and Strand have made another spectacle.

2         And what does Gold say in her speech?  She spends

3    the first half talking about herself, but afterwards she

4    starts talking about the election.  She acknowledges we're

5    here for the election.  That was the message she had until

6    it took six -- six -- officers to move her out of there.

7         Meanwhile, other officers are going through hell.

8    They're being assaulted.  They're being sprayed with OC

9    spray.  They're being hit with flagpoles.  And they know

10   this because they saw all of that, and officers can't help

11   them because they're dealing with Gold and Strand and their

12   speech.

13        They get them out of Statuary Hall, and then what

14   do they do?  They've been told by no less than ten officers

15   at this point to get out of the Capitol.  So what do they

16   do?  They stand on top of a statue in the Rotunda with a

17   bullhorn.

18        And you heard Strand last week.  He said:  Well, I

19   was just up there to help her out so she didn't fall.  He's

20   not helping her out.  Look at him.  He's got his hand up to

21   make sure the crowd is listening.

22        She doesn't need help.  She has a piece of paper

23   and a bullhorn.  She's fine.

24        They were up there for five minutes giving the

25   speech in the Rotunda, and the same exact thing happened at

1    Statuary Hall.  A crowd formed.  Officers who have been

2    there for hours and hours, assaulted, injured, trying

3    desperately to gain control of the Capitol, and you have

4    these two creating another scene, creating another crowd

5    within the crowd, creating more mayhem.

6            Strand and Gold finally leave the Capitol, and

7    what do we see here?  That blue circle, those are police

8    officers leaving the Capitol building; and in the yellow

9    circle is Strand.

10           Now, Strand told you last week he was clapping for

11   those officers because he was grateful that they helped him

12   outside the Capitol.  Ladies and gentlemen of the jury, I

13   know you didn't check your common sense at the door today.

14   He was clapping because those officers were leaving the

15   Capitol.

16           And you know what he didn't mention?  That he also

17   raised his fist at the officers.  What kind of gesture is

18   that?  It's a nasty gesture at people who have already been

19   through hell that day because of him and because of his

20   fellow rioters and what they have done.

21           Let's go through and see what did the defendant

22   say about that day in the moment when he first talked to

23   friends, loved ones.  What did he have to say?

24           4:19 p.m., a little more than one hour after he

25   finally left our Capitol building he says, "We stormed the

1    Capitol -- it's insane."

2          Well, last week he told us he was pushed inside

3    the Capitol.  You heard the interview he gave with Rob

4    McCoy.  He was pushed inside the Capitol.

5          If you're pushed inside the Capitol, you do not

6    say "we stormed the Capitol."

7          4:43 p.m. "I am incredibly proud to be a patriot

8    today, to stand up tall in defense of liberty & the

9    Constitution, to support Trump & #MAGAforever, & to send the

10   message:  WE ARE NEVER CONCEDING A STOLEN ELECTION

11   #WildProtest."

12         We've talked about intent.  Judge Cooper just

13   talked to us about intent.  It is difficult to tell

14   somebody's intent, but the defendant has made it a lot

15   easier for us.  This is what he was thinking on January 6th.

16   This is his intent on January 6th.

17         It's not about a speech.  It's not about COVID.

18   It's about a stolen election.  It's about what is happening

19   that day inside the Capitol building.

20         5:08 p.m., "We made history."  This is to his

21   brother, "Simone & I were with the first dozen or so

22   patriots to breach the Capitol!  We literally made history

23   right now... but we left before it got dangerous."

24         We're back to that language again about his entry

25   into the Capitol.  If you're pushed in against your will,

1    you didn't breach the Capitol.  You don't brag about

2    breaching the Capitol.

3            But he's right in what he said.  He did breach the

4    Capitol.  You don't brag about making history.

5            But here's where it gets really interesting.  His

6    brother says "How did you make history?"

7            And that's when he responds, "I don't think the

8    U.S. Capitol building has been stormed and breached like

9    that -- and it caused Pence to delay the certification, so

10   that's very significant."

11           And he's right, it is very significant.  But we're

12   back to that language again, the language in real time, how

13   he really felt on January 6th.  Not what he's saying now.

14   He stormed and breached the Capitol when he made history.

15           You heard him last week.  He said that he was not

16   proud that they stormed and breached the Capitol.  "They"

17   being the other rioters.  Not including himself.

18           But on January 6th he was proud of storming and

19   breaching the Capitol.  He was bragging about storming and

20   breaching the Capitol, and he was proud and bragging about

21   delaying the certification of the vote.  The same

22   certification that he claimed last week he didn't know was

23   occurring; the same certification that's at the heart of

24   Stop the Steal; the same certification that was one of the

25   reasons why he was inside the Capitol building that day.

1    4:46 p.m., he's asked:  Did you all go in because

2    of the election?

3    He says, "Yes.  We have nothing else left to do.

4    This was a peaceful but powerful show of human force.  The

5    next point will be even more forceful.  WE. WILL. NOT.

6    ACCEPT. THE. STATUS. QUO."

7    He's still not talking about COVID.  He's still

8    not talking about a speech.  What he's talking about was

9    what was on his mind that day, the election and stopping the

10   steal.

11   You see, a mob is a mob because of the numbers.

12   It's really as simple as that.  Members of the mob commit

13   violent acts, and they do so with impunity because they're

14   surrounded by other members who are stopping law enforcement

15   from getting to them.  That's what we heard all week, isn't

16   it?

17   Isn't that what Officer Pollitt told us?  We were

18   outnumbered 100 to one.

19   Sure, other people were using the flagpole as a

20   weapon to break the windows, but it's John Strand and his

21   fellow rioters right next to them that are not allowing law

22   enforcement to stop it.  That's the purpose of a mob.

23   When a flagpole is used to smash a window in the

24   House Chamber, they're able to do that because they have the

25   protection of the mob.  Police officers cannot stop them

1     because the mob is too large.

2              That is the defendant's role in January 6th.  He

3     is part of that mob.  And he wasn't in the back peeking over

4     saying, "I wonder what's going on up there?"  He's in the

5     front.  He is in the forefront of the mob.  He's watching as

6     this happens.

7              And we heard him last week say, well, I didn't --

8     I didn't know that all of this stuff had happened until I

9     watched the videos this week.  The videos are of him, of his

10    moments inside the Capitol, of the moments that are

11    occurring with him, next to him, by him, around him.  The

12    defendant was at the front as violent act after violent act

13    happened around him.

14             He admitted he saw glass shattering.  He admitted

15    a flagpole was used as a weapon right next to him.  He had

16    to have heard the desperate pleas of law enforcement telling

17    him to leave the Capitol.  He had to have seen the officers

18    getting mowed down by the mob he was a part of between

19    Statuary Hall and the House Chamber.

20             And he stayed.  He stayed and continued to do his

21    duty as a member of the mob.  He stayed until he was outside

22    the House Chamber and the certification of the vote had

23    ceased.

24             And when he left, what did he do?  He bragged

25    about it.

1           He had so many opportunities to not be a part of

2     this mob, so many opportunities to turn around.  Every

3     single step up the East Rotunda stairs, all 35 of them, was

4     a choice, a choice by the defendant to move closer to the

5     Capitol building.  Every single step, every single person he

6     passed getting to that East Rotunda door was another choice,

7     a series of choices.  Every single time he walked past a

8     police officer, past an empty bench, past an empty hallway,

9     past an empty office to go to the House Chamber was another

10    choice by the defendant.

11          And let's look at what Officer Brockwell showed

12    us.  How many different areas could the defendant have taken

13    that would not have led him to the House Chamber?  One, two,

14    three, four, five, six, seven, eight, nine, ten, eleven,

15    twelve, thirteen, fourteen, fifteen.  Yet somehow he missed

16    all of those and continued on straight to the House Chamber

17    73 seconds between the East Rotunda door and being outside

18    the House Chamber.

19          He was at the forefront of the mob as they were

20    chanting what he had told so many people, "Stop the Steal."

21    He chose to be there, to be part of a mob chanting "Stop the

22    Steal," because that was his intent, that was his purpose,

23    and he joined in on the effort to stop the steal, to stop

24    the certification of the vote, and to impede democracy.

25          So let's talk about our counts.  We have five

1     counts.  Count 1, obstruction of an official proceeding;

2     Count 2, entering or remaining in a restricted building or

3     grounds; Count 3, disorderly or disruptive conduct in a

4     restricted building or grounds; Count 4, disorderly or

5     disruptive conduct in a Capitol building; and Count 5,

6     parading, demonstrating, or picketing in a Capitol building.

7          So we went over the elements.  Judge Cooper went

8     over the elements of obstruction of an official proceeding.

9     He attempted to or did obstruct or impede an official

10    proceeding.  We saw and we heard from Kyle Jones that the

11    counting of the Electoral College votes was impeded.  They

12    stopped.  They did not begin again until 8:00 p.m. that

13    night finishing at 3:44 a.m. the next day.

14         The defendant acted with the intent to obstruct or

15    impede the official proceeding.  He told us his intent.  He

16    said we stopped the certification of the vote when we made

17    history after we stormed and breached the Capitol.

18         The defendant acted knowingly with awareness that

19    the natural and probable effect of his conduct would be to

20    obstruct or impede the official proceeding.  He stormed into

21    a Capitol building.  He breached a Capitol building with

22    hundreds of other rioters.  He failed to turn around when

23    told by law enforcement over and over again to do so.  Of

24    course it's going to result in the official proceeding

25    stopping, and he acted corruptly.

1          And we have the aiding and abetting language.

2     John Strand was surrounded by hundreds of fellow rioters,

3     all there with that purpose, to stop the steal, as they

4     chanted and told us over and over and over again, although

5     he was only part of a group of, say, 20 or so who actually

6     ended up in the vestibule outside the House Chamber door.

7          That group absolutely committed the obstruction of

8     the official proceeding because that's where that official

9     proceeding was supposed to be taking place.  They can't do

10    that when congressmen and women are on the floor with gas

11    masks on because of what the rioters have done to our

12    Capitol building.

13         The defendant knew the obstruction of the official

14    proceeding was going to be committed or be committed by

15    others.  He was a part of the mob that was doing this in the

16    moment.  He was storming through our Capitol building as the

17    official proceeding was taking place.  He was doing what he

18    said he was going to do.  He was stopping the steal.

19         The defendant performed an act or acts in

20    furtherance of the offense.  That's all he did.  He was not

21    just part of the mob.  He was at the front of the mob.  He

22    was stopping people from leaving, gathering there for two

23    speeches.  He was standing outside the House Chamber where

24    the official proceeding was supposed to be taking place,

25    part of a small group.  The others had left and gone through

1          those other options that Officer Brockwell talked about.

2                    The defendant knowingly performed these acts for

3          the purpose of aiding, assisting, soliciting, facilitating,

4          or encouraging others in committing the offense.  He told us

5          what he was going to do that day.  He said it was a war, a

6          civil war.  He said he was going to stop the steal, and

7          that's where the steal was taking place.

8                    And the defendant did that act or those acts with

9          the intent that others commit the offense of obstruction of

10         an official proceeding.  That's what they were all doing

11         together.  That was the purpose of being inside, and that

12         was particularly the purpose of those right outside that

13         House Chamber door.

14                   We talked about intent.  The defendant must act

15         with intent to obstruct the official proceeding, but that

16         need not be his sole purpose.  The defendant's unlawful

17         intent to obstruct the proceeding is not negated by the

18         simultaneous presence of another purpose for his conduct.

19                   I know we love to put in these huge words to make

20         it as confusing as possible, but the thing is, that doesn't

21         have to be the sole reason he was inside the Capitol.  He

22         could be inside the Capitol to be with his girlfriend and to

23         stop the steal.  It just has to be a reason, not the only

24         reason.

25                   And we see from what he's told his brother, "I

1    don't think the U.S. Capitol has been stormed and breached

2    like that -- and it caused Pence to delay the

3    certification."  That's the intent right there.  That's what

4    he was bragging about two hours after getting outside the

5    Capitol; that not only did he breach and storm the Capitol,

6    but he succeeded in his mission to stop the steal for

7    however short period of time it was.

8              Now, Counts 2 and 5 are kind of similar.  Count 2,

9    the defendant entered or remained in a restricted building

10   without lawful authority to do so.  We know that the Capitol

11   was a restricted building.  The defendant knows that the

12   Capitol is a restricted building.  He told us, "I knew I

13   wasn't supposed to go inside.  I saw those officers there."

14             He did it anyway, and he did so knowingly.

15             That the defendant paraded, demonstrated, or

16   picketed inside a Capitol building.  Well, we saw him up on

17   top of the Rotunda -- or on top of the statue inside the

18   Rotunda demonstrating with a mob surrounded below him

19   watching the speech between him and Gold.

20             We know what the restricted perimeter is because

21   Captain Mendoza told us what the restricted perimeter is,

22   and she knew because she actually drove the entire

23   restricted perimeter.  And that east front is within the

24   restricted perimeter.

25             We know that Vice President Pence was inside the

1    Capitol building that day.  We see him here.  And Liz Glavey

2    told us she was with him, and he was there.

3         Count 3, entering or remaining in a restricted

4    building or grounds.  The defendant engaged in disorderly or

5    disruptive conduct in or in proximity to any restricted

6    building.  We know he engaged in disorderly conduct inside

7    the Capitol building, outside the Capitol building, around

8    the Capitol building.  We know that he did so knowingly with

9    the intent to impede or disrupt the orderly conduct of

10   government.  Once again, Stop the Steal.  This is where the

11   steal is occurring, and that it, in fact, impeded or

12   disrupted the orderly conduct of government.  Of course our

13   congressmen and women cannot take part in the peaceful

14   transfer of power while they're on the ground in gas masks

15   because of the mob that the defendant is a part of.

16        And Count 4, once again, engaged in the disorderly

17   or disruptive conduct -- we just discussed that -- with the

18   intent to impede, disrupt, or disturb the orderly conduct of

19   a session of Congress.  We know he did that.  We know there

20   was a session of Congress.  We know the counting of the

21   Electoral College vote was that day, and he knew the

22   counting of the Electoral College vote was that day.

23        And now we see him here in the Rotunda, disorderly

24   conduct.

25        The defendant started this, started this entire

1   process, talking about war.  He came to the Capitol or to

2   Washington, D.C., to go to a Stop the Steal rally, to march

3   to the Capitol.

4          But he kept marching.  He did not stop.  He

5   marched through the restricted area.  He marched through the

6   Capitol.  He marched until he got to the House Chamber where

7   he was physically stopped by law enforcement, Officer

8   Brockwell inside with guns drawn.  And even then he didn't

9   leave; he just stopped.

10          He's made his intent very clear.  He wanted war.

11   He defined the war; a civil war, no bullets, yet.  He was

12   upset his candidate lost the presidential election, and he

13   did not want to accept those results.  He became part of a

14   violent mob to upend those results, to end the peaceful

15   transfer of power in this country.

16          He watched as officers were assaulted, the Capitol

17   building was wrecked, and Congress suspended the counting of

18   the Electoral College votes.  He watched as democracy came

19   to a screeching halt.

20          He took an active part in it.  He was at the

21   forefront of it.  Always there.  Always pushing forward.

22          He asked for this war.  He declared this war.  He

23   screamed on Twitter demanding this war.  And this, this

24   picture, this moment in time, congressmen and women behind

25   them sheltering, gas masks, furniture being used as

1    barricades inside our Capitol building during the peaceful

2    transfer of power, what is supposed to be the peaceful

3    transfer of power.  This moment, this is what he wanted, and

4    this is what that war looks like.

5              Thank you.

6              THE COURT:  Thank you.

7              All right.  Ladies and gentlemen, it's 11:00.

8    We're going to take our morning break, about 15 minutes.

9    We'll see you back at 11:55, all right?

10             (Jury exits courtroom)

11             (Recess taken)

12             THE COURT:  Okay.  Welcome back.

13             Mr. Brennwald, the floor is yours.

14             MR. BRENNWALD:  Thank you, Your Honor.

15             Good morning, ladies and gentlemen.

16             JURY IN UNISON:  Good morning.

17             MR. BRENNWALD:  We're getting close.  I was trying

18   a homicide case in Maryland about four years ago, and the

19   closing went almost two hours.  We're not doing that today,

20   so good times.

21             On January 6th in the morning I was at home

22   working, sitting on my couch with a dog curled up next to

23   me.  My wife, who is an Air Force veteran, fought in

24   Afghanistan, works at the Pentagon, was in the dining room

25   with all her screens working remotely from the Pentagon.

1    And I'm watching all this happen on TV.

2         But it started out as a political show where the

3    commentators bring on experts to talk about the

4    certification and how it works.

5         I've been practicing law 36 years.  I've seen

6    dozens of elections or a dozen elections, and I've never

7    quite understood how it works; so I'm watching to understand

8    who does what, where, and when.

9         At some point CNN went to a split screen because

10   people were streaming towards the Capitol, and I'm just

11   looking -- I'm actually trying to get work done because I

12   have a lot of cases, and at some point you couldn't help but

13   notice all these people flooding towards the west side of

14   the Capitol.  And they weren't saying anything in the studio

15   in New York about any of this; or maybe it was a studio in

16   Washington by Union Station, but they weren't saying

17   anything.

18        At one point I called my wife over and said, "Can

19   you come take a look.  Am I missing something?  Isn't there

20   something going on here?  This does not look good."

21        And she came over, and she looked and said, "Yeah,

22   this is not good."

23        It started on the west side of the Capitol.

24   People climbing scaffolding, doing all sorts of crazy stuff.

25        At first there wasn't much coverage of the east

1    side.  You have to go all the way around the building for

2    that.  But like you, as I watched that, as my wife watched

3    it with me at some point -- she stopped working for a

4    while -- we were outraged.  We were angry.  We were upset at

5    what was happening to our city.

6            And it was fair to say that we thought that

7    everybody there was a criminal.  Every single person was

8    just a bad person.  You know, living here, friends say

9    everybody in this needs to be put in jail, throw away the

10    key.

11            And then I get Mr. Strand's case, and it's the

12    only person I've seen so far who doesn't fit in with

13    everybody else.  He fits in in the political sense, but he

14    doesn't fit in in the actions sense.  He fits in in the

15    sense that he, like those people there, thought the election

16    was stolen, which I know we all think is completely

17    ludicrous, but he wasn't there action-wise doing what they

18    were doing.

19            So let's go forward here and take a look at the

20    case, if I can figure out how this works.

21            The government has shown you texts and Tweets.

22    We've seen them.  We've discussed them.  And I shudder to

23    think of what this case would be like defending it if we

24    didn't have videos.  I really do.

25            My dear departed mother heard me talk about the

1    Rodney King incident years ago.  She claims, and I haven't

2    verified it, that her -- my mother's -- grandfather was the

3    chief of police here at some point years ago.  She's a very

4    law-and-ordered person.  She believes police officers.

5          And when I told her about the Rodney King beating

6    incident, she's like, "Honey, that can't be true."  Until

7    she saw a video.

8          Videos matter, and you have videos here.

9          So the government can come here and tell you all

10   sorts of things about Mr. Strand, but you can see and have

11   seen and will see in the jury room what he actually did.

12   You'll never see him push anybody.  You'll never see him

13   assault anybody.  You'll never see him coordinate with

14   anybody.  You'll never see him act as if he had anything to

15   do with anybody else there except for Dr. Strand [sic].

16         Dr. Strand is the reason he had the money to come

17   here with her; the time, because he worked for her; and the

18   purpose, because she was here to give a speech.  If it

19   hadn't been for that, he would have been at this Beverly

20   Hills rally on the same day in California.

21         So when the government came to you in opening

22   statement and said this is not about some woman's speech,

23   this is all about some woman's speech, and if it hadn't been

24   for her being there, none of this would have happened with

25   Mr. Strand.

 1          Here's the million dollar question.  And I think I

 2   can answer it because I'm not from Texas, I'm not from

 3   Idaho, I'm not from Wyoming.  I'm not from places where

 4   people think in the stop and steal terms.  I'm from here.

 5          A hard part of this whole case for you -- and I

 6   don't envy you -- is that you can see with your eyes what

 7   Mr. Strand did in these videos.  You can see what happened

 8   with everybody else and his disconnection from everybody

 9   else.

10          But his Tweets and his texts spew information and

11   disinformation, in our view, that are offensive to us and

12   that we, to our core, disagree with.  And that is confusing

13   when you're watching videos and you're saying, well, I know

14   he said all this stuff, but I don't see him doing anything

15   like these other people are doing.  I see him there with

16   Dr. Gold, protecting her.  I see her always in front of him.

17          He told us that she wanted to go there when the

18   speech was cancelled.  I saw in an exhibit that there were

19   speeches that were supposed to be given.  I saw the text

20   that he sent to another friend before this happened.

21          The plan is what?  Go to the Capitol, obstruct the

22   proceeding?  No.  The plan is we're going to go to the

23   Ellipse, hear speeches, and then around 1:00 we're going to

24   march towards the Capitol, because that's where the speeches

25   were, and Dr. Gold and about 15 others are going to give

 1    speeches.

 2              That's why he was there.

 3              The confusing part, again, is because in his heart

 4    he believed in the message that people were spreading that

 5    day.  And so if you're looking at texts and Tweets and

 6    thinking, well, he liked what they did -- not the breaching

 7    of the Capitol part, but he liked the whole shouting and

 8    Trump this and Trump that.  And he did.

 9              But that's not why he was there, and you can see

10    that in the videos.

11              So the question is, can you look at what he did

12    and make a fair judgment despite the fact that all of us

13    don't agree with anything he says?

14              He sends a text on October 28th, "Trust me.  When

15    I write and speak the famous phrases 'live free or die' and

16    'give me liberty or give me death' -- I am not playing."

17              This is before the election.

18              Then he Tweets, "No, seriously.  This is LITERALLY

19    what the Insurrection Act is for."  December 1st.

20              Not to get too technical -- but I've been accused

21    of being technical because I'm a lawyer -- the Insurrection

22    Act is a lawful act.  It's something that a president can

23    do.  Whether they should is one story.  But when he says

24    this, he's not saying we are going to go out into the

25    streets and take over the streets without having legal

1    authority from the President to do that based upon the

2    Insurrection Act.

3            So, again, read it for what it's worth in the

4    proper context.

5            November 5th, the day before the election, "Yes.

6    We are organizing and mobilizing patriots to rally (and

7    (peacefully, prayerfully) protest in the streets.  This is

8    the fight of our lives, for our lives.  It truly is."

9            So he's talking about fighting.  You hear about

10   war, but this text tells you it's about peacefully and

11   prayerfully protesting in the streets.

12           We didn't get into the whole religion thing about

13   Mr. Strand because I can't stand it when people talk about

14   religion when they're on the stand, but that tells you a

15   little bit about Mr. Strand, his beliefs.

16           Going back to August, "Facebook and Twitter is

17   where the cultural and political wars are waged..."  That's

18   the kind of war he's talking about, not a physical war.

19           And if you don't believe that, remember Mr. Strand

20   had a gun in California.  He had a permit to carry that gun.

21   I'm not sure how much you know about traveling with a gun,

22   but you can actually check a gun in luggage at the airport.

23   You can't take it on the plane with you.  You can put it in

24   your checked luggage, and it will get to your destination.

25   When you pick up your suitcase at the carousel, you can pick

1    up your gun and off you walk with it as long as it's legal.

2    He didn't take his gun.

3            He wasn't here for war.  He was here for a speech.

4            And this is what Mr. Strand's core belief is.  "In

5    the world of conformity and cowardice, the simple act of

6    courageous conviction is singularly spectacular."

7            We can completely disagree with his convictions.

8    We can completely disagree with his beliefs.  But Mr. Strand

9    is a person of principle, so you need to separate the

10   politics from the principle.

11           I've already discussed this one.

12           Your job, ladies and gentlemen, in this case is to

13   decide whether he's guilty or innocent -- I'm sorry, I made

14   the mistake; I'm going to tell you about this -- guilty or

15   not guilty of the five charges against him.

16           There's the big charge, the obstruction charge,

17   and then there is the trespassing and like disorderly

18   charges.

19           When jurors go back to the jury room and

20   deliberate, they often ask themselves "How can I find

21   somebody innocent?  Because I'm either finding him guilty or

22   innocent."  But that's not what the jury form says.  It says

23   "guilty" or "not guilty."

24           There are words that you could put in after those

25   that would explain it better for you, "guilty beyond a

1    reasonable doubt."  And if you cannot say that you are

2    firmly convinced of a person's guilt, then it's not guilty.

3    It doesn't mean innocent.

4          And I say that to you not because we don't think

5    he is innocent, but because juries often have a hard time,

6    if they don't know this, getting to not guilty because

7    they're saying, "Well, I can't say he didn't do anything.

8    It looks like he might have done something."  But that's not

9    the legal standard, so I just want to emphasize that for

10   you.

11         The verdict form will not say "guilty" or

12   "innocent."  It will say "guilty beyond a reasonable doubt."

13   And if you're not convinced beyond a reasonable doubt, then

14   the other choice is not guilty.

15         You may have noticed, during my questioning of

16   these officers, that I wasn't attacking them.  I didn't go

17   after them.  People think defense lawyers are supposed to

18   try to tear officers to shreds.

19         We agree with these officers.  They're not telling

20   you anything that we don't agree with.  They don't know what

21   Mr. Strand did as far as whether he's guilty or not, but

22   they -- a couple of them saw him and Dr. Gold.

23         So we're not having a fight with the officers.

24   This is not about Mr. Strand's testimony versus the

25   officers'.  Not at all.

```
 1              We'll talk about the officers a little bit later.

 2              You've seen videos, ladies and gentlemen,

 3       throughout this case where the camera's above the crowd or

 4       it's at a distance; not where Mr. Strand was.  A couple of

 5       pictures show his vantage point, but a lot of them show the

 6       ground level.  We've seen a bird's eye view.  That is not

 7       the view he had that day.

 8              Dr. Gold, Mr. Strand explained last Friday, has a

 9       forceful personality.  There are different words one could

10       use, but she is a woman on a mission.  Most of us disagree

11       strongly with her mission, the mission of America's

12       Frontline Doctors.

13              I remember seeing the press conference on the

14       Supreme Court steps before I had even really thought about

15       this case.  She's a woman who won't be denied.  She's a

16       woman who is strong.

17              The problem is in our society, when a woman is

18       strong, they're often castigated and portrayed as a B word,

19       right?  Like a woman can't be strong and forceful without

20       other words being used.

21              Dr. Gold is just a strong-willed person, and those

22       other words are not pertinent to her.  She's a woman of

23       vision.  Whether you believe in her or not, she's a woman

24       who really, really was forceful in everything she did.

25              And Mr. Strand came into that situation with that
```

1    person as a much younger man who had been couch surfing,

2    struggling to get a job, doing acting, modeling, security

3    guards.  Security guards at a concert venue?  Security

4    guards for the British Embassy?  No, security guard at a

5    restaurant.  And that's the imbalance of power that we had

6    when this was happening.

7         And so when he is being told that he can work for

8    her, get paid by her full time and accompany her to

9    different places -- Tampa a couple of days before D.C., back

10   to Florida a couple of days after January 6th -- this was a

11   dream job.  Security, help out with the organization, kind

12   of be like a handy -- not a handy person but like a whatever

13   we need to have the company do.

14        And you can see in the videos where he follows her

15   around and is always protecting her.  Nobody else does that

16   in any of these videos.  Literally.  And that's why they

17   stood out.

18        One of the officers said, you know:  These people

19   stood out.  They didn't look like they belonged there.  They

20   weren't wearing MAGA clothes.

21        I'm not sure what this is, but -- or what this is

22   about, but, you know, pink scarf.

23        So Mr. Strand is there that day because of her,

24   came up with her, and it is all about a speech.

25        The problem is, aside from being broke and

1    desperate for work, Mr. Strand is a braggert, someone who

2    brags.  I'm sure we've all heard, maybe we've said it

3    ourselves:  We beat the Cowboys.  We beat the Giants.  We

4    beat the Eagles.  And whenever somebody says that to me,

5    just because I'm a lawyer who likes to parse words, I ask

6    him:  What position did you play?  You beat the Eagles?

7    Yes?  Were you the wide receiver?  You were sitting on your

8    butt watching it.

9            Kind of harsh, but...

10           So when Mr. Strand talks about we stormed them, we

11   breached the Capitol -- when you watch the video of him and

12   when you think of the words "storming" and "breaching," the

13   common understanding of that is we pushed our way in.  We

14   pushed past people.  We were bullying our way through.

15           He was trying not to get trampled.  I wouldn't

16   doubt for a second that Dr. Gold was trying to get in there

17   because she had been denied her speeching slot the afternoon

18   of January 6th because they cancelled the speeches at the

19   last minute once they had gotten there.  And you saw the

20   diagram, the speech areas.

21           But Mr. Strand, after the fact, was bragging about

22   what he supposedly did.

23           Mr. Strand, you weren't even pushing anybody.  You

24   didn't do anything.  You literally were there walking in

25   front of the crowd or being pushed in by the crowd.  What's

1  this we did this and we did that and the first twelve?  Are

2  you kidding me?

3       If you look on the west side, there were tons of

4  people coming through the back door on the west side.  In

5  fact, it's probably somebody from the west side who you saw

6  in the video pushing on that one door, the big Rotunda

7  doors.  Pushed, didn't open.  And then the person walks away

8  from the doors, and then looks up and says something

9  pointing to the door, and immediately after he does that he

10  goes over to the other door and he pushes it, and boom,

11  there it opens.

12       I don't know what that's about.  Officer Mendoza

13  or Captain Mendoza said, "It wasn't one of our people

14  buzzing him in."

15       But you'll see for yourselves, again, when you

16  want to watch it, that he literally tries the right door,

17  doesn't work.  He walks away.  He looks up at somebody, and

18  he goes like this (indicating).  He's talking and he points

19  to that door, and then when he goes there, it opened.

20       So Mr. Strand is acting like he was the reason for

21  this.  He was the reason that they had to stop the

22  certification.

23       He actually doesn't say that.  He says it caused

24  Vice President Pence to delay the certification.  He also

25  said it a few hours after he got out, after he had been

1    talking to people and found out what happened.

2            Mr. Strand told you that he really didn't know

3    exactly what the procedures were or what was happening as

4    far as the details, and I told you at the beginning of my

5    opening -- or my closing that I was watching it myself

6    trying to understand from the experts how this all works.

7            We found out, as we watched and as we heard on the

8    stand, that a joint session of the United States Congress

9    convened at the Capitol on January 6th.  This is Stipulation

10   702.1.  The Senate began its session at about 12:30.  That

11   would have been presided over by Mike Pence.

12           The two houses met at about 1:00 in the House of

13   Representatives chamber.  So they're meeting in the House

14   Chamber at 1:00.

15           At about 1:15, the House and the Senate

16   adjourned.  And you'll have this in the back.  The House

17   and Senate adjourned at 1:15.  So like over an hour before

18   Mr. Strand ever had anything to do with this they adjourned

19   to their separate chambers for up to two hours because some

20   senator and some congressman said we object to the counting

21   of the electoral votes from Arizona.  So they adjourned from

22   1:15 to what would have been 3:15, which is when Mr. Strand

23   left.

24           At about 2:12, 14 minutes before Mr. Strand walked

25   in or went into the House doors or the Rotunda doors, Vice

1    President Pence evacuated the Senate Chamber, and about one

2    minute later the senator who'd been presiding over it

3    declared a recess.  So basically at 2:13 the Senate was in

4    recess.

5            At 2:15, Speaker Nancy Pelosi evacuated the House

6    Chamber; about 15 minutes later, 2:25, 2:30, the person who

7    had become the presiding officer when she left called the

8    House into recess.

9            And Mr. Strand, according to the government, knows

10   all this.  He knows.  He had the intent.  He knew.

11           What's the evidence of his intent?  There is none.

12   The only evidence you have that he even knew about anything

13   is a text he sent two hours after he got out when everybody

14   was talking about it.  There's no other evidence that he had

15   any knowledge of this before.  He never talks about the

16   certification before.  He never talks about blocking

17   anything.  He never talks about I know where the House

18   Chamber is.  I'm going to make a beeline when we get to

19   these doors on the east side to go in.

20           He wasn't even supposed to be at the Capitol that

21   day.  Even though the plan was to come here to D.C. for

22   speeches for Dr. Gold, they were never supposed to go to the

23   Capitol.  Only when her will was denied, and she was -- I

24   was going to say "trumped"; I don't want to say that.  Only

25   when her goals were thwarted did she say I want to go talk.

1          How do we know that?  Well, because when you get
2     to the top of the steps there's a part where you can see --
3     I'm sorry, I'm not really good at this type of thing here,
4     but -- I'll have to get back to it later.  But there's a
5     picture and a video where Mr. Strand's trying to film her
6     outside the Capitol, where he said she wanted to talk.
7          They went to the top of the steps.  She's trying
8     to talk, and he films her.  And she says we're here for
9     this, we're here for that, something about freedom and
10    truth.
11         Because her thing is medical freedom.  Not
12    antivaccine; just don't want to have to have it to go to a
13    store.  Well, we can wonder how smart that is, but that's
14    another story.
15         So that's why they were there.
16         So she tries to give her speech at the top, and
17    it's laughable.  It's absolutely laughable because nobody's
18    listening.  Everybody's shouting and pushing and everything
19    else.
20         So then they end up going inside.  When the doors
21    are open from the inside, they end up getting shoved in, and
22    then they go through the House -- the Rotunda and Statuary
23    Hall.
24         Now, let me talk about that.  The government makes
25    a big deal out of the fact that there's all these exits

 1    everywhere, right?  Again, hindsight.

 2            When you walk into that hall and you see the

 3    videos, you can see everybody kind of going in that

 4    direction.  Why were they going there?  Did they know

 5    something?  I don't know.  There's no evidence of that, but

 6    people are going in that direction.

 7            You know you can't go back out the door the way

 8    you came in because people are pouring in.  You know that.

 9            Or you can hang out in the Rotunda.  You can hang

10    out on the step.  You can wait this and wait that.

11            If you're trying to protect somebody, that's

12    probably not the smart move.  You want to clear out and not

13    stay right there.

14            Well, he could have stayed in the Rotunda.  He

15    could have hung out on all these benches that we're talking

16    about.

17            That doesn't get you out.  You're still there.

18            If you move forward, you might find a way out.  If

19    you stay where you are, you are definitely remaining and

20    entering, and you're not going anywhere.

21            He then goes through the Rotunda, goes through

22    Statuary Hall, and then ended up getting to a hallway where

23    you couldn't go anymore.

24            When the government played the tape in the

25    hallway -- and this is really important -- when the

1    government played the tape in the hallway, they showed

2    Mr. Strand and Dr. Gold in front of him at about 2:28 and 50

3    seconds or so.  And then they had Ms. Rouhi skip forward to

4    2:31, and he's still there.

5            You know what happened during the part that they

6    skipped and did not show you until I showed it in my

7    questioning?  He looked around, left, right, trying to

8    figure out can we go this way, can I go that way, and he and

9    Dr. Gold actually left.

10           Why wouldn't they show you that part of it?  That

11   tells you something about his intent.  You can't go here,

12   locked, officers.  Maybe there's another way.  And they

13   actually leave for about two minutes, two and a half

14   minutes.

15           And then, of course, there are people just

16   streaming -- by now just streaming and streaming, and they

17   can't go anywhere so he ends up having to come back because

18   there's no way out.

19           Why are we not seeing that?  Why did I have to

20   show you that?

21           Same thing about the fist.  Remember the whole

22   fist-pumping "Stop the Steal, Stop the Steal"?  Officer

23   Pollitt told you that was my client's fist.  Officer Pollitt

24   didn't have the benefit of knowing that my client was

25   wearing a glove that day or gloves that day that would have

1    shown up on that fist if it was his glove, if it was his

2    fist.

3              Even in closing the government's telling you

4    Mr. Strand is shaking his fist at the police, but when you

5    watch the video -- and we'll show it to you -- he clapped

6    for them, and he went like that (indicating).

7              Let's talk about the charges themselves, ladies

8    and gentlemen.

9              We talked about this text he sent two hours later.

10   Notice it says "it caused Pence," not "we caused Pence."

11   He's talking about this kind of in a third-person way.

12             Stop the Steal was not about January 6th.  Stop

13   the Steal was a concept that actually started in 2016.  I

14   don't know if you all remember this.  The former president

15   was so worried about looking like a loser in the last

16   election that he already claimed, preemptively, "If I lose

17   it's because they cheated."

18             He repeated the same theme in 2020.  "If I lose,

19   it's because they stole it from me."

20             So the Stop the Steal is really about his goal not

21   to be embarrassed.  And it didn't have anything to do

22   specifically with January 6th.  It had to do with the entire

23   process.

24             The Republican party, congressmen, senators, were

25   doing everything they could to impede things moving forward.

1        This is just something.  General knowledge.  There

2    was an election board in Michigan that voted to certify or

3    not to certify, and they were flown to the White House, and

4    the White House tried to tell them not to certify, and there

5    were two Republicans, two Democrats.

6        There was this concerted effort to stop President

7    Biden from taking office and being certified.  It wasn't a

8    January 6th/John Strand issue.

9        One last time.  The text messages that talk about

10   what he did -- we breached, we did this, we did that -- all

11   after.  Nothing before.

12       Before it's "I organized this from our Beverly

13   Hills group to rally today," January -- I'm sorry, November

14   6, 2020.  That's what Mr. Strand did.

15       What level of proof do you need to find, in this

16   case, to find Mr. Strand guilty?  You'll have all this back

17   in the jury room, but I want you to look at this instruction

18   because if you see in the first full paragraph, the last

19   sentence, "if, after careful, honest, and impartial

20   consideration of all the evidence, you cannot say that you

21   are firmly convinced of the defendant's guilt, then you have

22   a reasonable doubt."

23       Think about those words, "firmly convinced."  They

24   do not show up here by accident.  They do not show up in

25   criminal cases by accident.  Because the consequences of

1    getting it wrong in a criminal case are so much worse than

2    if you are talking about somebody getting hurt in a car

3    accident.

4              So you have to be not just convinced of a person's

5    guilt -- convinced, I am convinced he did it -- you have to

6    be firmly convinced.  That's as strong as you can get.

7              Now, the instruction says it doesn't have to be

8    100 percent, but it's darn close.  It's darn close.

9              As I told you earlier, the main charge here is

10   obstruction of an official proceeding.  It's called

11   corruptly obstructing an official proceeding, and the word

12   "corruptly" is significant here.  Most crimes don't talk

13   about that.  They say, you know, if you steal something, we

14   can infer your intent, right?  Because this is all about

15   intent.  What did he intend?

16             You can infer his intent just by what he did, by

17   the very actions he did.  He went up, he took something off

18   of somebody's desk while they were out to lunch, took the

19   purse.  You don't have to ask, "What were you thinking?"

20   You just have to say, "Okay, well, if you went there, it

21   wasn't his, he took it."  You can infer his intent.

22             In this case, however, in this type of charge you

23   have to prove that he went into the Capitol that day with

24   the intent to corruptly stop this from happening.  Not to

25   help Dr. Gold in her speech.  Not to protect her.  But to

1        corruptly stop this certification process.

2                    The judge read you the instructions, and it's a

3        lot for you.  We've been dealing with these things for

4        months, so we understand how it works.  But we're going to

5        explain it to you.

6                    Three ways to convict.

7                    Number one:  He actually obstructed it, on

8        purpose, corruptly.

9                    Number two:  Maybe he didn't do that, but he tried

10       to do it.

11                   Number three:  Maybe he didn't actually do it,

12       maybe he didn't try to do it, but he helped somebody else do

13       it; aiding and abetting.

14                   So I can tell you that like in a lot of situations

15       you either do it or you don't do it.  This whole attempt

16       thing here, I submit to you, is nonsense.  He either did it

17       and went in to do it or he helped somebody else, but the

18       attempt is really not a logical conclusion here.

19                   Somebody will say, you know, I was trying to go to

20       the gym today.  You were trying to go to the gym today?  So

21       does that mean that you went but somebody physically held

22       you back, and you couldn't go?  No.  It just means I wanted

23       to go, but I didn't do it.  That's what attempt -- attempt

24       and murder.  I tried to kill somebody.  I hit him in the

25       leg.  They didn't die.

1           Here, if you look at the instructions on attempt,

2    you'll find out very quickly that it doesn't apply in this

3    case.  You have to find -- in order to find him guilty of

4    attempted obstruction, it's that he intended to commit the

5    crime, right?

6           So what evidence do we have that he intended to

7    commit the crime?  None.  What do you mean none?  He went

8    in.  Right.  But why did he go in?  He didn't go in to

9    obstruct.  He went to help Dr. Gold with her speech.

10          Number two, they took a substantial step to

11   committing that.  Well, if you didn't do one, you can't

12   really do two.

13          The first one, the first option you have is

14   actually obstructing.  So actually obstructing means that he

15   knew before he got there that there was a proceeding going

16   on.  He knew it.

17          We don't have any evidence of that.  He never

18   talks about it.  The only time he talks about it was two

19   hours later after people were talking about it.  There's no

20   evidence he knew.

21          Well, they're saying yes, but he went to the House

22   Chamber.  We already know that you couldn't see through the

23   House Chamber windows what was there.  It could have been

24   another hallway.  We also know from the officers' testimony

25   that there's no sign saying "House Chamber."

1        Well, maybe he knew because somebody had told him?

2   That's not evidence.  Guesswork is not evidence.  We don't

3   know that.

4        As much as Mr. Strand talked on his text messages,

5   as much as he Tweeted, do you think it would be reasonable

6   to think that he would tell one of his family members, who

7   he trusted, his text messages that he never thought would

8   get out, like, oh, yeah, Bobby told me or Johnny told me we

9   have to go here because that's where so-and-so's supposed to

10  be.

11       No evidence he knew that.  No evidence he knew

12  what was going on or where it was going on.

13       So when they try to paint him as a sinister human

14  being for going right there, Pence was actually on the other

15  side.  He had actually left by then; but he was on the other

16  side where the Senate is.  So was he -- who was he trying to

17  obstruct?

18       Aiding and abetting.  Who is Mr. Strand helping?

19  Did he know anybody else there besides Dr. Gold?  Was she

20  trying to obstruct?  Was he trying to help her obstruct?

21       There's a key part of this instruction that I want

22  you to make sure you understand.  And there's a lot to read

23  here, but this is something I asked myself, and you will ask

24  yourselves that, too.  What if he didn't go in there to

25  obstruct but just the fact that he was there with all these

1    other people caused obstruction?  Right?

2            So the instruction says here, "A defendant's

3    unlawful intent to obstruct a proceeding is not negated by

4    the presence of another purpose."  So, in other words, the

5    government can come back and say, you know, maybe he did go

6    there for Dr. Gold's speech, but maybe he also went there to

7    obstruct.  Maybe he had two purposes.

8            Of course, we don't know that that's the case, but

9    that's what they're going to want you to think.

10           But the next sentence says, "However, the fact

11   that his mere presence may have had the unintended effect of

12   obstructing does not establish that he intended to

13   obstruct."  In other words, he could have been there.  The

14   fact that he was there with all these other people could

15   have caused this to stop, even though he didn't intend it.

16   But his mere presence is not enough.

17           So these are complicated, and I'm not going to try

18   to take too much of your time because you can look at them,

19   but I just want to make sure that we're all clear on that.

20           All you have, ladies and gentlemen, is he went in;

21   he walked towards the House Chamber at some point; he tried

22   to leave the House Chamber; he went back because there was

23   no way out; and eventually they see okay, we clear out, and

24   people start to leave.

25           You'll see, as you saw in this case last week,

1    that when he tried to leave and Dr. Gold tried to leave at

2    about three something, they couldn't get out for quite a

3    while because people were still streaming in.  That's what

4    would have happened the entire time, 2:27 when he came in

5    until he tried to get out.  He still had to wait when he got

6    back there.

7            This case is all about his intent, ladies and

8    gentlemen, and there is no proof of his intent.

9            Entering and remaining in a restricted grounds.

10   This is probably the charge that's the most difficult from

11   Mr. Strand's point of view because he did enter, he did

12   remain.  But, as you see here, he had to enter knowingly,

13   remain knowingly.  And the question you have to ask yourself

14   is, when he was at the top of the steps and people were

15   pushing in, should he have let himself get trampled or

16   should he have pushed back past hundreds and hundreds of

17   people who are pushing forward?

18           Disorderly and disruptive conduct in a restricted

19   building.  "Disorderly" means when a person is unreasonably

20   loud and disruptive under the circumstances.

21           Was Mr. Strand ever loud, much less unreasonably

22   loud?  He's not accused of assisting Dr. Gold in that, in

23   case you think she's too loud.

24           Was he disruptive?  Was he trying to interfere

25   with another person by jostling them or crowding them?  If

1    anything, it's quite the contrary.  People were jostling and

2    crowding him.

3          Disruptive conduct is a disturbance that

4    interrupts an event, activity, or the normal course of a

5    process.  What did he do that was disruptive other than

6    being there?  Which is not enough.

7          So this one here, just so you know, the definition

8    of "disorderly and disruptive conduct" applies to one

9    location, and this applies -- this Count 4 applies to

10   disorderly conduct in a Capitol building.

11         And then we have the last trespassing-like charge,

12   parading, demonstrating, or picketing.  The instructions

13   aren't really helpful to you.  They say "picketing" and

14   "parading" have their usual meaning.  So we did you the

15   favor of looking up to see what *Oxford* says about

16   "parading."

17         "Parading" is walk or march in public or a formal

18   procession or in an ostentatious or attention-seeking way.

19   Did Mr. Strand march in a public formal procession or in an

20   ostentatious way on purpose?

21         "Picketing."  You know what "picketing" means.

22   You're holding a sign.  You're marching outside.  They're

23   not paying me enough, et cetera.

24         The instruction itself here includes the

25   definition of "demonstrating," and that goes back to the

1    first charge in a sense that he engaged in conduct that

2    would disrupt the business of Congress.

3              Again, he has to intend to do all these things.

4    He can't just be there with Dr. Gold trying to protect her

5    and be guilty of obstruction just because he's there.

6              (Video playing)

7              This is the video where Mr. Strand was actually

8    standing there, not pumping his fist.  And we only know this

9    because we see -- yes, this is -- I'm good at this.  I was

10   trying to zoom in.  But we saw his hand-in-a-glove

11   situation, and Ms. Ali is trying to come to the rescue.

12             We're back at the beginning.

13             (Pause)

14             So that's the video we showed you a second ago.

15   You see the fist right here.  No glove.  Not Mr. Strand.

16             But in opening the government pointed this to you

17   to prove -- do you see?  This is proof of intent right

18   there, right?  That's proof of intent to do something wrong

19   because you're there with the Stop the Steal movement, and

20   you're going like this, and you're part of the crowd.

21             You'll never see Mr. Strand do that.

22             (Pause)

23             I don't have control over it anymore.

24             (Video playing)

25             I asked Officer Pollitt about this, and I asked

1    him:  Isn't it true that that's not Mr. Strand's fist?  And

2    he said, no, it was.  And I understand why he would say

3    that, because he's an officer who passed out there and he

4    was upset and angry, and I totally get that; but obviously

5    it's not Mr. Strand's hand.

6              (Video playing)

7              MR. BRENNWALD:  Anyway, there's a video that

8    you'll see where Mr. Strand is coming into the Capitol, and

9    you can see -- you saw him multiple times where he's

10   stumbling and trying to keep Dr. Gold and himself standing

11   up.

12             We talked a few minutes ago about the fact that

13   the government is claiming over and over that he knew where

14   he was going.  He went right to the House Chamber.  And yet

15   in a text he sent afterwards, he said, "It's hard to know

16   exactly which area I was in."

17             And we know that this is true because Captain

18   Mendoza, she tried to identify a particular location in the

19   hallway that a video was taken, and she couldn't identify

20   it, and she's been in there hundreds of times.

21             Officer Brockwell, who I submit to you was the

22   most honest officer we had in this case -- unbelievably

23   honest.  When the government asked him a question, "Do you

24   see this?" if he didn't see it -- he knew what they wanted,

25   but he didn't say yes -- he said, "I can't actually tell."

1    That's what you hope for in testimony from the stand.

2           But he said the Capitol is not an easy place to

3    find your way around.  People get lost all the time.  It's

4    hard to find your way around without a tour guide.

5           But Mr. Strand, who hadn't been there, knew

6    exactly where he was and where he was going.

7           This is where he tells Rachelle Gillespie that

8    afternoon, at about 7:15, because this is showing you East

9    Coast time, "I was not near the chamber were Cruz and

10   Congress were meeting, as far as I know."

11          Cruz and Congress, who's talking about Cruz?

12          We're talking about Pelosi and Mike Pence.  He's

13   talking about Cruz.

14          "I wasn't near there as far as I know... hard to

15   know exactly which area we were in."  And then he comes up

16   with his justification for things.  "The crowd had zero

17   guns, no weapons, just flags and passion."

18          Dr. Gold's security.  Do you see his badge?  Do

19   you see his permit?  He didn't make this up.  This was all

20   well before January 6th.

21          When you look at these videos, look carefully to

22   see if anybody else is protecting anybody else.  He told you

23   why he was there; that was his intent.  These pictures at

24   various points in the building prove it beyond a doubt.

25          You'll see him in the videos scanning, looking

1    around to try to make sure that she's safe.  He keeps his

2    arms near her.  She's almost always in front of him.

3           The government said, "Oh, he's on a statue.  He's

4    not trying to keep her from falling.  He's looking.  He's

5    looking around.  He's got his ear cupped."  She said, "He's

6    trying to listen to a speech."  I would submit to you that

7    he just wants to make sure there's nothing crazy going on

8    around her.

9           But all of these things are not what anybody else

10   did toward anybody else, right?  I mean, there's nobody else

11   doing any of this type of thing.  So is he making it up?

12   Did they come up with this plan months ago in case they got

13   arrested?  Oh, well, we have an alibi.  We were there for a

14   speech.

15          He said on January 5th, "There will be more than a

16   million people here...gonna get ridiculous."  "We have entry

17   to the POTUS speech at 10:00 or 11:00.  Then the protest

18   speakers will happen after a march.  Somewhere around 1:00."

19          The protest speakers, nothing about storming the

20   Capitol or an insurrection.

21          Even a week before he tells his mother, "Also the

22   election battle is heating up.  Simone is a featured speaker

23   at the monster Wild Protest happening on January 6th."  Did

24   he send this to her knowing he was going to get arrested and

25   needed an excuse to be there?

1       "She's speaking at a large church in Tampa this

2   weekend."  That's why they flew from Tampa.  And you saw the

3   ticket.  "And then we'll go to the huge Wild Protest in D.C.

4   on January 6th."

5       You may remember someone talking about "Come to

6   D.C. on January 6th.  It's going to be wild."  We know who

7   said that, right?  And it wasn't Mr. Strand.

8       There's the ticket proving they came from Tampa.

9       Captain Mendoza acknowledged that that day there

10  were permits for speeches on the east side near the Capitol

11  grounds that day.  Not on the Capitol grounds, but near.

12  And in this Case No. 8 right there.

13      They get there, after marching there with a lot of

14  people, and somehow they're told, "Sorry, Dr. Gold, no

15  speech for you."

16      That did not sit well with Dr. Gold because

17  Dr. Gold, if she wants to do something, she's going to do

18  it.  And so she said, well, we're going to go to the Capitol

19  and talk there.

20      Mr. Strand did not think it was a good idea.  Why?

21  Because it was not a planned event.  It was not something

22  that we've scouted out.

23      Does that tell you anything about his intent?  We

24  shouldn't go there.  I don't know what's going to happen

25  there.  I don't know who is where or what.

1    Well, that wouldn't even be a question if he was

2  intending to go there in the first place and knew he was

3  going to go to the House Chamber.

4    THE COURT:  About ten minutes, Mr. Brennwald.

5    MR. BRENNWALD:  Yes, Your Honor.

6    Officer Mendoza told you that these huge doors --

7  there were two sets of doors near the Rotunda.  There were

8  these small glass doors with steel and glass, and there's

9  these huge heavy doors that swung open and shut.  And they

10  were supposed to be shut that day, and at some point they

11  were shut.

12    So did he have inside knowledge that somebody was

13  going to open these huge doors and let people in?  Oh, we're

14  going to get -- we're going to get there magically.

15  Somebody will open the doors for us and let us in.  Again,

16  proof that he did not have the intent to go in there because

17  those doors are supposed to be shut, and nobody's supposed

18  to open them.

19    I'm not talking about the doors that you push and

20  pull for 30 seconds.  I'm talking about these huge steel

21  doors that are there that Captain Mendoza talked about.

22    Captain Mendoza talked about the bike barriers

23  that were gone by 2:00 p.m.  Mr. Strand and Dr. Gold got

24  there a little bit after 2:00.  She acknowledged that there

25  were permits for speeches.  She acknowledges that the

1    Rotunda doors were open from the inside, and she said that

2    people there were wearing tactical gear and bullet-proof

3    vests, all of the things Mr. Strand was not.

4           Kyle Jones, I just want to spend ten seconds on

5    him, and this is a complete editorial.  People need to watch

6    his testimony.  It's too bad we can't videotape in the

7    courtroom here because everybody who's charged in these

8    cases should have to watch him talk about what he went

9    through.  It was horrendous.  And people don't get to see it

10   unless they're in court.  And that's really a shame.

11          Officer Vargas told you that there are no signs

12   near the House Chamber to indicate where you are, and he

13   also told you something interesting.  He said if it hadn't

14   been for Unsub 2 -- and "unsub" stands for unknown

15   subject -- Unknown Subject 2, that crowd in the hallway that

16   was pushing forward never would have pushed forward towards

17   the House Chamber, and no one would have gotten hurt.

18          Officer Pitts is a gentleman who told you that

19   Dr. Gold and Mr. Strand stuck out in the crowd, but they

20   were usually standing to the side of a particular hallway.

21   He also said if you were trying to leave the Capitol,

22   you'd normally go out the way you came in, which was what

23   Mr. Strand was hoping but couldn't get to for quite a while.

24          He also acknowledged it would have been very hard

25   to go out the Rotunda doors as people kept coming in

1    throughout the afternoon.  He said, yeah, I tried to tell --

2    I told them to get out, but he doesn't know if they actually

3    heard him.

4              Officer McGoff is the one who tried to get

5    Dr. Gold to leave.  I want you to watch this part in a

6    second.

7              (Video playing)

8              MR. BRENNWALD:  This is someone who speaks with a

9    purpose, who has energy, who has drive, and who won't be

10   denied.

11             Let's go ahead and keep playing.

12             (Video playing)

13             MR. BRENNWALD:  The government said this is about

14   a political speech.  She was there talking about, you know,

15   we're here because of politics.  Everything you've heard so

16   far is about masks and medical freedom and things like that.

17   That's what her shtick is.  American Frontline Doctors; not

18   America's Frontline Politicians.

19             Now, watch as -- play the rest.

20             (Video playing)

21             MR. BRENNWALD:  That's who Mr. Strand was helping.

22   You saw when the police were trying to get her out of there.

23   She pushed back and resisted.  They finally had to

24   physically push her out of there.

25             On the other hand, when he was on the other side

1    of the rope filming, he just left when they were done.

2              You might not like Dr. Gold.  You might not like

3    AFLDS.  That's not what this case is about directly.

4              Mr. Strand sent a Tweet months later looking

5    through his rose-colored glasses.  He believed in the Stop

6    the Steal.  Most of the people there believed in Stop the

7    Steal.  But he didn't want people to think that this was a

8    bad movement, and so he comes up with this.  It wasn't bad,

9    we walked through, et cetera.  Rose-colored glasses.

10             I guarantee you -- listen to me here.  I guarantee

11   you that after hearing Kyle Jones, after hearing Pitts,

12   Pollitt, everybody, Mr. Strand does not see it the way he

13   did back then.

14             You'll see on here in the poster, this was a wild

15   protest.  It doesn't say wild insurrection.  It doesn't say

16   wild obstruction of a proceeding.  They were supposed to be

17   there to protest.

18             As you know, someone told them to go down

19   to the Capitol, and they did.  However, as you also know,

20   Mr. Strand went there for a different reason, which was to

21   help Dr. Gold and her speech.

22             You're going to go back and look at some videos.

23   If you see Mr. Strand ever doing anything physical,

24   forceful, to push his way in, to do anything like that, then

25   you need to look at that very carefully.

 1          You won't see that, though.

 2          Finally, what the government wants you to do here

 3     is to smear Mr. Strand with what everybody else did.  He

 4     didn't push the police.  He didn't assault the police.  He

 5     didn't destroy property.  He did not shout political

 6     slogans.  He didn't spray chemicals.  He didn't carry poles.

 7     He didn't carry other weapons.  He didn't wear political

 8     clothing.  He didn't shout in the face of the police as you

 9     saw some people do.  He did not show any anger on his face.

10     He did not aggressively confront the police.  He came there

11     for a completely different reason.

12          And when you watch his demeanor -- you saw him on

13     the stand, right?  On Friday?  You tell me, does he look

14     like the type of person who went there that day to do what

15     he did?

16          Now, he was talking about it afterwards like oh,

17     look what we did.  That was complete bravado and bragging.

18     He had every opportunity that day to show solidarity with

19     people who were there.

20          I noticed in one of the videos on the way out the

21     door, right before he left, somebody said something to him,

22     and he goes like this (indicating), like a little quick

23     (indicating), something like that; like okay, yeah, yeah.

24     But that was on his way out.  No other time does he indicate

25     he's got anything to do with these people.

1    The government's going to come up here and have

2    about 10, 15 more minutes to try to counter what I've told

3    you.  Whenever I am sitting through that, I'm always

4    thinking -- when they say oh, what about, what about this,

5    and I'm always thinking yeah, but you forgot about that one.

6        I can't get up again, which I know you're thankful

7    for, but as Ms. Ayers comes back with her rebuttal, keep

8    your thinking caps on and think of what I would say in

9    response to that.

10        The bottom line is, ladies and gentlemen, they can

11   try to smear him with what everybody else did.  They can try

12   to make it look like he was shaking his fist, when he

13   wasn't.  They can try to make it seem like this was a

14   political thing for him, when that day it wasn't.  They can

15   do all these things.

16        But you have the videos.  You have all the

17   evidence you need to show you what he actually did.  If you

18   just watch him from the time he went in to the time he went

19   out, you'll never see him do anything that would indicate he

20   was part of this obstruction thing.  He was there for her,

21   and he wishes probably he'd never met her because that's

22   where he is -- that's why he is here now.

23        Thank you for your time, and we'll see you later.

24        THE COURT:  Thank you, Mr. Brennwald.

25        Ms. Perez.

1    MS. AYERS-PEREZ:  So let's talk about intent,

2    because he just talked about it quite a bit.  When can

3    intent form?

4         The thing is that intent can form like that, in an

5    instant.  It doesn't have to be three weeks before.  It

6    doesn't have to be a day before.  It could be right at that

7    moment.

8         Mr. Strand could have formed his intent when he

9    was in California, when he was in Florida, when he was on

10   the plane to Washington, D.C., when he was in Washington,

11   D.C. on the 5th, when he was at the Stop the Steal rally in

12   Washington, D.C., on the 6th, when he was marching to the

13   Capitol.  Any of those times.

14        He could have formed his intent when he realized

15   it was possible, when he was at the Capitol and realized we

16   can do this.  They're outnumbered.  We can go in.  We can go

17   through those doors.  There's my intent.  That is still

18   intent.

19        It doesn't have to be formed weeks in advance,

20   days, hours.  It can be formed right that moment when you

21   realize oh, my God, this is possible, and I'm going to do

22   it.

23        Which is what he did.  It's what all of them did.

24   They were there at the Capitol.  Police were overrun,

25   clearly overrun.  The defendant said it himself.  He was

1    shocked there were so few officers there.  Shocked there

2    were so few officers there and so many of them.

3            And yet he kept going in.  Because at some point

4    in that time he had already formed the intent because he had

5    already realized -- just like his fellow rioters had already

6    realized -- this is possible.  It's possible so now we're

7    going to do it.

8            And we know about dual intent.  He could have been

9    there with Gold as well, his girlfriend, and to Stop the

10   Steal once he realized they can go in.  Once he realized

11   this is possible.

12           Mr. Brennwald just asked you, what did Mr. Strand

13   do that was disruptive?

14           Well, in Mr. Strand's own words he breached and he

15   stormed the Capitol.  He did as part of a group, as the

16   forefront of that group.

17           You saw his texts.  "We were one of the first

18   dozen patriots in."  The quotes were added by me.

19           Look at the video that they just showed.  Of

20   course he thought that because he was one of the first group

21   in that door.  He wasn't on the west side.  He didn't know

22   what was happening over there.  That's what he thought in

23   that moment.

24           John Strand was 37 years old when he was there.

25   He's not a child being led around by his mother through the

1    Capitol building.  He is a 37-year-old man with his

2    girlfriend going through the Capitol building during the

3    certification of an electoral proceeding or the electoral

4    count.  Not a child.

5         He wasn't forced.  He's not in handcuffs.  She's

6    not dragging him along throughout the Capitol.  Most of the

7    time she's in front of him.  He says this is a legitimate

8    technique for his security guard business with her, although

9    if you look here, when he is clapping and shaking his fist

10   at officers, she's behind him.  His back is towards her in

11   the middle of a crowd, exactly what he said he would not be

12   doing that day as a security guard.

13        But that's the point about intent.  You don't have

14   to believe that he came to Washington, D.C., knowing that

15   this was possible.  He may not have realized it was possible

16   when he was at the Stop the Steal rally that morning.  But

17   at some point, once he realized he could do it, he did it.

18   He formed his intent, and he went in.  He went in not in the

19   back of the group, not in the middle of the group, at the

20   front of the group.

21        And when the defendant talks about, well, I was

22   pushed in -- we heard from Officer Pollitt.  He talked about

23   seeing people who were sprayed by law enforcement, and they

24   turned around, and they left.  At those same doors that the

25   defendant says he couldn't do -- he couldn't turn around and

 1     leave.  He had to have gone in, but others could do that.

 2              And he said he tried to leave the House Chamber

 3     and was just looking for an exit.  The Capitol Police have

 4     made it very, very clear they did not want anybody inside

 5     that Capitol building.  So why in the world the defendant

 6     would think the way to the exit is through this line of

 7     officers trying to stop me is absurd.

 8              They're not stopping you from exiting the Capitol.

 9     So why are you staying there?  And if you want to leave, why

10     are you going into a tiny vestibule outside a door that he

11     said is foggy, you can't see through, but at the same time

12     Sergeant Pitts told us the door was broken.  And Sergeant

13     Pitts actually put his head through the door, so yes, you

14     could see through the door.

15              And if this entire event was about a speech, as

16     the defendant claims -- he spent just under 49 minutes

17     inside the Capitol.  It was almost 30 minutes into that that

18     they gave a speech, that Gold gave a speech.  In that first

19     about 28 minutes he made a beeline for the House Chamber,

20     got there in about 73 seconds, part of a mob that pushed

21     through a line of officers, and sat in a vestibule outside

22     the House Chamber for 18 minutes.  No speeches.  In all that

23     time, with all those people, no speeches.  If that's your

24     purpose, why aren't you doing it?

25              Because the speeches were an afterthought.  They

1    occurred on the way out of the Capitol.  As they were going

2    out the same way they came in:  Oh, hey, let's give a speech

3    here in Statuary Hall where there were like eight people

4    around when she gave that speech.  There were more people in

5    the Rotunda at that point when they were finally pushed in

6    there.  But they did that as a duo.  He was up there on the

7    statue with her.  He was motioning to the crowd for her.

8         There's been a lot made about the fact that we

9    didn't see any violence from the defendant, and we didn't

10   see him destroy any property.  He's not charged with that.

11   This is what he's charged with, which is obstructing the

12   official proceeding.  So that's a wash.  That's not why

13   we're here.

14         We're here because of his conduct in and around

15   the Capitol building and how that affected the official

16   proceeding, and that conduct as part of the mob as a whole,

17   of the group as a whole.

18         And one of the things the defendant said in that

19   September Tweet that they just showed was he left as soon as

20   a uniformed officer told him to.

21         That is absolutely laughable.  No, he didn't.

22   There were, what, ten at that point who had told him to

23   leave.  They ignored the officers over and over again.  They

24   left when they were ready to leave regardless of what the

25   officers thought.  He didn't care what officers thought that

1     day, and he made that very, very clear.

2          So before I conclude about intent, it didn't have

3     to be formed weeks in advance.  He didn't have to know this

4     was possible weeks in advance.  I'm not sure anybody knew

5     that was possible weeks in advance.

6          But at some point, when he and his fellow rioters

7     were marching, storming, breaching barricades, he realized

8     it was possible, and then he had the intent, and then he

9     acted on that intent.

10         Thank you.

11         THE COURT:  Thank you, Ms. Ayers-Perez.

12         All right, ladies and gentlemen.  I'm going to

13    give a few concluding instructions.

14         First of all, your verdict must represent the

15    considered judgment of each juror, and in order to return a

16    verdict, each juror must agree on the verdict.  In other

17    words, your verdicts must be unanimous.

18         When you go back to the jury room, you will be

19    provided a verdict form for use when you have concluded your

20    deliberations.  The form is not evidence in the case, and

21    nothing in it should be taken to suggest or convey any

22    opinion by me as to what the verdict should be.

23         Nothing in the form replaces the instructions of

24    law I have already given you, and nothing in it replaces or

25    modifies the instructions about the elements which the

1      government must prove beyond a reasonable doubt.

2            The form is meant only to assist you in recording

3      your verdict.  It is very clear to follow.  There are five

4      counts with a checkmark for guilty or not guilty on each

5      count, so just please follow the instructions closely.

6            I will be sending into the jury room with you the

7      exhibits that have been admitted into evidence.  I think

8      they will appear on a laptop, and there should be a screen

9      for you all to pull them up and to examine them, if you

10     like.  You may examine any or all of them as you consider

11     your verdict.

12            Please keep in mind that the exhibits that were

13     only marked for identification but were not admitted into

14     evidence will not be given to you to examine or to consider

15     in your verdict.  I think we'll have the demonstratives sent

16     back as well as, I believe, the "Area Closed" sign is in

17     evidence and the gloves and maybe a few other pieces of

18     physical evidence as well.

19            During the course of the trial a number of the

20     exhibits were admitted into evidence.  Sometimes only a

21     portion of an exhibit was admitted, such as portions of a

22     longer video, a document with some words or pictures blacked

23     out or otherwise removed, or a video played without audio.

24     There are a variety of reasons why only a portion of an

25     exhibit is admitted, including that the other portions are

1   inadmissible or implicate an individual's privacy.  As you

2   examine the exhibits and you see or hear portions where

3   there appear to be omissions, you should consider only the

4   portions that were admitted.  You should not guess as to

5   what has been taken out or why, and you should not hold it

6   against either party.  You are to decide the facts only from

7   the evidence that is before you.

8          When you return to the jury room after probably

9   getting lunch -- Ms. Jenkins, do we have lunch for the

10  jurors?

11          THE COURTROOM DEPUTY:  Yes, Your Honor.

12          THE COURT:  The lunch will be provided for you

13  back in the jury room today.

14          But after you get your lunch, the first thing that

15  you should turn to is the selection of a foreperson to

16  preside over your deliberations and to be your spokesperson

17  here in court.

18          There are no specific rules regarding how you

19  should select a foreperson.  That is up to you.  However, as

20  you go about the task, be mindful of your mission -- to

21  reach a fair and just verdict based on the evidence alone.

22  Consider selecting a foreperson who will be able to

23  facilitate your discussions, who can help you organize the

24  evidence, who will encourage civility and mutual respect

25  among all of you, who will invite each juror to speak up

1    regarding his or her views about the evidence, and who will

2    promote a full and fair consideration of the evidence.

3           The question of possible punishment of the

4    defendant in the event of a conviction is not a concern of

5    yours and should not enter into or influence your

6    deliberations in any way.  The duty of imposing a sentence

7    in the event of a conviction rests exclusively with me.

8    Your verdict should be based solely on the evidence in this

9    case, and you should not consider the matter of punishment

10   at all.

11          I will reiterate the instruction that I've given

12   you throughout the trial, which is to avoid any publicity or

13   communications about the case or to conduct any independent

14   research about the case.  If any publicity about the trial

15   inadvertently comes to your attention, do not discuss it

16   with you jurors or anyone else.  Just let me and my clerk

17   know as soon after it happens as you can, and we will then

18   briefly discuss how to handle it.

19          If it becomes necessary, during your

20   deliberations, to communicate with me, you may send a note

21   through Ms. Jenkins or one of the Marshals, who will be

22   posted outside of the jury room, signed by your foreperson

23   or by one or more other members of the jury.  No member of

24   the jury should try to communicate with me about the case

25   except by such a signed note, and I will not communicate

1    with any member of the jury on any matter concerning the

2    merits of the case, except in writing or orally here in open

3    court.

4              Bear in mind also that you are never, under

5    any circumstances, to reveal to any person -- not to

6    Ms. Jenkins, the Marshal, or to me -- how the jurors are

7    voting until after you have reached a unanimous verdict.

8    That means you should not tell me in writing or in open

9    court how the jury is divided on a particular matter, 6 to 6

10   or 7 to 5 or what have you, or in any other fashion, or

11   whether the vote is for conviction or acquittal or on any

12   other issue in the case.

13             The attitude and conduct of jurors at the

14   beginning of their deliberations are matters of considerable

15   importance.  It may not be useful for a juror, upon entering

16   the jury room, to voice a strong expression of an opinion on

17   the case or to announce a determination to stand for a

18   certain verdict.  When one does that at the outset, a sense

19   of pride may cause that juror to hesitate to back away from

20   an announced position after a discussion of the case.

21   Furthermore, many jurors find it useful to avoid an initial

22   vote upon retiring to the jury room.  Calmly reviewing and

23   discussing the case at the beginning of deliberations is

24   often a more useful way to proceed.

25             Remember that you are not partisans or advocates

1    in this matter, but you are the judges of the facts.

2          The last thing I must do before you begin your

3    deliberations, which I take no joy in doing, is to excuse

4    the two alternate jurors.  It's as if you've sat through a

5    movie, but you can't see the end.

6          As I told you before, the selection of an

7    alternate was an entirely random process.  It's nothing

8    personal.  We selected two seats to be the alternate seats

9    before any of you entered the courtroom, and since the rest

10   of you have remained healthy and attentive, I can now excuse

11   Juror No. 8 in the upper left-hand row and Juror No. 13, the

12   second from the end on the upper row.

13         But before you leave, I want to make sure that

14   Ms. Jenkins has all of your current up-to-date contact

15   information.  And I do this because it is possible that we

16   will need to summon you back to rejoin the jury in case

17   something happens to a regular juror during the

18   deliberations.  Since that possibility exists, I'm also

19   going to instruct you not to discuss the case with anyone or

20   to communicate about it on the Internet or to do any

21   research until the jury has deliberated and returned a

22   verdict.

23         If you are not needed, we will call you and let

24   you know that there has been a verdict and that you are now

25   free to discuss the case.

1        So please report back to the jury room after we've

2   excused everyone, and they will give you further

3   instructions.  Thank you very much for your service.  I know

4   that it can be frustrating to be excused before the end of

5   the case, but we just have to pick two jurors in order to --

6   or to make sure that we have a full complement.

7        All right.  With that, when you have reached your

8   verdict, please send me a note informing me that you've done

9   so and have your foreperson sign and date the note.  Do not

10  tell me what your verdict is.  The foreperson should fill

11  out and sign the verdict form that will be provided.

12       I will then call you into the courtroom and ask

13  your foreperson to read it in open court.

14       It is quarter to 1:00.  You'll have lunch.  It is

15  up to the jury how long to deliberate.  Don't feel as if you

16  need to return a verdict today.  You can take as long as you

17  like.

18       If you do go past today, it will be up to you what

19  time you want to end today.  Sometimes we bring the jury

20  back into the courtroom.  Given that we've already -- we

21  only have the afternoon, I probably won't do that, but just

22  let Ms. Jenkins know what time you want to leave.

23       If you do not render a verdict today, and you come

24  back tomorrow, don't start your deliberations until all 12

25  of you are back, okay?  It's important not to deliberate

1     with fewer than 12 jurors.

2             All right?  So with that, thank you, again, for

3     your attention and your hard work.  Please retire to the

4     jury room, and you can begin your deliberations once we have

5     all the evidence back.

6             Ms. Jenkins, is the evidence back?

7             THE COURTROOM DEPUTY:  Not quite, Your Honor.

8             THE COURT:  Not quite.  Just wait for the computer

9     with the evidence, and once it's there, you can start your

10    deliberations.

11            (Jury exits courtroom)

12            THE COURT:  All right.  Congratulations.  Well

13    tried by both sides.

14            Stick around.  We may get a note.  Make sure

15    you're within a few minutes of the courthouse, okay?

16            (Lunch recess taken)

17

18

19

20

21

22

23

24

25

1          A F T E R N O O N   S E S S I O N

2          THE COURT:  Good afternoon, everybody.

3          So not surprisingly, we have a thoughtful and

4    hard-working jury.  The foreperson sent out a note at 4:10

5    p.m.:

6          "Judge Cooper, can 'intention' be defined as

7    occurring after its corresponding action?  For example,

8    could one take a walk without the intention of getting

9    exercise, then say their intention was to, quote, get some

10   exercise, after they took the walk?"

11         The Court would propose answering that question as

12   follows:

13         "You should assess the defendant's intent as of

14   the time he took the action in question.  Statements the

15   defendant made after the action may be used to infer what

16   his intent was."

17         My general approach on notes is, you know, usually

18   to refer the jury to the instructions, if the instructions

19   cover the question, but to be as helpful as possible to the

20   jury when the instructions are not -- don't cover the

21   question.

22         So any objections or comments or suggestions with

23   respect to that response?

24         MS. AYERS-PEREZ:  No objections from the

25   government.  It's right in line with what we were thinking,

1   and I think that it's an appropriate response.

2           THE COURT:  Okay.  Mr. Brennwald.

3           MR. BRENNWALD:  I would think that it would be

4   helpful to add a sentence after the second one, and I think

5   the sentence should be "statements the defendant made after

6   the action may be used to infer what his intent was, but

7   that intent had to exist at the time he took the action."

8           THE COURT:  Well, I think that's duplicative of

9   the first line.

10          MR. BRENNWALD:  I think it's a little confusing,

11  but...

12          THE COURT:  Yes.  Do you have an edit to the first

13  line to propose?

14          MR. BRENNWALD:  I would think that maybe we could

15  put the first line after the second line.  In other words,

16  "Statements the defendant made after the action may be used

17  to infer what his intent was, but you should assess the

18  defendant's intent as of the time he took the action in

19  question, not after."  In other words, just flip them.

20          THE COURT:  I think that's six of one, half a

21  dozen of the other.

22          To the extent you object, your objection's noted,

23  but...

24          All right.  Lauren.

25          All right.  Sit tight.  I don't know if they're

1     going to want to go until after 5:00 or not.  If they ask if

2     they can stay, I usually will let them stay as long as they

3     like within reason.

4               MR. BRENNWALD:  7:00 or 8:00 you mean?

5               THE COURT:  Well, I don't want to be here until

6     8:00, but let's see what they say.  I suspect that they'll

7     want to go home around 5:30.

8               MR. BRENNWALD:  Okay.

9               (Recess taken)

10              (Whereupon the hearing was

11               adjourned at 5:12 p.m.)

12          **CERTIFICATE OF OFFICIAL COURT REPORTER**

13

14              I, LISA A. MOREIRA, RDR, CRR, do hereby

15    certify that the above and foregoing constitutes a true and

16    accurate transcript of my stenographic notes and is a full,

17    true and complete transcript of the proceedings to the best

18    of my ability.

19        Dated this 26th day of October, 2022.

20

21                              /s/Lisa A. Moreira, RDR, CRR

22                              Official Court Reporter
                                United States Courthouse

23                              Room 6718
                                333 Constitution Avenue, NW

24                              Washington, DC 20001

25