## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-85-CRC-1** |
| **JOHN STRAND,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence John Strand to 78 months in custody, 36 months' supervised release, $2,000 in restitution, and a total mandatory assessment of $170. The 78-month recommendation is at the middle of the advisory Guidelines imprisonment range of 70 to 87 months as calculated in the PSR.

### I.       INTRODUCTION

The defendant, John Strand, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that interrupted the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power, injured more than one hundred police officers, and resulted in more than $2.8 million dollars.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Strand, a former television actor and fashion and romance novel cover model working for "America's Frontline Doctors," stormed the Capitol on January 6, passing a fallen and injured Capitol Police Officer to be one of the first people through the broken and battered East Rotunda Doors. Once inside the Capitol, Strand and his co-defendant, Simone Gold, made a beeline for the House Chamber. Strand raced through the Rotunda and Statuary Hall before making his way to a hallway just outside the House Chamber doors.

Strand made his way to the front of a mob facing off against a line of police guarding the House Chamber. The mob, with Strand at the very front, violently pushed their way through the line of Capitol police officers, resulting in a head injury to Sergeant N.V., who was at the front of the police line. Strand and Gold then stood outside the House Chamber Doors, watching on as a fellow rioter with a flag pole broke the windows in the House Chamber Doors. Inside the House Chamber, officers drew their weapons and barricaded the doors in a desperate attempt to prevent Strand and the mob from breaching the House Chamber, where members of Congress and others remained inside.

Strand and Gold eventually were forced to leave the hallway outside the House Chamber by Capitol Police Officers and Metropolitan Police Officers. Strand and Gold stopped for Gold to give a speech in Statuary Hall and the Rotunda, before finally exiting the Capitol building, 48 minutes after entering.

On the Capitol Steps, Strand took a series of selfies, made a vulgar gesture at the besieged police officers, and boasted on Twitter about having stormed the Capitol. Strand has since leveraged his crimes in extensive self-promotion in which he seeks money for "legal services," even as taxpayers shoulder the actual burden of his criminal defense.

The government recommends that the Court sentence Strand to 78 months' incarceration, which is within the advisory Guidelines' range of 70 - 87 months, which the government submits is the correct Guidelines calculation. A 78-month sentence reflects the gravity of Strand's conduct, but also acknowledges his lack of violence on that day.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the Affidavit in support of the Criminal Complaint filed in this case, ECF 1, as well as paragraphs 9 through 16 of the PSR, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.      Strand's Role in the January 6, 2021 Attack on the Capitol

#### *Approach and Entry to the Capitol*

Strand travelled to Washington D.C. from Florida on January 5, 2021.      Strand made clear that his intention in traveling to Washington D.C. was to challenge the certification of the electoral college vote.   On the morning of January 5, he wrote on Twitter:



*Image 1 (taken from GX 909)*

Strand's tweet on January 5 followed weeks of social media posts and private communications in which he expressed his anger over the results of the 2020 election and his determination, as he wrote on January 5, "act" and "stand firm."   On December 1, 2020, for example, Strand posted a tweet referencing the Insurrection Act and pronounced, "This. Is. War.":



*Image 2 (taken from GX 913)*

Strand attended the Stop the Steal rally on the morning of January 6, 2021, and then marched to the U.S. Capitol, where he joined a crowd of rioters that had breached the security perimeter on the East and North sides of the Capitol.   After breaking through the security perimeter, Strand walked up the 35 steps on the East Side of the Capitol and made his way to the front of a large crowd that was trying to breach the East Rotunda Doors.



*Image 3 (still image from GX 503.01; Strand, circled in yellow)*

4

Strand continually pushed to the front of the crowd, until he was directly in front of the East Rotunda Doors, which were locked.   The crowd at which Strand was in the forefront of continued to grow.   Some of the rioters were chanting "Stop the Steal".   Within a few feet of Strand, rioters smashed the windows of the East Rotunda Doors and assaulted police officers with flag poles.   The smell of pepper spray was heavily present in the area, and the East Rotunda Doors' alarm was blaring.   Officers used a "flash bang" grenade to encourage the crowd to disperse.   Strand, however, stood firm and remained near the front of the mob outside the East Rotunda Doors.

Directly in front of Strand (circled in yellow), some of the rioters pulled Capitol Police Officer J.P. (circled in red) into the mob.   Images 4 and 5, below, show the moment that Officer J.P. was standing in front of Strand, and the next moment, where he was pulled down into the crowd.

 

*Images 4 and 5 (still images from GX 504.01; Strand and co-defendant Gold both wearing sunglasses)*

Other rioters in the crowd helped Officer J.P. to his feet.   Strand made no effort to do so; in fact, Strand used the opportunity to move closer towards the East Rotunda Doors. Mere seconds later, the crowd breached the door.   Strand became one of the first people inside the Capitol Building from the East Front at approximately 2:27 p.m.

5



*Image 6 (still image from GX 401.01; Strand circled in yellow)*

Once inside the Capitol Building, Strand and Gold made a beeline to the main House Chamber.  Unlike many other rioters who stopped to congregate and marvel at the Rotunda, Strand and Gold quickly proceeded through the Rotunda and Statuary Hall, joining a mob that had formed in the hallway outside the House Chamber Door.  Strand, again, worked himself to the front of the mob, positioning himself within a few feet of a small group of Capitol Police Officers who tried to hold a line outside the House Chamber Door.  This was one of the most sensitive areas in the entire Capitol Building: the House Chamber was the primary location where the Electoral College vote was being held.  At the time that Strand and his fellow rioters congregated outside of it, there were still members of Congress and others sheltering in place in the House Chamber.

Strand was at the forefront of the group of rioters as they pushed past the police line and made their way into the small vestibule outside the House Chamber Door.  There was now only one set of doors between Strand and the floor of the House Chamber.  United States Capitol Police Sergeant N.V. testified at trial that it was the size of the mob, more than the actions of any

6

individual rioter, that caused his police line to be overrun. (Trial Tr. 09/21/22 at 597:18-24). Sergeant N.V. also testified that as he attempted to resist the mob while being pushed toward the House Chamber Door, the force of the mob caused him to bang his head against a statue. (Trial Tr. 09/21/22 at 598:21-25 – 599:1) Sergeant N.V. described at trial his fear that, while he was in the vulnerable position trapped inside the vestibule with the mob, one of the rioters could gain access to his weapon and use it against the police. (Trial Tr. 09/21/22 at 599:23-25 – 600:1-4) Strand contributed to the dangerous mob that overran Sergeant N.V.'s police line and, furthermore, Strand had placed himself at the very front of that mob.

Former Deputy House Parliamentarian Kyle Jones testified at trial that he was scared for his life while he was sheltering in place in the House Chamber. (Trial Tr. 09/20/22 at 453). Capitol Police Officer B.B. was inside the House Chamber during this time as well.   Officers had barricaded the House Chamber Door with furniture, and had their guns drawn and pointed at the rioters, including Strand, on the other side of the door, as shown in Image 7, below.



*Image 7 (Officer B.B. wearing light blue protective mask)*

Strand had been proclaiming on social media for weeks "Stop the Steal."   In the vestibule outside the House Chamber door, Strand was surrounded by rioters chanting "Stop the Steal." Rioters intent on "stopping the steal" used flag poles to smash the windows to the House Chamber

Door windows within a few feet of Strand.   Once again, Strand stood side-by-side with this property-destroying mob.   Other rioters close to Strand shouted things like "use your Kevlar" as they attempted to break down the House Chamber Door.

Multiple Capitol Police Officers attempted to get Strand and the mob to leave the vestibule. Capitol Police Sergeant J.P. testified that he thought Strand and Gold did not speak English (which they do) because they were so unresponsive to his shouting demands that they leave the area. (Trial Tr. 09/21/22 at 652:14-17) It took an influx of Metropolitan Police Department and Capitol Police officers to force Strand and Gold out of that vestibule.



*Image 8 (Still image from GX 506.1; Strand circled in yellow)*

Strand and Gold then attempted to give two speeches inside the Capitol.   Gold first gave a speech in Statuary Hall while Strand filmed her.   Strand and Gold's speech stunt made it more difficult for the officers to clear Statuary Hall. (Trial Tr. 09/21/22 at 689:10-14) Officers had to forcibly move Gold before she stopped her speech.



*Image 9 (Still image from GX 407.01; Strand circled in yellow)*

Strand and Gold then went into the Rotunda.   Even though Strand had just seen officers forcibly shut down Gold's speech in Statuary Hall, Strand and Gold chose to give another speech, this time standing on top of a statue of President Dwight Eisenhower to do so.   Gold used a bullhorn to give this speech.   Strand, while standing on top of the statute, gestured to draw the crowd's attention:



*Image 10 (Still image from GX 510.01)*

Although Gold's speeches did not garner significant crowds, they did attract the interest of

a few rioters, and Strand and Gold's conduct likely encouraged others to resist the police officers' efforts to control the riot as well.   Strand and Gold thus made it more difficult for the police to clear rioters from the Capitol.   Those officers were prevented   from assisting their fellow officers elsewhere in the Capitol as many of them were under violent assault.

In total, Strand spent more than 49 minutes inside the Capitol. His participation in the riot contributed to the mob's ability to delay the certification proceedings for hours.   Members of Congress and the Vice President had to be evacuated and to take shelter while Strand, among other things, stood shoulder to shoulder with rioters who tried to smash down the House Chamber Door, and paraded on top of a statute while his co-defendant gave a speech with a bullhorn.

Shortly after leaving the Capitol, Strand took a selfie on the Capitol steps and publicly declared this on Twitter:



*Image 11, (taken from GX 902)*

Strand also made clear that he was knowledgeable of, and proud of, his role in delaying the

10

certification proceedings—and thereby undermining the peaceful transfer of power.  He texted his brother within hours of leaving the Capitol and boasted that he had "made history."  When asked how he had "made history," Strand responded "I don't think the US Capitol building has been stormed and breached like that – and it caused pence to delay the certification, so that's very significant" *See* Image 12



*Image 12, (taken from GX 342.01)*

Additional communications from Strand on January 6 made clear that he intended to breach the Capitol and he was proud to have done so.  He wrote to his friends that day, "I was with the first dozen people to breach"; "We stormed the Capitol"; "Simone and I were with the first dozen patriots to breach the Capitol."

Strand testified in his defense at trial.  As described in detail *infra,* Strand testified that he had not intended to go into the Capitol; that his only purpose in being inside the Capitol was to protect the safety of his co-defendant Gold; and that he was not aware that Congress was certifying the Electoral College vote until after his 49-minute escapade in the Capitol was over.  This testimony was squarely contradicted by Strand's actions on January 6, as shown on video, and Strand's contemporaneous communications, in which he conveyed his true intentions in his own words.  The jury necessarily found Strand's testimony not credible in convicting him on all five

11

charges.

## III.    THE CHARGES AND TRIAL

On February 5, 2021, a federal grand jury returned an indictment charging John Strand with five counts: obstruction of an official proceeding under Title 18, United States Code, Sections 1512(c)(2) and 2 (Count One), entering and remaining in a restricted building or grounds under Title 18, United States Code, Section 1752(a)(1) (Count Two), disorderly and disruptive conduct in a restricted building or grounds under Title 18, United States Code, 1752(a)(2) (Count Three), disorderly conduct in a Capitol building under Title 40, United States Code, Section 5104(e)(2)(D) (Count Four), and parading, demonstrating, and picketing in a Capitol building under Title 40, United States Code, Section 5104(e)(2)(G) (Count Five). ECF 13.

On, September 27, 2022, John Strand was convicted of those offenses following a jury trial. ECF 108.

## IV.    STATUTORY PENALTIES

John Strand now faces sentencing on the five counts of conviction. As noted by the Presentence Report issued by the U.S. Probation Office, Strand faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100 for Count One; up to one year of imprisonment, a term of supervised release of not more than one year, and fine up to $100,000, and a mandatory special assessment of $25 for each of Counts Two and Three; and up to six months of imprisonment, a fine up to $5,000, and a mandatory special assessment of $10 for each of Counts Four and Five.

## V.       THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Government concurs with the Guideline analysis from the PSR regarding Count One. PSR ¶ 48-57.   Under U.S.S.G. § 1B1.1(a)(1), the Court should conduct   the Guidelines analysis for each count of conviction. That analysis for all counts of convictions is as follows:

Count One: 18 U.S.C. § 1512(c)(2) and (2)

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Causing or Threatening to Cause Physical Injury or Property Damage | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[2] | +3 |
| U.S.S.G. §3 C1.1 | Obstruction | +2 |
| | **Total** | **27** |

Count Two: 18 U.S.C. § 1752(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3 (a) | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A) | Trespass occurred at any restricted building or grounds[3] | +2 |

*Cross Reference*

---

[2] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. That occurred here in spades.   Strand was found guilty of corruptly obstructing and impeding an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. By the evening of January 6, law enforcement officers from across the D.C. metropolitan area had responded to assist in protecting the Capitol from the rioters.

[3] Section 2B2.3 gives "restricted building or grounds" the meaning that the phrase is given in 18 U.S.C. § 1752. U.S.S.G. § §2B2.3 cmt. n.1.

| U.S.S.G. § 2B2.3(c)(1)/2X1.1 | Intent to Commit a Felony[4] | | **27** |
| | | **Total** | **27** |

<u>Count Three: 18 U.S.C. § 1752(a)(2)</u>

| U.S.S.G. § 2A2.4(a) | Base Offense Level | | 10 |
| | | **Total** | **10** |

| **Combined Offense Level** | | | **27** |
| Acceptance of Responsibility (U.S.S.G. §3E1.1)[5] | | | <u>0</u> |
| **Total Offense Level:** | | | **27** |

Counts One through Three group because all involve the same victim: Congress. U.S.S.G. § 3D1.2(a) and (b).   The offense level for that Group is the level "for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group." U.S.S.G. § 3D1.3(a).   Since Counts One and Two have the highest offense levels for any count in the group (both are 27), the combined offense level for the group is 27.   And because acceptance of

---

[4] Since the Section 1752(a)(1) offense was committed with an intent to commit another felony (18 US.C. § 1512), the base offense level and any specific offense characteristics under § 2J1.2 apply to the Guidelines calculation for the § 1752(a)(1) charge, pursuant to U.S.S.G. § 2B2.3(c)(1) and § 2X1.

[5] Strand contested essential factual elements of guilt at trial, such as denying that he intended to go inside the Capitol building, denying that he knew the election certification was happening on January 6, denying that he voluntarily went inside the Capitol building, and claiming that Officer J.P. merely tripped, even though Officer J.P. was violently forced to the ground right in front of Strand.   Additionally, in the **<u>six</u>** months since a jury convicted Strand, Strand has not agreed to sit down with Probation and be interviewed by Probation. PSR ¶ 65.   Accordingly, the adjustments for acceptance of responsibility in U.S.S.G. §§ 3E1.1(a) and (b) should not apply.   U.S.S.G. §§ 3E1.1 Application Note 2; U.S.S.G. § 3E1.1(b).

responsibility points are not available in the instant case, the total offense level remains 27.   This is the same as the Probation Officer's estimated total offense level of 27.   PSR ¶ 57.

The U.S. Probation Office calculated Strand's criminal history as category I, which is not disputed.   PSR ¶ 60.   Accordingly, Strand's Guidelines imprisonment range is 70 to 87 months' imprisonment.

### a.   Enhancement Under U.S.S.G. §2J1.2(b)(1)(B)

The enhancement in U.S.S.G. § 2J1.2(b)(1)(B) applies where "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice."   For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress, § 1515(a)(1)(B).

There are multiple theories for application of this offense characteristic based on U.S.S.G. § 1B1.3 which encompasses both Strand's own acts or omissions and those whom he aided, abetted, counseled, commanded, induced, procured, or willfully caused.   U.S.S.G. § 1B1.3(a)(1)(A).   It also includes "all harm that resulted" from Strand's acts or the acts of others engaged in jointly undertaken criminal activity with Strand.    U.S.S.G. § 1B1.3(a)(1)(B).

As discussed above, Strand was at the forefront of a violent mob outside the East Rotunda Doors.   Strand witnessed violence break out all around him—officers being hit by flag poles, windows being smashed in, and Office J.P. being dragged down directly in front of Strand.   Strand did not just witness this violence, he actively utilized this violence to continue his mission.   As Officer J.P. laid on the ground in the mob of people, directly in front of Strand, Strand used that as an opportunity to continue his mission to disrupt the Electoral College certification vote into

the Capitol building despite the violence.   Strand made a beeline for the House Chamber, which

was one of the most sensitive areas inside the entire Capitol building on January 6.   As part of

that beeline to the House Chamber, Strand was at the forefront of a mob that overtook multiple

United States Capitol Police (USCP) officers attempting to protect the House Chamber.   At least

one USCP officer, Sergeant N.V., was injured when the mob that Strand stood at the forefront of

overtook the police line[6].   Strand was again part of the mob outside the House Chamber doors

while members of Congress and staffers tried to escape.   Officers had barricaded the House

Chamber doors from the inside, with furniture, because of the very presence of Strand and the

mob.   Violence once again broke out all around Strand, as fellow rioters smashed the windows to

the House Chamber, while Strand stood his ground outside the House Chamber.

      That this horrific violence occurred all around Strand on January 6 was not a surprise to

Strand, he was fully aware of the violence that would likely take place on January 6 before it

occurred. Prior to January 6, Strand had multiple social media posts and text messages alluding to

violence in the name of "stopping the steal".   On October 28, 2020, in response to a friend texting

Strand about democrats "getting in" to the White House, Strand stated: "Trust me.   When I write

---

[6] Sergeant N.V. testified at trial, in reference to being injured by the mob that overtook him
outside the House Chamber, and described the moments of injury as: "Unfortunately at this point
I was already pushed into the room between two doors [Sergeant N.V. is referring to the
vestibule right outside the House Chamber doors], and that is where I got pushed all the way in.
And right before you get to the second set of doors, there's three steps.   Because I was being
pushed, I wasn't looking behind me, and that's where I tripped, and I hit my head up against the
marble statues that are there in that area between two rooms." (Trial Tr. 09/21/22 at 598:19-25 –
599:1.   Sergeant N.V. elaborated more: "The pure force of the amount of weight that was being
pushed by the mob, it kind of – when I smacked my head – it's something I normally don't do,
walk around smacking marble with your head – it kind of dazed me for a minute.   And then I
had to start thinking of what I'm carrying on my person at that time." (Trial Tr. 09/21/22 at
599:7-12.

and speak the famous phrases 'live free or die' and 'give me liberty or give me death' – I am not playing." (Trial Tr. 09/22/22 at 885:20-22).   On November 7, 2020, the day most major news outlets called the 2020 Presidential Election for then President-Elect Joseph Biden, Strand texted a friend, "And yes, it is outrageous, but exactly what we expected – this is the beginning of a civil war, perhaps not a 'hot war' with bullets (yet) but a definitive conflict nonetheless." (Trial Tr. 09/22/22 at 892:8-11).   On December 1, 2020, Strand tweeted a response referencing the Insurrection Act and stated, "No, seriously.   This is LITERALLY what the I act is for.   THIS. IS. WAR. #TruthMaverick #ThisElectionWASrigged #StopTheSteal #IrredeemablyCompromised #TheConstitutionMatters (Trial Tr. 09/22/22 at 896:19-25 – 897:1-3.

Strand's behavior on January 6 was threatening.   He was at the forefront of a dangerous mob that stormed into the Capitol building, and stormed through a police line outside the House Chamber, injuring a Capitol Police Sergeant.   His texts and social media posts in the days and weeks leading up to January 6 make it clear that he was prepared for violence on January 6. Strand was anticipating violence on January 6.   He was part of a mob where violent acts by rioters were reining down on law enforcement officers.   And, in fact, Strand used the violent acts of his fellow rioters to increase his position within the Capitol – when rioters threw Officer J.P. to the ground outside the East Rotunda Doors, Strand moved closer to the doors, overtaking where Officer J.P. had just stood, and being one of the first ones inside the Capitol.   When rioters, including Strand, stormed forward outside the House Chamber, eviscerating a police line standing between them and the House Chamber, Capitol Police Sergeant N.V. was injured.   In response to this, Strand stood his ground outside the House Chamber.   This was extremely threatening

behavior meriting application of the § 2J1.2.(b)(1)(B) enhancement, as also noted by Probation. PSR ¶ 49.

### b. Enhancement under U.S.S.G. §3C1.1

The two-level enhancement under U.S.S.G. §3 C1.1 is appropriate here based on Strand's false testimony.   U.S.S.G. § 3C1.1's Application Note 4(B) states that "committing . . . . perjury" warrants the two-level obstruction enhancement.   Application Note 4(F) adds that "providing materially false information to a judge" does as well.   Here, the preponderance of the evidence plainly shows that Strand made perjurious statements during his trial testimony.

### i.    Strand's False Testimony that He Never Intended to Breach the Capitol and Obstruct the Certification

At trial, Strand repeatedly testified that his only purpose in being inside the Capitol on January 6 was to protect his co-defendant Simone Gold and not to disrupt the election certification. He stated on direct examination,   "[w]hen we were in Washington, D.C., on January 6th my only purpose that day was just for Dr. Gold's speech." (Trial Tr. 09/23/22 at 1088.)   On cross-examination, he was asked, "[y]our testimony is that your sole purpose of being inside the Capitol was to be with Ms. Gold to provide her security; is that right?"   He responded, "Yes, sir." (Trial Tr. 09/23/22 at 1131).).   Strand insisted that he did not know that the certification of the election was occurring on January 6: "I didn't even realize that [the] official certification was happening at that time so that wasn't even in my consciousness." (Trial Tr. 09/23/22 at 1089).)

That testimony was flatly contradicted by his many communications and social media pronouncements about stopping the steal and "never conceding a stolen election" both before and after January 6.   On January 5, 2021 Strand posted on Twitter:



*Image 13, (taken from GX)*

On January 6, 2021, after spending more than 40 minutes inside the Capitol during the riot,

Strand tweeted this:



*Image 14, (taken from GX )*

By convicting Stand of violating 18 U.S.C. § 1512(c), which required the government to

prove beyond a reasonable doubt that Stand intended to obstruct a "proceeding before Congress,"

the jury necessarily—and correctly—found incredible Strand's testimony that he had no such

intention. This Court, applying the preponderance of evidence, should reach the same conclusion.

19

*ii.*   *Strand's False Testimony that the Crowd Forced Him into the Capitol*

Strand also testified that he was forced into the building by "physical force of the crowd," and that he and Dr. Gold "were pushed in."   (Trial Tr. 09/23/22 at 1113-1114.)    He insisted that he "had not wanted to be inside the Capitol at all."   (Trial Tr. 09/23/22 at 1115.)   This testimony was squarely contradicted by the video evidence that showed Strand remaining at the front of the mob outside the East Rotunda Doors while rioters assaulted officers within feet of Strand and smashed the door's window with flag poles.   The video evidence then showed Strand entering the building, without being pushed or forced, after the rioters in front of him breached the doors.

Strand's testimony that he did not want to be inside the Capitol was also contradicted by the evidence showing him, while inside the Capitol, quite happy to be there:


*Image 10 and 15: Strand Inside the Capitol Building*

*iii.*   *Strand's False Testimony Warrants a Two-Level Enhancement*

Significant portions of Strand's testimony, particularly those described *supra,* were materially false about essential elements of the charged crimes, including whether Strand intended to disrupt and certification, whether Strand knowingly and willfully entered the Capitol building,

20

and whether Strand acted corruptly.  These statements were false, concerned a material matter, and were made with the willful intent to provide false testimony.  Strand went beyond a mere denial of guilt, lack of memory, or confusion: he offered an alternative, demonstrably false explanation for his confrontation with the police. This adjustment has been given to other January 6 defendants who gave false testimony regarding their criminal conduct at trial, and it is warranted here.[7]

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, John Strand's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and almost throwing the United States into a Constitutional crisis. Strand marched to the East side of the Capitol building, where he led a mob of rioters through the East Rotunda Doors.  Strand made a bee-line for the House Chamber, where he, once again, was at the forefront of a mob of rioters who overtook a line of Capitol Police Officers.  Strand stayed outside the House Chamber doors for eighteen minutes as staffers and Congressmen sheltered inside, fearful for their lives. The

---

[7] *See United States v. Webster*, 21-cr-208 (APM) (applying the two-level obstruction enhancement where, among other things, the jury found that the defendant falsely testified that his assaultive conduct was in self-defense); *United States v. Matthew Bledsoe*, 21-cr-204 (BAH) (applying the two-level obstruction enhancement after the defendant falsely testified about his knowledge of the vote certification); *United States v. Thompson*, 21-cr-161 (RBW) (applying the two-level obstruction enhancement after finding that the defendant falsely testified about his whereabouts and other material facts related to his actions on January 6).

nature and circumstances of Strand's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 78 months in custody, 36 months supervised release, $2,000 in restitution, and a mandatory assessment of $100 for count one (18 U.S.C. 1512(c)(2) – obstruction of an official proceeding), a $25 special assessment for counts two and three: count two (18 U.S.C. 1752(a)(1)—entering and remaining in a restricted building or grounds), count three (18 U.S.C. 1752(a)(2)—disorderly or disruptive conduct in a restricted building or grounds), and a $10 special assessment for counts four and five: count four (40 U.S.C. 5104(e)(2)(D)— disorderly conduct in a Capitol building), and count five (40 U.S.C. 5104(e)(2)(G)—parading, demonstrating, or picketing in a Capitol building).

**B. Strand's History and Characteristics**

Central to the Court's consideration of Strand's history and characteristics is his lack of remorse for his criminal conduct on January 6.   Worse yet, he has repeatedly spread false information about the riot he observed while seeking to fundraise off of the notoriety achieved by his crimes.

In his trial testimony, Strand attempted to portray himself as remorseful over the terrible events of January 6, and in particular, as concerned about the plight of the police—who, as the Court well knows, spent hours under physical assault by the members of the mob, many of whom were armed with pepper spray, flag poles, and other weapons.   Strand told the jury, "I remember feeling grateful for the police that day, but I'm even more grateful now."   (Trial Tr. 09/23/22 at 1055.)   He further testified that "seeing more and more footage of other places [in the Capitol] and of course this week hearing personal testimonies from people that were in really dangerous places is a lot more worrisome than what I had understood at the time."   (Trial Tr. 09/23/22 at

22

1084.)   He insisted that he was "not proud of people breaching and storming the Capitol." (Trial Tr. 09/23/22 at 1086.)   He pretended that he wished that none of the victims on January 6 suffered as they did: "I didn't feel in real danger. But I realize that the officers did, and that that was a very terrible experience, and I wish that would have never happened."   (Trial Tr. 09/23/22 at 1090.)

These crocodile tears are sharply contrasted by Strand's many self-promoting interviews both before and after trial, in which Strand has consistently minimized the violence of January 6. A few weeks before trial, on August 26, 2022, Strand gave an interview in which he described the rioters inside the Capitol Building as "pretty much like tourists."[8]   John Strand, SAS Interview Series (Aug. 22, 2022), *available at*: https://omny.fm/shows/liberty-station/john-strand-sas-interview-series-liberty-station-s .

A week before his trial, on or about September 12, 2022, Strand sought more publicity for himself by giving a live YouTube interview.   *See* Ex. A, John Strand Interview with Brandon Straka.   Straka asked, "Was anything that you were a part of or observing, would you describe it as a riot?" Strand responded, "Not in the slightest."   *Id.* at 49:00.   He described the scene of the mob trying to breach the East Rotunda Doors as "entirely boisterous and fun," and compared it to a rock concert.   *Id.* at 55:00.   (At trial, the video evidence would show that during this scene, rioters were assaulting police with mace and flag poles, and smashing windows.)

On March 8, 2023—approximately six months after his conviction at trial— Strand gave an interview on "Diamond & Silk Chit Chat Live," in which the host falsely introduced Strand as having had "an approved Government permit to be at the Capitol on January 6."   Strand

---

[8] On cross-examination at trial, Strand conceded that he did not express any remorse in this interview.   (Trial Tr. 09/23/22 at 1128.)

described his case as a "miscarriage of justice," and asserted that January 6 "wasn't an evil day" or a "dark day," characterizations that he described as a "lie." *See* Ex. B, Diamond & Silk Interview.   He claimed that "I was there" at the Capitol Riot and "everything I have seen from the Government and news media [about January 6] has been lie after lie after lie."   He then proclaimed, "January 6 is terrible lie . . . it wasn't an insurrection . . . that whole concept is a joke."

In these interviews and others, Strand frequently urged listeners to donate money to him to support his "legal defense," often by pointing them to his website, JohnStrand.com.   *See* Ex. C , Part 2 - John Strand's J6Trial Update.   On the website, Strand decries "the unfettered political persecution" and "political apartheid" that gave rise to his conviction, while asking for financial donations, which can be made through the website.   *See* Ex. D, Printout of JohnStrand.com.

Strand's lack of remorse and financial opportunism is particularly galling because of the trial evidence showing precisely what he and the rioters around him did on January 6.   Strand forced his way to the front of a mob that overran a police line outside the House Chamber and attempted to breach the House Chamber door—at a time when Members of Congress and others remained inside the Chamber.   Strand saw a rioter a few feet in front him swing a pole at a police officer.   (Trial Tr. 09/21/22 at 533-534; Trial Tr. 09/23/22 at 1110.)   Strand stood at the front of the mob when it breached the East Rotunda door, and a rioter smashed the windows of that door just in front of Strand.   (Trial Tr. 09/21/22 at 527; Trial Tr. 09/23/22 at 1108-1109.)   Rioters smashed the glass panels in the House Chamber door immediately in front of Strand as well. (Trial Tr. 09/23/22 at 1122.)   Officer J.P. was pulled down into the mob, also just in front of Strand, in a harrowing moment that Officer J.P. described at trial as having left him "terrified." (Trial Tr. 09/21/22 at 944.)   Yet Strand continues to spread false information about January 6 in

his self-promoting public appearances.

Strand undisputedly has a First Amendment right to say what he says. The Court may nonetheless properly consider the manner in which Strand exercises his free speech rights in assessing his remorsefulness and character under Section 3553(a).[9]

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. John Strand's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.     The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[10] The demands of general

---

[9] *See Wisconsin v. Mitchell*, 508 U.S. 476, (1993) holding that "Traditionally, sentencing judges have considered a wide variety of factors in addition to evidence bearing on guilt in determining what sentence to impose on a convicted defendant. See *Payne* v. *Tennessee,* 501 U. S. 808, 820-821 (1991); *United States* v. *Tucker,* 404 U. S. 443, 446 (1972); *Williams* v. *New York,* 337 U. S. 241, 246 (1949). The defendant's motive for committing the offense is one important factor. See 1 W. LeFave & A. Scott, Substantive Criminal Law § 3.6(b), p. 324 (1986) ("Motives are most relevant when the trial judge sets the defendant's sentence, and it is not uncommon for a defendant to receive a minimum sentence because he was acting with good motives, or a rather high sentence because of his bad motives"); cf. *Tison* v. *Arizona,* 481 U. S. 137, 156 (1987) ("Deeply ingrained in our legal tradition is the idea that the more purposeful is the criminal conduct, the more serious is the offense, and, therefore, the more severely it ought to be punished")

[10] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Strand has shown no remorse for his own conduct or that of the mob he was a part of, on January 6.   On the contrary, Strand has continued to deny the events on January 6 were violent. Despite having appeared to show self-serving remorse on the witness stand at trial, Strand's true feelings have continued to emerge through his post arrest and post-interviews.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every

sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[11]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[12]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[11] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[12] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

*United States v. Matthew Bledsoe,* (21-CR-204-BAH) has substantial similarities with this case. Bledsoe entered through the Senate Wing Doors within 15 minutes of the initial breach of those doors. Comparatively, Strand was in the very first group of people to enter the Capitol through the East Rotunda Doors. Bledsoe went near the House Chamber, whereas Strand stood amongst the mob directly outside the main House Chamber doors for an extended period of time. Like Strand, Bledsoe also employed inflammatory social media rhetoric prior to January 6, although Strand directly bragged about stopping the certification of the vote on January 6. Bledsoe paraded through the Capitol with a flag and spent a total of 22 minutes inside the Capitol, while Strand spent 48 minutes inside the Capitol. Like Strand, Bledsoe also did not accept responsibility and was convicted after a trial. Judge Howell sentenced Bledsoe to 48 months' incarceration.

*United States v. Richard Michetti*, (21-CR-232-CRC) is another January 6 case which has some similarities to the Strand case, but a number of distinguishable facts that makes Strand demonstrably more culpable. Michetti entered the Capitol on January 6 through the Upper West Terrace door. Michetti entered within a few minutes of the door being breached. Michetti shouted at Metropolitan Police Department (MPD) Officers, saying "we pay you" and "you are starting a civil war". Michetti tried to enter the Rotunda multiple times before MPD forced him out. Michetti accepted responsibility for his conduct on January 6, and pled guilty to obstruction of an official proceeding. Michetti was subsequently sentenced to 9 months' incarceration. Strand's conduct is distinguishable from Michetti's in a number of ways. First, in the more than 26 months since January 6, Strand **still** has not accepted responsibility for his conduct that day. Second, Strand made his way to the front of two very violent mobs on January 6—one outside of

the East Rotunda Doors and one outside of the House Chamber.   Those mobs were responsible for at least two USCP officers being injured.   Second, Strand witnessed multiple acts of violence occurring around him on January 6, and he continued on his mission.   Third, Strand had numerous incendiary messages on social media in the days and weeks leading up to January 6, implying that violence would be coming on January 6.   Fourth, Strand ended up outside, for an extended period of time, one of the most sacred areas in all of the Capitol.   Strand was mere feet from the main House Chamber door, where officers had barricaded furniture on the other side of it, with guns drawn, as staffers and congressmen were inside the House Chamber, trying to evacuate as fast as possible.   Fifth, Strand joined his co-defendant, Simone Gold, in creating further disarray inside the Capitol by having two speeches on the floor of Statuary Hall and the Rotunda.

*United States v. Timothy Hale-Cusanelli*,(21-CR-37-TNM) is another January 6 case with similarities to the Strand case.   Like Strand, Hale-Cusanelli was at the forefront of the mob attacking the Capitol on January 6.   Also like Strand, Hale-Cusanelli bragged to people in the days after January 6 about his role in the Capitol Breach.   Likewise, Strand bragged to his brother that the rioters, himself included, had stopped the certification of the vote.   Hale-Cusanelli also went to trial and testified in his own defense.   Like Strand, Hale-Cusanelli feigned ignorance while on the stand about the certification proceedings that were happening on January 6.   Hale-Cusanelli had the same calculated guideline range that Strand has – 70-87 months.   Judge McFadden sentenced  Hale-Cusanelli  to 48 months' imprisonment.

Notably, some of the factors that Strand likely will point to as purportedly mitigating factors here—that he himself did not engage in violence or commit property damage—were

present in the Bledsoe and Hale-Cusanelli cases as well.  Of course, if Strand had done any of those things, he would have faced additional charges.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes apply here. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096.

Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.  *Papagno*, 639 F.3d at 1096.  The MVRA applies to only certain offenses "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), such as a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii).  *See Fair*, 699 F.3d at 512 (citation omitted).  Because Strand t was convicted of violating 18 U.S.C. § 1752(a)(1) and (a)(2), which are offenses against property, the MVRA applies here.

The applicable procedures for restitution orders issued and enforced under these two

statutes is found in 18 U.S.C. § 3664. See 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Here, the victim of Strand's violations of 18 U.S.C. § 1752(a)(1) and (a)(2) is Congress.

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b).   Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).   The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), see 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic

circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h).   That latter approach is appropriate here.

More specifically, the Court should require Strand to pay $2,000 in restitution for his convictions on Counts Two and Three. This amount fairly reflects Strand's role in the offense and the damages resulting from his conduct.   Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

### VIII.   FINE

Strand's conviction under Section 1512 subjects him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider Strand's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. Strand has raised, and continues to raise, money on his website based upon his false statements and misrepresentations on the events of January 6. Strand's lawyer is court appointed, and he is not paying his own legal fees.   Strand should not be able to capitalize on his participation in the Capitol breach in this way. Financial records obtained

through a Rule 17 subpoena show that Strand has raised more than $17,300[13] for his 'legal defense' without disclosing that he in fact has taxpayer-funded counsel.   At minimum, the Court should assess a fine of at least $17,300 to preclude Strand from having profited from his crimes.   Moreover, Strand has not participated in the pretrial services interview and has not shown that he is unable to pay a fine.   The Court found that Strand qualified for Court-appointed counsel upon his arrest, but Strand in fact appears to have substantial financial means.   He currently lives in a residence that, according to public records, was purchased by a corporate entity named 'Naples Freedom Headquarters' for more than $3 million in January 2022.   Under the circumstances, a fine of $50,000, which is near the low end of the Guidelines range, is amply warranted.

## IX.    REQUEST FOR REMAND

The Government submits that, if the Court sentences Strand to a term of incarceration, he should be remanded rather than offered voluntary surrender, pursuant to 18 U.S.C. § 3143.   A defendant has the greatest incentive to flee following sentencing.   Some defendants accused of crimes arising from January 6 have indeed become fugitives.   *See, e.g.,* "California man charged in Jan. 6 U.S. Capitol riot flees to Belarus," Reuters (Dec. 11, 2021) available here https://www.reuters.com/world/us/california-man-charged-jan-6-us-capitol-riot-flees-belarus-2021-12-11/.

Furthermore, the Court permitted Strand to remain on release pending sentencing following the jury verdict on September 27, 2022.   More than eight months have passed between the jury's verdict and sentencing.   Strand has had ample opportunity to get his affairs in order and prepare for the possibility of prison, and by this submission, the Government has placed Strand on notice

---

[13] *See* Gov't Ex.1-8, showing money raised by John Strand on his website entitled: "From Gucci to Guilty". Records show that between September 2022 and April 2023 Strand has raised approximately $17,326.

that it opposes voluntary surrender.  The Government therefore submits that, pursuant to the statutory presumption, Strand should be remanded.

## X.      CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 78 months in custody, 36 months supervised release, $2,000 in restitution, and a mandatory assessment of $100 for count one (18 U.S.C. 1512(c)(2) – obstruction of an official proceeding), a $25 special assessment for counts two and three: count two (18 U.S.C. 1752(a)(1)—entering and remaining in a restricted building or grounds), count three (18 U.S.C. 1752(a)(2)—disorderly or disruptive conduct in a restricted building or grounds), and a $10 special assessment for counts four and five: count four (40 U.S.C. 5104(e)(2)(D)—disorderly conduct in a Capitol building), and count five (40 U.S.C. 5104(e)(2)(G)—parading, demonstrating, or picketing in a Capitol building).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:      _/s/ April H. Ayers-Perez_
April H. Ayers-Perez
U.S. Department of Justice
Trial Attorney
TX Bar No. 24090975
450 5th St NW, Room 11412
Washington, D.C. 20530
(202) 894-4237
April.AyersPerez@usdoj.gov

Jason M. Manning
NY Bar No. 4578068
Trial Attorney & Detailee
U.S. Attorney's Office, District of Columbia
(202) 436-5364

35

Jason.Manning@usdoj.gov