UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES                              :

     v.                                    :   Case No. 21-CR-85 (CRC)

JOHN STRAND                                :

## **DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Defendant, John Strand, through undersigned counsel, Stephen F. Brennwald, submits the following Memorandum in Aid of Sentencing, requesting that this Court impose a sentence of 60 days of home confinement[1] followed by a 12-month period of supervised release, $500 in restitution, and any applicable special assessments.  In support of the foregoing, he states as follows:

### *Introduction*

Defendant John Strand and co-defendant Simone Gold were indicted in connection with the events of January 6, 2021, at the United States Capitol in Washington, D.C.

The grand jury charged both individuals with Obstruction of an Official Proceeding, in violation of 18 U.S.C. §1512(c)(2) and 2; Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. §1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. §1752(a)(2); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. §5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building.

---

[1] *See* U.S.S.G. § 5F1.2.

Following the return of the indictment, the government informed each defendant that if that defendant entered a guilty plea to the misdemeanor charge in Count 2 of the indictment – Entering and Remaining in a Restricted Building or Grounds – the government would dismiss the remaining charges.

Co-defendant Simone Gold accepted the government's plea offer, and was sentenced to **60 days** of incarceration to be followed by a **12-month term of supervised release**.  Monetary penalties and fines were also imposed.  The government had recommended a 90-day sentence – or slightly less than a quarter of the one-year maximum penalty for that offense.

Defendant Strand chose to go to trial, and was ultimately convicted of the five charges in the indictment.  None of the charges carries a mandatory sentence.

The government now asks that Mr. Strand be sentenced to 78 months in prison – about **2,372 days - 36 months of supervised release**, $2,000 in restitution, and a mandatory assessment of $170.[2]  *The sentence the government proposes would be 39.5 times greater than the sentence imposed on his co-defendant, Dr. Simone Gold, who was the "leader" in this two-person entry into the Capitol*.

---

[2] In keeping with its aggressive approach throughout this case, the government also requests a $50,000 fine, "reasoning" that Mr. Strand lives in a home (that is not his and from which he could be removed at any time) valued at more than 3 million dollars, and that he has raised about $17,300 for legal fees although he is represented by government-funded counsel.  The government seems to forget that Mr. Strand went to trial, and will need funds to pay for appellate counsel.  No appellate lawyer in undersigned counsel's experience would handle an appeal in a case like  this for anything less than $50,000, so Mr. Strand has managed to raise, so far, only about a third of the money he likely will need for an appeal.

Mr. Strand will argue that a sentence that is somewhat less than that imposed in his co-defendant's case is appropriate as he was clearly a follower of his co-defendant on that day, following her under conditions that made him feel constrained to do so.[3]

The fact that he was convicted of more charges at trial[4] does not alter the reality "on the ground" that day – that Dr. Gold insisted on going inside the Capitol, and that Mr. Strand, who was there to protect her, as video after video irrefutably proves, felt compelled to go with her to do just that.[5]

**The Facts[6]**

Of the approximately 1,000 individuals who entered the United States Capitol on the afternoon of January 6, 2021, John Strand is, if culpable at all, certainly the least culpable of them all.  For unlike virtually every other person who entered the Capitol that day, his goal was not to cause violence, or even to voice displeasure at the results of the

---

[3] To be clear, defendant is not arguing that he has a legal basis to establish the legal defense of duress.

[4] This is not a case where a defendant who rejected a plea offer now faces a mandatory minimum, such that the trial penalty comes not from a judge, but from the defendant's choice to risk his freedom.

[5] The fact that he bragged, several hours after the pair left the Capitol, that they had "stormed" the Capitol and that former Vice-President Pence delayed the certification, while certainly **the** one piece of evidence that led to Mr. Strand's conviction, does not change the fact that Mr. Strand was bragging about something he had not actually done, but for which he was hoping to get "bragging rights."  This is clear because in the weeks and months leading up to January 6, 2021, he never once discussed the upcoming certification, or indicated that he was intent on going into the Capitol at all, much less for an unlawful purpose with a corrupt intent.  He also only learned about this delay in the hours after he had exited the building, as word was spreading throughout the crowd.  Mr. Strand's text to his brother Bobby (Gov. Tr. Exh. 342.01) was akin to a politician who votes against a bill in Congress who later takes credit for a new project in his or her district at a groundbreaking ceremony.  This will be discussed further, below.

[6] The government's presentation of "the facts" in its own sentencing memorandum is shockingly misleading, and counsel has had to restrain himself when characterizing the government's repeated inaccurate assertions.  Defendant will address the government's mischaracterizations of the facts throughout his own presentation of the facts, which are virtually all on video or contained in social media or text messages, and are, therefore, irrefutable.  Unfortunately for Mr. Strand, those representations, or misrepresentations, are repeated in paragraphs 17 to 33 of the Presentence Investigation Report ("PSR") and unless corrected, will become a permanent part of the record.  The PSR, in the aforementioned paragraphs, essentially copies, word for word (with a few words changed for grammatical purposes), the contents of an email sent by the government to the probation officer who prepared this report.  *See*, Letter from Government to Probation Office, appended hereto as Exhibit Two, at pages 2-4.  In other words, the government actually wrote the portions of the presentence report outlining what it (inaccurately) alleges are the facts of this case.  This is highly troubling, given the inaccuracies.

presidential election and its processes.[7]  And it was certainly not to obstruct the certification process, corruptly or otherwise.  He was there to provide security for Dr. Gold, whose plans to give a speech on the East side of the Capitol that afternoon were thwarted when the speech permit that had been issued by the United States Capitol Police Board was apparently canceled or revoked.[8]

At some point after Dr. Gold and Mr. Strand arrived in the vicinity of the Capitol following a series of speeches at the Ellipse, a person near Mr. Strand and Dr. Gold received a phone call saying that the speeches were canceled.  This made no sense to Mr. Strand or Dr. Gold, as the contemplated speeches involved over a dozen politicians, in addition to Dr. Gold, and had been planned weeks in advance.  Tr. 9/26/21, at 1027:6-23.[9]

Regardless, after it appeared that the outdoor speeches near the Capitol were not going to take place, Dr. Gold noticed that people were heading towards the East plaza and steps of the Capitol, and because she wanted to speak to a large crowd, Dr. Gold went in that direction.  Mr. Strand followed.  As he explained at trial:

---

[7] Mr. Strand, as his many texts and other messages indicate, was clearly very displeased with the result of the election.  As a result, he organized protests, rallies, and otherwise encouraged people to become engaged in the process of lawfully attempting to rectify what he thought was a stolen election.  His actions leading up to January 6, as will be discussed further, prove that despite some strong words, he did not intend to commit any violence on January 6, and he did not, in fact, act in a violent way whatsoever, either on that day or before that day, the government's misleading remarks notwithstanding.  He lawfully possessed a gun, and if he had been intent on acting violently that day, he could have easily brought it with him to the Capitol.  He did not, as that was not the reason he was in Washington on that day.

[8] The permit is appended as Exhibit One, though there were many permits issued for post-Ellipse events near the Capitol that day and afternoon.

[9] For the record, all references to trial testimony are cited herein as "Tr." followed by the date of the proceeding, the page in the transcript, and the relevant lines on that page.

4

```
22    Q.  Do you know why Dr. Gold went in that direction?

23    A.  Because that's where the people were going.

24            So her intention, when she got there, was to give

25    a speech to a crowd, and then she realized that all the
```

1036

```
1     crowd was going in that direction, so she went to the crowd.
```

Tr. 9/23/21, at 1035:22-25; 1036:1.

Mr. Strand was concerned about Dr. Gold's move toward the steps because as a

person trained in security procedures, he realized that this was not part of any plan they

had ever discussed.

```
23      people started moving towards the steps.

24      Q.   Okay.  And is that what you and Dr. Gold did?

25      A.   After a few minutes she turned and went that way.  I
```

1029

```
 1      mean, she gave me a look like I've got to go this direction.

 2      That's where the people are.

 3      Q.   Did you say anything to her about whether she should go

 4      there?

 5      A.   I didn't because she moved quickly and didn't give me a

 6      chance to say anything, but she saw in my face that I was

 7      concerned because I didn't know what the plan was or where
```

*Id*., at 1028:23-25; 1029: 1-7.

Mr. Strand testified that as he walked toward the steps, he did not see any see any police officers standing behind bike racks - evidence that would have indicated that the plaza area was closed.  *Id*., at 1034:7-12.

As the crowds grew bigger, they began move onto and up the stairs on the East side of the Capitol.  Mr. Strand noticed a surge, but was confused by it, as he didn't understand what was going on.  *Id*. at 1037:2-8.  He also did not have a vantage point that allowed him to see everything clearly.

Dr. Gold thus went in the direction the people went, and Mr. Strand followed her. He felt that he had to.  His testimony about the imbalance of power between himself and Dr. Strand is quite telling about the reason he followed her up the Capitol steps and eventually into the Capitol.

```
17    Q.  In your relationship between September, October,
18    November, December of 2020, did it feel to you like a
19    balanced relationship power-wise within the couple?
20    A.  No.  It felt highly imbalanced from the beginning, and
21    it always has.
```

Tr. 9/23/21 at 1014:17-21.

One must recall that the two had not known each other a long time, and that Mr. Strand was hired to protect Dr. Gold on this trip to Washington, D.C.  She was his "bread and butter."

As they got closer to the top of the steps, on the North side, Dr. Gold tried to get the attention of the crowd in order to give her speech, without success.  *Id.*, at 1038:5-7, 11-12.  Government Exhibit 307, played at trial, showed Mr. Strand filming Dr. Gold while she attempted to speak to those around her.  But people in the crowd either were not listening or could not hear her.

At this point, the two were up against the building, on the very edge of the crowd, and not in the middle or in the front of the crowd, as the government repeatedly asserts in its memorandum.  Mr. Strand explained that for the sake of her safety, he always tried to

keep Dr. Gold to the side of any crowd, and certainly away from the middle of a crowd. It is harder to keep someone safe when they're surrounded.

(Incidentally, many U.S. Capitol CCTV video clips show Mr. Strand and Dr. Gold at various locations in the Capitol, and those videos consistently show the pair standing to the side of any group of people, out of harm's way. That is why it is so disconcerting to find so many statements in the government's memorandum falsely claiming, over and over, that Mr. Strand was at the front of, or part of, a crowd that pushed past officers and overran police positions ("breaking through the security perimeter" for example).[10]  None of those statements (highlighted in footnote 10, below) is true.

Quite tellingly, the only image the government includes in its sentencing memorandum showing Mr. Strand and Dr. Gold near a crowd inside of the Capitol – except one discussed below where Dr. Gold was giving a speech - clearly shows that they are to the side of the crowd.  *See* Image 8, below.  Mr. Strand is not at the front of the crowd, nor even in the middle of it.  And he was certainly not pushing against any police officers, then or at any time that day.  The image shows the two by a wall that would

---

[10] *See* Gov't Sent. Memo. at 2:7-9 ("Strand made his way to the *front of a mob* facing off against a line of police guarding the House Chamber")("The mob, with *Strand at the very front*, violently pushed their way through the line of Capitol police officers, resulting in a head injury to Sergeant N.V."); 4:7-8 ("After *breaking through the security perimeter*, Strand walked up the 35 steps on the East Side (sic) of the Capitol and made his way to the *front of a large crowd* that was trying to breach the East Rotunda Doors (sic)"); 5:1-3 ("Strand continually *pushed to the front of the crowd*, until he was directly in front of the East Rotunda Doors (sic), which were locked. The crowd at which *Strand was in the forefront of* continued to grow"); 5:13 ("Strand made no effort" to help Officer J.P. to his feet – of course the officer was helped up by people who were closer to him within a second or two, as video demonstrated, and images 4 and 5 in the government's memorandum show Mr. Strand at that very moment attempting to protect Dr. Gold from the push of the crowd); 6:4-5 ("Strand, again, worked himself to the front of the mob"); 6:11-12 (Strand was at the forefront of the group of rioters as they pushed past the police line and made their way into the small vestibule outside the House Chamber Door (sic)"); 7:8 ("Strand had placed himself at the very front of that mob"); 10:7-8 ("Strand … stood shoulder to shoulder with rioters who tried to smash down the House Chamber Door (sic)").  Again, not one of these statements is true, and is clearly contradicted by video evidence.  .

provide security on that side of Dr. Gold's body.  (Mr. Strand is circled in yellow, with Dr. Gold immediately in front of him).  They could not be any farther away from the center of the crowd than they are in that narrow space.



*Image 8 (Still image from GX 506.1; Strand circled in yellow)*

Another remarkable point that can be gleaned from the above image is that Mr. Strand's vantage point, vertically-speaking, was very limited.  This is true of many of the events that occurred both outside and inside the Capitol that day.  While those of us who have reviewed video evidence of the events after the fact have had a bird's eye view of many of the events that transpired, that was not the view Mr. Strand enjoyed throughout his time in the Capitol.

In its memorandum, the government also shows an image of men inside the House Chamber with guns drawn, dramatically proclaiming that their guns were "pointed at the rioters, including Strand, on the other side of the door…." *Id*. at 7:12-13.  It never acknowledges that a) Mr. Strand had no idea what was on the other side of those doors;

b) he was not at the front of the group of people who were up against those doors (as demonstrated by the image on page 8 of the government's memorandum); and that c) Mr. Strand did not even know where he was within the Capitol at that point in time.[11]

Finally, and rather ironically, the only times that Mr. Strand was standing at the front of a crowd was when Dr. Gold was giving her two speeches inside of the Capitol. And those two different groups of people clearly were not attacking any officers, pushing past anyone, or becoming unruly.

The video from which the still shot below was taken yet again confirms, however, that it was Dr. Gold, not Mr. Strand, who wanted to be inside the Capitol that day after she was denied her chance to speak outside of the building and was unable to attract a crowd at the top of the East Rotunda steps.  This is evident from the fact that when officers tried to get her to stop speaking and clear the room, as shown in image 9, she did not move immediately (this is clearer in the video recording of the event), and was pushed out of that room by the police.  Mr. Strand, on the other hand, stopped filming immediately and moved out of the room in conformity with the officers' directives.

---

[11] Defendant realizes that the government is attempting to represent its client (the people) zealously, but that does not give it license to advance not only partisan, but incorrect, claims against a defendant.  This proceeding affects a person's liberty, and is not a game to be won.



*Image 9 (Still image from GX 407.01; Strand circled in yellow)*

Thus, despite all of the government's over-the-top assertions about Mr. Strand's actions that day, the evidence shows that none of them are true.

All of the video recordings show that Mr. Strand did not assault anyone, push any officers, attack officers, go to the front of any line, lead others in a push against the police, go to the front of the crowd to storm the Rotunda doors, destroy any property, yell and scream and incite the crowd, encourage others to commit any unlawful acts, or otherwise engage in any activity that was dangerous or threatening to life or property. This is irrefutable.

Likewise, he did not enter the Capitol carrying a flag, a flagpole, zip ties, a knife, a gun, a stun gun or taser, pepper spray, a baseball bat, a baton, brass knuckles, scissors, needles, a screwdriver, or any other weapon.  This is also irrefutable.

He did not wear body armor, a gas mask, a ballistic helmet, camouflage clothing, a Trump shirt or flag, a "back the blue" flag, "army" boots, or any other accessory that would indicate that he came prepared for "battle."  This again is irrefutable.

His behavior was very different than the vast majority of those who went into the Capitol, and his clothing, as well as that of co-defendant Simone Gold, distinguished them from everyone else in the crowd.

As Officer Joseph Pitts, who testified at Mr. Strand's trial about Mr. Strand and Dr. Gold's appearance, said:

> "There were two individuals that really stood out to me because they were dressed completely different than anybody else.  Like I said earlier, most of the people there were wearing like tactical vests and helmets.  These two individual were wearing leather jackets and had like Top Gun aviator sunglasses on."

Tr., 9/21/21, at 645:6-11.

With respect to any organizations, Mr. Strand was never aligned, nor did he communicate, with any group that had spent months planning a violent response to the election, such as the Oathkeepers, the Proud Boys, the Three-Percenters, or any other group.  The only group he was aligned with (other than America's Frontline Doctors – a non-violent group of medical professionals) was the group that organized peaceful rallies in Beverly Hills in the weeks that followed the November election.



As the date stamp on the foregoing image shows, Mr. Strand organized this rally a mere three days after the November 3, 2020, election.  There is no reference to war, to an insurrection, or to any other type of violent activity.



The foregoing image also shows Mr. Strand's mindset following the election.  In it, he tells his mother, Claire Strand, that they will have the BHFR – or Beverly Hills Freedom Rally – every Saturday "to equip citizens to get involved in community outreach and local governance."

There is no question that Mr. Strand was very upset about the outcome of the election, as were tens of millions of Trump supporters.  And Mr. Strand did use strong words in some of the messages he sent in the following weeks, including the word "war." But that word is often used in a philosophical way, rather than a military sense (like the expression "fight for your rights," for example).

But it is beyond clear that whatever he was thinking and feeling about the election on January 6, 2021, he did not go to Washington, D.C. on that day to engage in violence, or even to protest inside or outside of the Capitol.  He was there solely as a helper and protector of Dr. Gold, who had given a speech to a large crowd on January 5, and was scheduled to be among a group of speakers who had been given a permit to speak on the East side of the Capitol (but not within the plaza area) that afternoon.[12]

The following text, sent the day before January 6, 2021, explains his entire reason for being in Washington, D.C. on January 5 and 6, 2021.  Notice the reference to "protest speakers" (again, this is referring to January 6, 2021 – not to some prior political rally).

---

[12] Again, defendant is aware of the text he sent more than two hours after he and Dr. Gold left the Capitol talking about Pence delaying the certification.  As noted above, and discussed further below, the statement was pure braggadocio, and an attempt to take credit for something he had never intended to do.



So while the government points to Mr. Strand's heated rhetoric following the election, it is beyond clear that Mr. Strand never discussed or contemplated any intent to try to block or delay the certification proceeding.  It is true that ***after the fact***, like a politician claiming credit for a project he did not vote for, Mr. Strand tried to take credit for the delay in the certification process.  And that, based on the first jury note, clearly resulted in his conviction on the obstruction charge.  But that was never his intent.  It was merely his attempt to make himself appear more important in the political process than he really was.

When Mr. Strand sent this text to a friend, he obviously did not know that it would be found through an FBI search of his phone and computer so he had no reason to create a reason or pretext (i.e., that they were there for a speech) that he could later use at trial as an excuse for entering the Capitol.

With respect to Mr. Strand's claim that he was in Washington, D.C. on January 5 and 6, 2021, to provide security for Dr. Gold, defendant notes that when the FBI searched his residence, agents found his valid and then-current security and investigations license, as well as his permit to carry a firearm.



These items show that Mr. Strand was not simply someone who claimed he could provide security to Dr. Gold, but who was State-approved to do so, with a firearm no less. (Of note, Mr. Strand's California firearm license likely would have allowed him to bring his firearm to the District or to request a permit to bring it into the city, but he did not do so, as he was not intent on committing violence, and did not think that he would need a firearm to protect Dr. Gold while she was in Washington, D.C.)

The following photographs – clips from Capitol video footage – show Mr. Strand in an active protective stance as Dr. Gold entered and made her way through the Capitol.

Literally no one else who entered the Capitol that afternoon is seen on any video recording overtly and physically protecting one of their friends or associates in this manner.  Thus further proves Mr. Strand's claim that he was providing security that day.







Incidentally, this last image shows a glove on Mr. Strand's right hand.  This is

significant because, at trial, the government played a video that showed Mr. Strand and

Dr. Gold in the crowd that has massed outside the East Rotunda doors sometime after 2

p.m.  That video shows a man the government claimed was Mr. Strand repeatedly

shaking his fist in the air as the crowd chanted a political refrain over and over.

When the defense presented its case at trial, it showed conclusively that the person

who  raised his fist was not wearing any glove at all, and therefore could not have been

Mr. Strand.  This picture, along with a picture of Mr. Strand in the Rotunda, proves in yet another way that Mr. Strand did not, contrary to the government's contention, come to the Capitol on January 6, 2021, to engage in violent protest – a theme the government so desperately continues to pursue in its sentencing memorandum notwithstanding all of the evidence to the contrary.

The government also repeatedly, and incorrectly, claims in its sentencing memorandum that after Mr. Strand and Dr. Gold entered the Capitol, they "made a beeline for the House Chamber."  The government knows that this is not true because it has seen Mr. Strand's text message indicating to a friend after he left the Capitol that afternoon that he did not know exactly where he had been inside the Capitol.



Mr. Strand never thought that any of his private messages would be read by anyone but the intended recipient, so he was not self-censoring when he wrote the message shown above.  He literally did not know where he and Dr. Gold were, or were going, when they walked through the Rotunda, and away from the chaos at the East

Rotunda doors. And he certainly had no idea that he and Dr. Gold ended up outside of the House Chamber.

As was revealed at trial, there are no signs above the hallways in the Capitol indicating which way one should go to find the House Chamber.  Thus, for the government to continuously state – five times[13] alone in its sentencing memorandum – that Mr. Strand and Dr. Gold "made a beeline to the House chamber" as if they knew where they were going, overtly implying that they went there specifically to obstruct the certification process, is beyond the pale.

The "beeline" statements are particularly galling because it is clear that the government knows that the Capitol building is a large and confusing place where people often get lost.  At trial, the government, on direct examination, asked one of its own witnesses, Officer Brockwell, about the Capitol building, and **whether it was easy to get lost in the building**.  The exchange went as follows:

---

[13] This incorrect claim concerning a material fact (since, if true, it would support the argument that Mr. Strand intended to obstruct the certification process) is found in the government's sentencing memorandum on page 2, at line 4, page 6 at line 1, page 16 at lines 1 and 3, and page 21, in the third line from the bottom.

```
 9      Q.   Is the Capitol building big?

10      A.   It is.

11      Q.   Is it complex?

12      A.   It is.

13      Q.   Is it easy to get lost in?

14      A.   It is.

15      Q.   Are there a lot of hallways?

16      A.   A lot of hallways, a lot of offices, yes.

17      Q.   Okay.  Have you ever gotten lost in there maybe when you

18      first started?

19      A.   When I first started, yes.  You get turned around quite

20      frequently.

21      Q.   Do you see other people who sometimes get turned around

22      after they first start?

23      A.   Yes.
```

Tr. 9/22/21, at 753:9-23.

On cross-examination, the officer acknowledged that if one was in the Rotunda,

and had never been there before (as was the case with Mr. Strand), it would not be easy to

know where one was going if one walked in a certain direction.

```
11      Q.   Yes.  If I was there on January 2, 2021, and I'd never

12      been there before, and I find myself in the Rotunda, would

13      it be clear for me what would happen if I went in this

14      direction and that direction and how I could get to

15      different places in the Capitol?

16      A.   No.
```

Knowing all this, and having seen Mr. Strand's text message that said "I was not near the chamber where Cruz/Congress were meeting, *as far as I know*," there is simply no excuse for the government to insinuate and argue repeatedly that Mr. Strand "made a beeline for the House Chamber" as if he knew where he and Dr. Gold were going.

As Mr. Strand testified, he was trying to get Dr. Gold away from the pack of people who were being squeezed through the Rotunda doors.   Once they were in, they tried to keep ahead of that mob by going through the Rotunda to a place where there was less chaos.  The Rotunda, at that point, was not terribly crowded, but it also did not provide an immediately-obvious exit point, so there was no point in stopping there.

Another critical item of evidence regarding any purported intent to obstruct the certification proceeding is the video recording taken outside of the House Chamber.  That recording shows that while Mr. Strand and Dr. Gold did end up outside the Chamber, after they were there for a little while, and the crowd appeared to be able to go no further, they actually both walked back out of the view of the camera, and into Statuary Hall, as they were attempting to determine whether they could now walk back out of the Capitol the way they came in.  When they realized that that was not possible, based on the number of people still flowing through the Rotunda, they came back to the area outside the House Chamber and stood to the side of the crowd.

When a lone officer eventually told the crowd that they should go back the other way, Mr. Strand (and Dr. Gold) went back the other way.  He never pushed any officer in an attempt to get into the House Chamber, nor did he encourage anyone else to do so. Any claim to the contrary is completely false.  He also never led a mob or a group of

people to push against any police officer(s) anywhere in the building, and he never placed himself at the front of a crowd in order to carry out any such actions. Had he done so, he would have endangered Dr. Gold, and diverted from his mission that day, which was solely to protect her.

The government's assertion that Mr. Strand and Dr. Gold made a beeline to the House Chamber is intended to go to the heart of the matter in this case – whether Mr. Strand corruptly intended to obstruction the certification process. The government knows full well that its argument in this regard is not only unsupported by the evidence, but clearly contradicted by video and textual evidence. Yet it persists in making it in order to try to impute knowledge to Mr. Strand that he did not have, and actions that he did not undertake.

As clearly shown earlier, Mr. Strand's intent on the afternoon of January 6, 2021, was solely to protect the safety of his co-defendant, Dr. Simone Gold. And her intent was to give a speech – if not outside, as previously planned, then anywhere she could find an audience.

### *Stop the Steal*

Defendant needs to emphasize that the phrase "Stop the Steal," as used in the days and weeks leading up to the rally, as well as on the day of the rally itself, was not a reference to criminal activity, including any riot at the Capitol.

Whoever coined the phrase, it was meant to designate various individuals' efforts, including those of lay people, news personalities, politicians, trial lawyers, and others to try to legally and politically fight against what they saw as an unfair election.

That is why several news networks (Fox News, Newsmax, ANN, etc.) ran stories claiming that the election had been "stolen."

That is also why former president Donald J. Trump filed a series of lawsuits in battleground states challenging the validity of the vote count, or the process by which elections were conducted.  Republican politicians in a number of states vowed to investigate the claimed results, and some held hearings, including in Pennsylvania and elsewhere.  Witnesses advanced all manner of theories about disappearing ballot bins, mysteriously-appearing suitcases, cross-border-voting, voting by deceased individuals, and more.

Then-President Trump continuously kept the issue in the news, and every conceivable legal effort to overturn the election results was undertaken, including an attempt to convince former Vice-President Pence either not to certify the election, or to count several states' "alternate electors" in Mr. Trump's favor.

Finally, even on the fateful day, several congressmen and senators raised objections to the certification of the vote count of certain states.  This was done in an attempt to stop or slow down the certification of the official proceeding, though it is permissible by law.  The point is that many people tried to use lawful means to "stop the steal," so it was not a phrase that referred to an attempted insurrection or a riot.

When the legal efforts in state and federal courthouses failed, the former president announced that there would be a big rally in Washington, D.C. on January 6, 2021.  He predicted that it "would be wild."  Mr. Strand had no idea how wild it would become.

Defendant emphasizes the foregoing because many people today harbor the false belief that the phrase refers only to the events that took place on January 6, both at the Ellipse and at the Capitol, and conclude that anyone who went to Washington, D.C. on that day went there with the intent to obstruct the certification proceeding.  That is not true, and it wasn't true of Mr. Strand.

When Mr. Strand and Dr. Gold went to Washington, D.C. for the Stop the Steal rally, they were not signing up to storm the Capitol, or to obstruct the certification proceeding.  They were there so Dr. Gold could speak.  And she did speak on January 5, 2021, and was going to speak again on January 6, 2021, along with more than a dozen politicians and "personalities."

Even more important is the fact that Dr. Gold was not in Washington, D.C. on January 5 and 6 to give a political speech, but to talk about her medical views on vaccines.  Dr. Gold is not against vaccines at all, but is against "mandatory" vaccines, and laws that prevent people from participating in certain activities (flying, attending church, etc.) if they are not vaccinated.

Because of her strong medical and philosophical views about the issue of "medical freedom" (thus the Beverly Hills Freedom Rally), she wanted to come to Washington, D.C. to speak to thousands of people about an issue close to her heart.

She is extremely passionate about this issue, and that is why when her plan to speak to crowds outside the Capitol on January 6, 2021, was thwarted for an unknown reason, despite there having been permits for such a speech, she was determined to "get her message out."  And that is why, when she found out that there would be no speeches

at the location to the Northeast of the Capitol where a permit had previously been granted, and she saw people going towards the East Rotunda steps, she decided, at that moment, to go to those steps and try to give a speech there.

As testimony at trial revealed, she had spoken to a crowd in Tampa, Florida, on January 3, 2021, and was scheduled to fly back to Florida for another speech about this topic on January 8, 2021.  Tr. 9/23/21 at 1016:8-14.[14]  Giving speeches was not a foreign concept to her, and was, in fact, an important way for her to spread her message.

Mr. Strand just happened to have been providing security for her that day, and was put in the unenviable position of either abandoning her when she went towards the Capitol steps, attempting to physically pull her away from the Capitol – something that would have likely cost him his job, or go with her and try to make sure she was safe from any harm (as she had received threats from various quarters because of her message).

He made his choice, and the rest is history.

### Applicable Law

### A.  Applicable Law

The United States Supreme Court declared, in *United States v. Booker,* 543 U.S. 220 (2005), and then reiterated in *United States v. Rita,* 551 U.S. 338 (2007), *Kimbrough v. United States,* and *Gall v. United States,* 552 U.S. 38 (2007) that judges have absolute discretion when fashioning sentences pursuant to the United States Sentencing Guidelines.

---

[14] It would be strange indeed for someone who had spoken at a rally several days before January 6 and who intended to speak at another rally two days later to decide to participate in an insurrection in between.

This Court, however, must adhere to the statutory requirements delineated in 18 U.S.C. § 3553(a).  Having done that, a judge is free to sentence a defendant who does not face a mandatory-minimum sentence to any sentence that "…is sufficient, not greater than necessary, to comply with the purposes" of federal sentencing.  *Id*.

The factors the Court must consider include:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed—

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

> (B) to afford adequate deterrence to criminal conduct;

> (C) to protect the public from further crimes of the defendant; and

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

>> (i) issued by the Sentencing Commission …

(5) any pertinent policy statement …

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

 (7) the need to provide restitution to any victims of the offense...

***The Sentencing Guidelines***

The base offense level for the obstruction charge, pursuant to U.S.S.G. § 2J1.2(a) is 14.

### *Enhancements Regarding "the Administration of Justice"*

The probation office and the government argue for an eight-level enhancement under § 2J1.2(b)(1)(B) – Causing or Threatening to Cause Physical Injury or Property Damage, as well as a three-level enhancement under § 2J1.2(b)(2) – Substantial Interference with the Administration of Justice.

U.S.S.G. § 2J1.2(b), subtitled "Specific Offense Characteristics," provides three scenarios in subsection (1) under which an enhancement from the 14-level base offense level is appropriate.  The first relates to sex offenses (resulting in a four-level enhancement under (b)(1)(A)), the second addresses physical injury to persons or property damage "in order to obstruct the administration of justice," (resulting in an eight-level enhancement under (b)(1)(B)) and the third addresses obstruction in the context of domestic or international terrorism (for which a twelve-level enhancement is warranted under (b)(1)(C)).

Subsection (2) addresses the "substantial interference with the administration of justice." U.S.S.G. §2J1.2(b)(2).

It is evident from the application notes that the term "administration of justice" in both sections has a limited reach, and applies to legal proceedings, not congressional proceedings. Application Note 1 gives examples of different types of "substantial interference with the administration of justice," which is obviously a greater act than a "less substantial interference" with the administration of justice.  And under the broader category of "substantial interference" the notes specify that the types of acts contemplated all relate to judicial proceedings.

They include:

"Premature or improper termination of a felony investigation."

"An indictment."

"A verdict."

"Any determination based on perjury, false testimony, or other false evidence."

"the unnecessary expenditure of substantial government or court resources."

U.S.S.G. § 2J1.2, comment. (n.1).

This makes it clear that the term "administration of justice," as used in U.S.S.G. § 2J1.2, does not encompass a congressional proceeding as not a single example even references a colorably quasi-judicial type of proceeding in Congress (such as, for example, a fact-finding hearing).[15]

And even where a defendant engaged in any of those types of acts in the context of a judicial proceeding, the base offense level of 14 should only be increased by three levels.

Here, the government and the probation office state that both enhancements should apply, resulting in an eleven-level increase.

Neither enhancement is warranted, or appropriate under the law.

Even if the certification proceeding would qualify under the "administration of justice" standard, Mr. Strand's conduct on January 6 did not involve "causing or threatening to cause physical injury to a person, or property damage."  In fact, not only did Mr. Strand not cause or threaten to cause physical injury to anyone, or damage property, he did not even encourage, aid, abet, or otherwise indirectly commit any such acts.

---

[15] Another judge in this Court, in the case of *United States v. Joshua Black*, 21-CR-127 (ABJ), recently stated that guideline 2J1.2 did not apply in Mr. Black's case (because he was acquitted of the obstruction count) but that even if it had, she would not have applied either the eight or three-level enhancement because the defendant had not committed any such acts *and* the term "administration of justice" did not include congressional proceedings. Counsel did not witness the sentencing hearing, and does not have a copy of the transcript of that proceeding, so his representations here are based on a report from the attorney who represented Mr. Black at sentencing.  The attorney, however, is an attorney whose judgment and reports counsel trusts.  Interestingly, in the sentencing memorandum filed by the government in Mr. Black's case, it makes the same conclusory statement that "the administration of justice" is synonymous with "official proceeding."  *Gov. Sent. Memo*. at 24-26.

An analysis of this guideline and its potential enhancements probably provides another reason why the government misstates the evidence against Mr. Strand so often throughout its memorandum. Because the video evidence does not show Mr. Strand pushing any officers, threatening any officers, or otherwise committing any act that could qualify under this enhancement, the government is left simply to argue otherwise, and claim that he did, in fact, engage in such acts. But defendant's memorandum clearly demonstrates that this is not the case.

For those reasons, neither the eight-level nor the three-level enhancements here is warranted.

Defendant also notes that the government does not cite a single case in support of its argument that the certification proceeding constitutes "the administration of justice." It merely makes a conclusory statement that "[f]or the purposes of this enhancement, the 'administration of justice' is synonymous with 'official proceeding' as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a 'proceeding before the Congress, § 1515(a)(1)(B)" again without citing any cases, application note, or other authority. Defendant agrees that the term "official proceeding" is defined in the foregoing statutes as including "a proceeding before the Congress."[16] That does not lead to the conclusion that "a proceeding before the Congress" constitutes "the administration of justice."

### Enhancement for Obstruction of Justice

The two-level enhancement sought by the government pursuant to U.S.S.G. § 3C1.1 is admittedly a closer call.

It is true that Mr. Strand testified at trial, and it is true that he maintained his innocence during his testimony.

---

[16] Defendant argued in a pretrial motion, and continues to argue, that the certification proceeding at issue here does not constitute a "proceeding" before Congress, and he does not waive that argument.

The government argues that the jury necessarily disbelieved his testimony about the certification process, and points to Mr. Strand's social media pronouncements to prove its point. Its point is not well taken.

Those posts (found on pages 19 of the government's memorandum) point to someone who was upset about the election, and believed that people needed to stand firm for the truth. They say nothing about the certification process, and it is clear that if Mr. Strand had intended to encourage people to resist the certification proceeding, he would not have been shy about saying so. But he said nothing about it because he did not understand the process or how it worked.

He did brag about the delay after the fact, but as noted above, one has to consider his audience, and his desire to take credit for something he thought the other person would like.

Thus, his testimony in that regard was not false.

In this vein, it is important to recall the bizarre question in the first jury note. Apparently finding no basis to convict Mr. Strand of the obstruction count, given his lack of statements before January 6 about the certification process, and the absence of actions indicating any such intent on January 6, it reached out to the Court to ask whether it could convict Mr. Strand on the basis that he may have formed the intent to obstruct the proceeding *after* he left the Capitol that day, rather than before he went in. The note said:

**NOTE FROM JURY**

Judge Cooper

Can intention be defined as occurring after its corresponding action? For example " could one take a walk without the intention of getting exercise" then say there intention was to " get some exercise", after they took the walk?

31

The note is puzzling and troubling because this Court had already clearly defined the concept of intent, including in the context of the obstruction charge.  Thus, the jury here wondered if Mr. Strand could be convicted even if he had had no intent to obstruct the proceeding before he went into the Capitol but then claimed afterward that he had had that intent.

Defendant realizes that the Court attempted to clarify the issue for the jury, but it is clear that the jury did not believe that the evidence it possessed showed that Mr. Strand intended to obstruct the proceedings before he went in, and while he was in, the Capitol.

Because of the confusion surrounding this issue, one cannot be confident that the jury understood the law, or actually disbelieved Mr. Strand.

The government next argues that Mr. Strand did not tell the truth when he stated that the crowd forced him into the Capitol.

This is the only portion of Mr. Strand's testimony that is arguably questionable, objectively speaking.

In responding to the government's claim in this regard, undersigned counsel notes that he has spoken with a number of January 6 defendants who were on those East Rotunda steps that day.  Counsel has been struck by the number of defendants – none of whom knew each other or had spoken to each other - who also related having felt this incredible push at their back as the East Rotunda doors opened and the crowd surged through.  Again, none of these people knew each other, as they came from different parts of the country.  But for some reason, despite video evidence appearing to show that there were spaces in parts of the crowd, many people felt that they were not in control of their bodies for a period of time.

That is not to say that those individuals did not voluntarily walk up the steps to the doors in the first place, but there again, many of them arrived after 2 p.m. (like Strand and Gold), by

which time the bike racks had been knocked over or pushed aside, so they did not see the barriers that had been placed in area of the East Plaza.

Video evidence at trial also showed that the East Rotunda doors were opened by an individual from the inside.  That would have made it appear to the crowd outside that they were being officially let in.

In footnote 5 of its memorandum, the government also argues that Mr. Strand was not truthful when he claimed that Officer Pollitt merely tripped outside the East Rotunda doors. Evidence showed, however, that the officer lost consciousness, which, to Mr. Strand, would have easily appeared to be a trip and fall.  Evidence of this loss of consciousness appears in an email sent by a United States Capitol Police Officer (Ofc. Smither) on January 10, 2021, at 15:34, to FBI Special Agent Stewart Curcio, provided to the defense as Jencks.

At this time an unknown individual that was with another white male in a gas mask and military helmet sprayed Pollitt with OC Spray.

Pollitt stated that he then blacked out. When he regained consciousness, he was no longer in the door foyer area

This "Pollitt narrative" is just another example of the government's attempt to make up for the lack of evidence that Mr. Strand was violent or hostile that day.  It used the same argument against Dr. Gold at sentencing, falsely claiming that she and Mr. Strand ignored the officer's plight and walked past him into the Capitol.  The truth, of course (reflected on video) is that the officer fell toward their left, and was immediately surrounded by other people in the crowd who pulled him to his feet in a matter of seconds.

This Court undoubtedly has a good memory not only of Mr. Strand's testimony, but also of his demeanor on the stand.  And counsel submits that when Mr. Strand had finished testifying, no one in that courtroom, with the possible exception of government counsel, had the feeling or the thought that Mr. Strand had made a mockery of his oath to tell the truth.  He was composed,

straightforward, logical, sensible, and reasonable.  Again, the only aspect of his testimony that anyone might question concerns this idea of being pushed into the Capitol, but counsel submits that while that may be a basis to deny him a reduction for acceptance of responsibility, it is not a basis to enhance his offense level by two levels for obstruction of justice.

Mr. Strand thus calculates his offense level at level 14.  Given his lack of any criminal history, he submits that his guideline range is 15 to 21 months on Counts One, Two, and Three. Counts Four and Five are not subject to a guideline analysis.

### *The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant*

Defendant has already discussed the nature and circumstances of the offense extensively. To some degree he has also already discussed his history and characteristics.  He appends hereto, however, a more complete outline of his life, including his family background, work history, and other important details about his past, attached as Exhibit Three.

Defendant notes at this juncture that all of this information would have been included in this report had he ever been notified of a date and time for an interview with the probation office. That never happened, through no fault of Mr. Strand whatsoever.  Mr. Strand was indeed waiting for months for any notification that an interview had been scheduled.  His wait was in vain.

The government is fully aware of this, as undersigned counsel spoke face to face with the government about the fact that Mr. Strand had never been given a date and time to participate in an interview.  Defendant was shocked, therefore, when he found out he was being blamed for not having participated in an interview he never knew about, and that was never scheduled.

Despite having this information, the government, in its sentencing memorandum, writes the following in footnote 5:  "Additionally, in the **six** months since a jury convicted Strand, Strand has not agreed to sit down with Probation and be interviewed by Probation. PSR ¶ 65."

(Emphasis in original.)[17]   The government then adds that because of this, and for other reasons, Mr. Strand should not receive an adjustment for acceptance of responsibility.

That is a stunning assertion given the government's knowledge that its claim is untrue.

For the purposes of this §3553(a) factor, defendant concludes by saying that he stands by his discussion of the nature and circumstances of the offense as he has described them in the factual portion of this memorandum.  He maintains that the facts of his case show that if he was in any way culpable for his actions on January 6, 2023, he is the least culpable person who entered the Capitol that day.

Because he has no criminal history, but has worked hard his whole life, he submits that the proposed sentence of 60 days of home confinement, followed by a period of supervised release or probation, as well as a $500 fine, would represent a fair sentence in this case.

### *The Proposed Sentence Would Reflect the Seriousness of the Crime*

This memorandum has already addressed the "seriousness of the crime," or lack thereof, as it pertains to Mr. Strand.  It has argued that compared to the conduct of all of the other defendants who entered the Capitol on January 6, 2021, Mr. Strand's conduct was about as "innocuous" as any conduct could have been.

He did not assault anyone, destroy any property, push any officers, help others push any officers, throw any object, chant any chant, raise his fist or arms in anger, shout or berate any law enforcement officer, or remain in an area when he was told to leave. He also did not destroy any evidence of his participation in that day's events, as he did not believe he had committed any crime.

---

[17] Once again, how does the government include such an incorrect statement in its memorandum?

He also did not enter into any sensitive areas, such as the Senate Chamber (as others had done), any congressional office, or other similar room.

He also had no idea where he was within the Capitol, so his presence near the doors of the House Chamber is of no moment.

Finally, he never participated in any criminal actions undertaken by others in that vast crowd.

The government also points to acts of violence committed by others in the crowd, and attempts to impute responsibility for those acts onto Mr. Strand.  That would be highly inappropriate under the circumstances of this case.

Counsel recalls the protest marches in January 20, 2017, when hundreds of thousands of people marched to protest the election of the former president.[18]

During that march, some in the crowd stepped a few feet away from the larger group and broke large plate glass windows in banks and in coffee shops.  One could argue that the mere presence of so many angry or passionate people in the crowd of marchers on January 20, 2017, somehow emboldened these (apparently Antifa, based on their clothing) individuals to become violent, but that would not be a fair assessment of the alleged role of the crowd in that march.  Nor is it fair to impute the actions of others in the Capitol on January 6, 2021, to Mr. Strand.

---

[18] Undersigned counsel represented two separate defendants in connection with that prosecution – one person who was merely marching with the crowd, and another who allegedly broke a huge plate glass window at a Bank of America branch.  Thus, counsel is intimately familiar with the facts underlying that prosecution, and is able to make an informed comparison between that event and this one.

While it has become a common refrain to say that "a mob isn't a mob without the numbers," a large group of people who are not attacking any police officers or destroying property should not be automatically accused of unwittingly encouraging troubled individuals in their midst or their vicinity who commit such acts.

Mr. Strand certainly never said or did anything that would have encouraged or caused anyone else to commit acts of violence, but his mere presence among the crowd is being used to paint him as an aider and abettor of terrible acts perpetrated by deranged individuals. That is not appropriate, or just.

In light of all of this, Mr. Strand submits that a sentence of 60 days of home confinement, a twelve-month period of supervised release or probation, along with a fine of $500, would be sufficient, but not greater than necessary, to achieve the goals enumerated in 18 U.S.C. § 3553(a).

### The Proposed Sentence Must Also Promote Respect for the Law, Provide Just Punishment to Mr. Strand, and Deter Criminal Conduct, both by him and by Others.

These three goals would be met through the imposition of the proposed sentence under the particular circumstances of this case, for the same reasons presented above.

Notably, and perhaps counter-intuitively, respect for the law is actually *diminished* when a sentence is unfairly high. Here, people following Mr. Strand's case could fairly wonder why someone who went into the Capitol to provide security to Dr. Gold, who had no idea where he was going, who committed no acts of violence or encouraged others to do so, who was not dressed for battle, who did not bring any weapons or items that could be used as a weapon, and who had to wait approximately 15

37

minutes by the exit doors until there was enough space for him and Dr. Gold to leave, should receive more than the proposed sentence.

Again, Mr. Strand's conduct, before, during, and after the relevant events, could not have been any more innocuous than it was.

**_The Need to Protect the Public from Further Crimes_**.

Mr. Strand has been on pretrial release for over 28 months without a single violation.[19]

While he has remained "free," he has experienced a great deal of stress because of the charges and the constant reminder that he is under court supervision.

Moreover, he is now a convicted felon, a status that not only carries a great stigma, but will limit his employment opportunities for the rest of his life.

Mr. Strand has learned a very hard lesson as a result of his experience in Washington, D.C. on January 6, 2021.

In addition to having been unfairly portrayed by the government at trial and in general, he has been the subject of ridicule and mockery by news organizations and many private individuals.  His face has appeared in wanted posters, in tweets, and in other social media in a very unflattering and often libelous way.

And he now faces sentencing in one felony and four misdemeanor cases.

Thus, Mr. Strand has already suffered serious consequences, both professionally and personally, as a result of his presence at the Capitol on January 6, 2021.

---

[19] Paragraph 8 of the PSR claims that Mr. Strand failed to report on one occasion.  Mr. Strand states that he sent a screenshot to his supervising officer showing a "missed call" by Mr. Strand to the agent.

Further punishment is not required.

***The Court's Duty to Provide the Defendant with any Necessary Educational or Vocational Training, Medical Care, or Other Correctional Treatment***.

Defendant submits that, thankfully, he is not in need of any educational or vocational training services, or specific medical care.

***The Need to Avoid Unwarranted Disparities***

This factor is often the most difficult one to evaluate, given the differences between defendants in cases such as these.

This case is different, as Mr. Strand had a co-defendant who has already been sentenced. That co-defendant, Dr. Simone Gold, was clearly the reason Mr. Strand was at the Capitol on January 6, 2021, and the balance of power in their relationship tilted heavily in her favor. That is why, when she decided to walk toward the East plaza of the Capitol, Mr. Strand felt a great deal of pressure, as well as a professional responsibility, to follow her in order to ensure her safety.

As Mr. Strand explained at trial, that had never been a part of the plan, given the speech permits that had been granted before that day. But plans change, and Mr. Strand reacted quickly, following Dr. Gold wherever she went, and keeping his arms around her while looking out for unexpected dangers.

Dr. Gold, as noted earlier, received a 60-day prison sentence for her behavior, and she was the "leader" in this group of two. It would stand to reason that Mr. Strand should receive a lesser sentence. After all, they both engaged in exactly the same conduct that day, though Dr. Gold was the reason that both of them went into the Capitol.

It is true that Mr. Strand chose to go to trial, and was convicted of a felony offense.  But there should not be a "trial penalty" because of his decision to exercise his constitutional right to a trial.

Sometimes a defendant creates his or her own trial penalty when rejecting a plea offer that would have avoided a mandatory-minimum prison term.  That is not the case here, as there is no mandatory minimum sentence for any of the offenses of conviction.

The government has argued that Mr. Strand should receive a greater punishment because he denied his criminal responsibility.  However, he already faces a higher guideline range because he cannot receive a two-level reduction for acceptance of responsibility.  Had he received such a reduction (only two levels here given the starting offense level of 14), he would be facing a guideline range of 10 to 16 months, rather than 15 to 21 months.

A case that is somewhat comparable to this case is the case of *United States v. Robert Packer* (21-CR-103 (CJN)).

Mr. Strand's case is comparable in the sense that Mr. Packer never committed any acts of violence, but he was very close to the doors to House Chamber, albeit, like Strand, unwittingly.  In fact, Mr. Packer was right outside of those doors at the very moment that Ashley Babbitt was shot and killed.

Like Mr. Strand, Mr. Packer had no idea where he was within the Capitol.  And like Mr. Strand, Mr. Packer did not wear any tactical or other military type of gear.  What he did wear was a highly offensive shirt with the words "Camp Auschwitz – Arbeit Macht Frei."  He received a sentence of 75 days in prison, and the shirt was surely an

important factor in the imposition of that sentence, given the absence of any other aggravating factors.

The government points to several cases in its analysis of this sentencing factor, none of which bear any resemblance to Mr. Strand's case.

For instance, the government shockingly points to the case of *United States v. Timothy Hale-Cusinelli* (21-CR-37(TNM)) to support its 78-month recommendation. Mr. Hale-Cusinelli is the "Hitler lookalike" whose face has been splashed all over the media since January 6, 2021.



Aside from the fact that the judge in that case imposed a sentence of 48, rather

than 78, months, there are serious differences between these men's cases.

First, Mr. Hale-Cusinelli recorded video of himself screaming at United States

Capitol Police officers, and chanting "Stop the Steal" with other individuals.  In one of

the videos, he screamed "Fuck you! The revolution will be televised, cunt!" at a police officer guarding the West front of the Capitol.

Second, Mr. Hale-Cusinelli was seen on CCTV footage waiving his arms in an attempt to get others to "advance" into the Capitol because, as he said, "we need more people."

Third, while a Capitol police officer was attempting to arrest  someone who was aggressively resisting arrest, Hale-Cusinelli tried to pull the putative arrestee away from the officer.  Thus, the government's representation that Mr. Hale-Cusinelli did not engage in violence is incorrect.

Fourth, Hale-Cusinelli left the Capitol by climbing through a window.  After he had left the building, he picked up a Trump flag that he found outside and took it home with him.

Fifth, he was recorded in a conversation in the days after January 6 telling another person that "I really fucking wish there'd be a civil war."  He made other similarly disturbing comments as well.

All of the foregoing points to a person who was at the Capitol to help lead a revolution, not, like Mr. Strand, to guard a doctor who was spontaneously attempting to give a speech about medical freedom.

They also point to someone who actively interfered in an attempted arrest, who literally shouted obscenities at police officers, and who was encouraging others to come into the Capitol building.  Thus, there is no comparison between these two cases.

The government next points to the case of *United States v. Matthew Bledsoe* (21-CR-204(BAH)), another instance where a defendant was not sentenced to 78 months, but to 48 months.

In Mr. Bledsoe's case, the evidence showed that to gain entry into the Capitol, Mr. Bledsoe scaled a wall on the northwest side of the building.  Once he was inside the Capitol, he yelled "[w]here's those pieces of shit at?"  He then joined the crowd in repeatedly chanting "Stop the Steal!"  On the second floor of the Capitol, he filmed himself yelling "Our house!" and walked around with a Trump flag that he had obtained, eventually placing the flag in the arms of a statue of former president Gerald Ford.

Finally, Mr. Bledsoe was not compliant with his conditions of release.

Mr. Strand never joined in any chants, never yelled at anyone, never carried around any political items, did not climb any wall to gain entry into the Capitol, did not indicate a desire to search for "those pieces of shit," and never filmed himself in the Capitol yelling anything, much less "Our house!"

He also has not violated his conditions of release – something (a violation) that can be an indication of a person's future likelihood of success on supervised release or probation.

Despite all of this, he was sentenced to "only" 48 months in prison.

The next case cited by the government is the case of *United States v. Richard Michetti* (21-CR-232(CRC)), a case with which this Court is intimately familiar.

Mr. Michetti pled guilty to a § 1512(c) obstruction charge, and was sentenced to 9 months in prison.  The evidence showed that Mr. Michetti confronted officers multiple

times while in the Capitol, repeatedly shouting at them that "we pay you!" "you are

starting a civil war!" and calling them "fucking animals."  He also yelled at officers while

he was in the Rotunda, saying "You know you caused a civil war! You know that, right?"

While he was in the Capitol, he revealed his clear purpose in being there that day,

as he texted a friend at 2:09 p.m. that "Gotta stop the vote it's fraud this is our country."

 He also confronted officers at close range, and displayed rather aggressive

behavior.

Mr. Strand did none of the above, in any way.

Continuing on, defendant points to the case of *United States v. Bradley Rukstales,*

*21-CR-41(CJN).*

The court imposed a 30-day sentence of incarceration in Mr. Rukstales's case.

The case against Mr. Rukstales called for a 30-day sentence because after he and

others entered into the Capitol, the crowd they were in caused police officers to retreat

downstairs, into the Crypt area, after they threw chairs at the police.

Mr. Rukstales came down the stairs, in the direction of the police officers, and

once he was at the bottom, he picked up a chair and actually threw it in the direction

where the police officers had retreated, although no officers were nearby at that precise

time.

Then, when officers came to arrest him, he resisted arrest and struggled with the

first two officers who tried to arrest him, causing a third officer to have to come over to

help the first two, thereby taking up valuable "officer" availability where and when it was

desperately needed.

Mr. Strand obviously never threw anything at anyone, as he was fulfilling his duty to protect Dr. Gold.

Although Mr. Rukstales' case was only a misdemeanor, he actually engaged in conduct that was far worse than anything Mr. Strand engaged in, as Mr. Strand was participating in a protection assignment.

*United States v. Troy Williams and Dalton Crase, 21-CR-82(CJN)*

Mr. Williams and Mr. Crase each received a sentence of probation (36 months), as well as $500 in restitution.  And the behavior in their cases was more serious than Mr. Strand's although they were both charged with misdmeanors.

First, the men went into the Capitol twice.  They first went in after witnessing numerous acts of violent destruction of property, which one of them filmed, and they went in 50 seconds after the Parliamentarian Doors were breached.

Second, after leaving the Capitol building after their first foray, they went around the building and re-entered at another point, eventually taking selfies and lighting a cigarette, seemingly with pride and pleasure at being inside.

Both men also joined in chants of "USA, USA!" and other chants.

Williams later noted that "most" of the rioters didn't want to hurt anybody, but were present "just to let them know that when push comes to shove, we will fight.  We will just walk into this bitch [the U.S. Capitol]."  He added that "if things don't change, we'll make a change."

*United States v. Adam Honeycutt* (22-CR-50(CJN))

Although he pled to a misdemeanor charge, Mr. Honeycutt's conduct was vastly different than that of Mr. Strand.  For example:

a) He went in through the Lower West Terrace, where some of the greatest violence took place;

b) He entered a sensitive space used by members of Congress;

c) He entered the building by climbing through a broken window;

d) He filmed and posted videos of property destruction in the Capitol;

e) He posted images on social media showing confrontations between the crowd and police officers, then ***mocked*** the vastly outnumbered police officers for "hiding" from the crowd.

f) He helped the crowd pass a long wooden plank to others who were committing acts of violence and battling the police in the Lower West Terrace;

g) He posted, then deleted, messages on social media, then gave a false account of his conduct on Facebook that minimized his role; and

h) He had a heightened responsibility to respect the law because he was a bail bondsman.

For all that, he only received a sentence of 90 days.

Defendant could spend hours comparing the cases of those who have pled guilty or been convicted following a trial, and all that it would show is that there was no one in the Capitol that day in Mr. Strand's shoes. Everyone else was in there to – at a minimum – shout and yell about a stolen election.  Some were there to commit acts of violence.

Some encouraged others to join the crowd and confront the police. And still others shouted and intimidated police officers through vulgar and threatening chants.

Mr. Strand did none of that.

He and Dr. Gold did not fit into the scene that afternoon, and they never intended to be a part of the "scene" that day.  But Dr. Gold is a very strong-willed person who will not be denied, and Mr. Strand was the unfortunate person who made a split-second and natural decision to protect his boss.  He has already paid for this decision dearly.

Mr. Strand will end with the case of *United States v. Kenneth Harrelson* (22-CR-15(APM)).

Mr. Harrelson was a member of the Oathkeepers who was charged with seditious conspiracy, obstruction, and conspiracy to impede or injure an officer.

According to the government's evidence, Mr. Harrelson was part of the group that pre-planned the placement of a rapid-deployment force across the Potomac River in Virginia ahead of their expectation that former president Trump may invoke the Insurrection Act.  If he did not, however, they were prepared to take matters into their own hands.

Without going into greater detail, defendant notes that this Oathkeeper received a sentence of 48 months in prison – 30 months less than the suggested requested by the government in Mr. Strand's case.

Perhaps no other case demonstrates the inappropriate nature of the government's request with respect to Mr. Strand, again bringing up the question "why?"

### *Conclusion*

Mr. Strand is before this Court after having been convicted of one felony and four misdemeanors.  Most people in the courtroom on the day the verdicts were announced, including at least one prosecutor who fairly regularly attended the proceedings, were surprised that Mr. Strand was convicted of the obstruction charge.[20]  And it seems clear that the jury really "reached" in finding him guilty of that charge as at least one or more jurors wanted to know if they could convict him even if he did not have the intent to obstruct at the time he was in the Capitol.

Jury trials in cases such as these are emotionally-charged affairs, and defendants face a steep uphill battle given the unique impact that day had on most citizens of this city.

Regardless, the verdict is the verdict, and the Court will have to sentence Mr. Strand accordingly.  He merely asks the Court to look at the evidence provided by various video recordings, and sentence him accordingly.

Respectfully submitted,

/s/

_____
Stephen F. Brennwald, Esq.
Bar No. 398319
Brennwald & Robertson, LLP
922 Pennsylvania Avenue, S.E.
Washington, D.C.  20003
(301) 928-7727
(202) 544-7626 (facsimile)
E-mail:  sfbrennwald@cs.com

---

[20] Even a reporter for Mother Jones who attended the trial daily and who wrote what can only be described as "snarky" articles about Mr. Strand's trial actually sent out a tweet the night before the trial stating that "Strand's lawyer may just have achieved a slightly worse outcome than the plea offer he was given," which she knew was to a single misdemeanor.

<u>CERTIFICATE OF SERVICE</u>

       I HEREBY CERTIFY that a copy of the foregoing was sent by email, this 30th day of May, 2023, to all counsel of record.

/s/

_____

Stephen F. Brennwald