```
 1                   IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2
        - - - - - - - - - - - - - - - x
 3      THE UNITED STATES OF AMERICA,
                                          Criminal Action No.
 4                   Plaintiff,           1:21-cr-00085-CRC
                                          Thursday, September 15, 2022
 5      vs.                               2:05 p.m.

 6      JOHN HERBERT STRAND,

 7                   Defendant.
        - - - - - - - - - - - - - - - x
 8

 9      _____

10                  TRANSCRIPT OF PRETRIAL CONFERENCE
            HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                  UNITED STATES DISTRICT JUDGE
        _____
        APPEARANCES:
12      For the United States:        APRIL HOLLY AYERS-PEREZ, ESQ.
                                      U.S. ATTORNEYS OFFICE
13                                    Southern District of Texas
                                      11204 McPherson Road
14                                    Suite 100a
                                      Laredo, TX 78045
15                                    (956) 723-6523

16                                    JASON MANNING, ESQ.
                                      DOJ-CRM
17                                    1400 New York Avenue NW
                                      Washington, DC 20005
18                                    (202) 514-6256
                                      jason.manning@usdoj.gov
19
        For the Defendant:            STEPHEN F. BRENNWALD, ESQ.
20                                    BRENNWALD & ROBERTSON, LLP
                                      922 Pennsylvania Avenue, SE
21                                    Washington, DC 20003
                                      (301) 928-7727
22
        Court Reporter:               Lisa A. Moreira, RDR, CRR
23                                    Official Court Reporter
                                      U.S. Courthouse, Room 6718
24                                    333 Constitution Avenue, NW
                                      Washington, DC  20001
25                                    (202) 354-3187
```

```
 1                      P R O C E E D I N G S

 2              THE COURTROOM DEPUTY:  We are on the record for

 3      Criminal Case 21-85, Defendant 1, United States of America

 4      vs. John Herbert Strand.

 5              Counsel, please identify yourselves for the record

 6      starting with the government.

 7              (Pause)

 8              THE COURT:  You're on mute, Ms. Ayers-Perez.

 9              MS. AYERS-PEREZ:  I apologize.  April Ayers-Perez

10      and Jason Manning for the government.

11              THE COURT:  Okay.  Good afternoon.

12              MR. BRENNWALD:  Good afternoon, Your Honor;

13      Stephen Brennwald and Sameera Ali for Mr. Strand.  And I

14      would ask the Court to waive his presence for this hearing.

15              THE COURT:  Okay.  We will waive his presence.

16      Please convey to him everything that is discussed so he's

17      fully abreast of the latest and greatest on the case, okay,

18      Mr. Brennwald?

19              MR. BRENNWALD:  Yes, Your Honor.  Thank you.

20              THE COURT:  All right.  All right.  So this is our

21      pretrial conference just to sort of give you folks a lay of

22      the land and for me to, you know, lay out the guidelines for

23      trial.

24              I'd like to start with the government's motion in

25      limine, then we will move to Mr. Strand's objections to the
```

 1     government's or at least some of the government's exhibits.

 2     I will not likely be able to resolve all of those, but I'd

 3     at least like a sense of what the objections are.  If I can

 4     resolve them today, I will; if not, we can reserve those

 5     objections until next week.

 6             Then I want to go over the witness list, talk

 7     about the schedule, go over voir dire and the Court's -- the

 8     voir dire questions, and then the Court's procedures for

 9     picking the jury; then talk about courtroom logistics and

10     take any questions that you folks might have for me.  All

11     right?

12             All right.  So, Ms. Ayers-Perez, you have filed a

13     motion in limine on a number of issues, many of them relate

14     to Ms. Gold's potential testimony.

15             Mr. Brennwald, will she be a witness, or no?

16             MR. BRENNWALD:  Your Honor, that's a decision that

17     we plan to make at the time that -- you know, once the

18     government puts on its case, but it is possible that she

19     would be.  I'm leaning against it, but it's possible.

20             So I'm not trying to be cagey, I'm just letting

21     the Court know.  It's hard to make a decision until the time

22     comes; so it would be better to address it to some degree

23     now, I would think.

24             THE COURT:  I will reserve a definitive ruling on

25     the aspects of the government's motion that relate to her

 1    until we know whether she will be a witness or not.  But to

 2    inform that decision, why don't we go ahead and talk about

 3    that, and I will give you whatever impressions I have.

 4           So the first issue is impeachment with a redacted

 5    plea agreement, Ms. Ayers-Perez?

 6           MS. AYERS-PEREZ:  Yes, Your Honor.  And with the

 7    Court's indulgence, Mr. Manning, if he could talk about the

 8    motion in limine for us, and I'm going to jump in for the

 9    exhibits, if that's okay with Your Honor.

10           THE COURT:  That's perfectly fine.

11           Mr. Manning?

12           MR. MANNING:  Sorry, Your Honor, my screen had

13    just frozen.

14           Were you asking us to address the merits of our

15    argument and the use of --

16           THE COURT:  Yes, just give me an outline.  I've

17    obviously read the papers.

18           All right.  We have an echo, so if you're not

19    speaking, maybe go on mute.  I'm not sure of the cause of

20    that.

21           THE COURTROOM DEPUTY:  Your Honor, I was

22    connecting the public access line, so that was the issue.

23           THE COURT:  All right.

24           All right.  Go ahead, Mr. Manning.

25           MR. MANNING:  Sure.  So to the Court's point about

1    our use of redacted versions of Ms. Gold's plea agreement

2    and statement of offense, the government's position is that

3    it would be not only irrelevant, but also distracting and

4    confusing for the jury if information were put before the

5    jury showing that the government's agreed to allow Ms. Gold

6    to plead to the misdemeanor and to drop the 1512 obstruction

7    charge, the felony charge against John Strand.

8           We know that charge is central to the trial that's

9    coming up, and if the jury were to see indications that for

10   Strand's co-defendant that charge had been dropped, it could

11   lead the jury to erroneously conclude that that indicates

12   some sort of weakness of the charge, when, in fact, it's

13   irrelevant to the jury's role as finder of fact.

14          So we propose just to redact the aspect of the

15   plea agreement and statement of offense that make reference

16   to which charge she pled guilty to and which were dismissed;

17   not to redact anything related to the factual admissions,

18   which we believe are relevant.

19          THE COURT:  Well, if she were to testify, any

20   basis for an objection that they couldn't impeach her with

21   the factual representations in the plea agreement apart

22   from the government's decision to exercise its discretion

23   not to -- or to drop the other charges?

24          (Pause)

25          MR. BRENNWALD:  Are you addressing me, Your Honor?

1          THE COURT:  Yes.

2          MR. BRENNWALD:  Oh, I'm sorry, I missed a word.

3          THE COURT:  This is why we should be doing this in

4     person.

5          MR. BRENNWALD:  I agree.  I agree.  I'm here so --

6     I mean, I'm a mile away so...

7          THE COURT:  Yes.

8          MR. BRENNWALD:  In any event...

9          THE COURT:  I guess any objection, if Ms. Gold

10    were to testify, to the government using her plea agreement

11    and the statement of offense to impeach her but without

12    disclosing the provisions related to its decision to

13    exercise its discretion to drop the other charges?

14         MR. BRENNWALD:  So the answer is that it depends

15    on what questions they ask her, obviously.  Also, the plea

16    agreement that she signed says that there is a quote -- I

17    shouldn't say "quote," I don't know exactly -- there's a

18    factual basis for the other charges that were in the

19    indictment.

20         Obviously if they start asking about that, then

21    that would open the door to the other charges that were in

22    the indictment.  So it really depends on what questions they

23    ask her on cross-examination.  That may very well open the

24    door to that.

25         Absent an unopening of the door, I don't think I

1    would have a basis to bring that out on my own.

2        THE COURT:  We will cross that bridge if we get to

3    it.  I see no reason for an objection to introduction of the

4    factual aspects of the plea agreement and the statement of

5    offense, generally speaking, as impeachment evidence if

6    she's called in the defense's case.

7        All right.  Statements about COVID by Ms. Gold.

8        MR. BRENNWALD:  You're asking me, Your Honor?

9        THE COURT:  No, Mr. Manning.

10       Well, I guess the question for you, Mr. Brennwald,

11   is would you intend to elicit any statements from her about

12   her beliefs regarding COVID vaccinations?

13       MR. BRENNWALD:  Your Honor, the answer to the

14   question is we don't intend to get into vaccine mandates and

15   all of that other medical type of thing.  If she testified,

16   she might testify that the purpose that they came to

17   Washington was to give a speech on what they're calling --

18   when I say "they," Mr. Strand and Ms. Gold -- call medical

19   freedom.

20       I need to be able to say that they were there for

21   some other non-January 6th purpose, but I don't intend to

22   get into any granular aspects of the rest of that because,

23   frankly, it doesn't endear anybody in this city to them, so

24   I don't -- I don't plan on going into that at all, but I do

25   need to be able to have her say something about the reason

1    she was there without being preachy.

2            And I've told her that, and she understands that

3    it would be counterproductive.

4            THE COURT:  That was my first impression; that the

5    reason for their presence is relevant to intent on the

6    obstruction charge, and if the reason for their presence

7    relates to giving a speech about COVID, then I think that's

8    relevant to that defense.  But obviously this will not be a

9    trial about COVID vaccine efficacy or mandates or anything

10   like that.

11           All right.  And any statements she might make

12   about his out-of-court statements are obviously hearsay

13   unless an exception exists.  But, Mr. Brennwald, are you --

14   do you intend to elicit anything like that?

15           MR. BRENNWALD:  No, I do not, Your Honor.

16           THE COURT:  Okay.  And I would likely take the

17   government up on its invitation to engage Mr. Strand in a

18   colloquy if she were to testify.

19           All right.  I have not gone through your

20   objections, Mr. Brennwald, point by point.  I understand

21   there's two videos that you've been provided in discovery

22   that the government intends to play that you find

23   objectionable.  I know that you all have sent those over,

24   but I've not had a chance to review them.

25           Mr. Manning, what is -- or Ms. Ayers-Perez, what

1       is it that you intend on playing, generally?

2               And, Mr. Brennwald, what's the nature of the

3       objection?

4               MS. AYERS-PEREZ:  So there are two videos, Your

5       Honor.  These are what we called open source videos.

6       They're not Capitol CCTV footage.  They're footage -- one of

7       them is actually from a reporter that's out there.  Another

8       one is from a fellow rioter.

9               The first video captures the scene outside the

10      East Side of the Capitol prior to the defendant entering the

11      Capitol, and there's a very large and boisterous crowd.  You

12      can hear chanting.  You can hear people talking and yelling

13      and screaming.  You see things being thrown.  You see some

14      violence.  You see a number of police officers.  One of the

15      officers that you see quite frequently in the video is one

16      of our witnesses who will testify to the authenticity of

17      this is what happened during that time in that place.

18              As I understand Mr. Brennwald's objection to it,

19      it's twofold:  one, hearsay for the audio that you hear from

20      the fellow rioters chanting and screaming; and, second,

21      there is a watermark on the video that just happens to be --

22      the person who made the video has that watermark.  I don't

23      know how to remove that.  But we could do a jury instruction

24      that that should not be something that they consider.  In.

25              The first video, the watermark says "Insurgence

1     USA" on it.

2               I'm sorry, the second video says "Insurgence USA."

3               And so --

4               THE COURT:  What is Insurgence USA?

5               MS. AYERS-PEREZ:  I honestly do not know, Your

6     Honor.  It's whatever watermark the person who -- this is a

7     video from a fellow rioter.  Whatever watermark they

8     happened to put on the video.

9               THE COURT:  Got it.

10              Mr. Brennwald?

11              MR. BRENNWALD:  Your Honor, if I could ask the

12    government -- I know the Insurgence USA video.  I understand

13    what that's about, and I can address that in a minute.

14              But the first video that the government's talking

15    about, if I could ask through the Court, is that the one-

16    minute, speeded-up video, or is that a separate video?

17              If you tell me the exhibit number, I can at least

18    see which one you're talking about.

19              MS. AYERS-PEREZ:  The exhibit number is 512 and

20    the subsets of 512.

21              MR. BRENNWALD:  512, okay.  I'm looking at my

22    objection document to see.

23              I didn't even address 512 in my objections because

24    I don't think it was designated as such when I filled this

25    out.

1          Your Honor, one issue is -- just in general is

2     that I'm seeing some of these things, you know, for the

3     first time when the government submitted this exhibit list.

4     I'm not saying they didn't turn it over until now, but it

5     took me hours and hours to go through all these exhibits

6     when I got them, and I looked at them basically the day

7     before the day of the deadline to file the objections.

8          So 512, I don't really know what that's showing.

9     I see it here.  It's open source video, 28 minutes and 36

10    seconds.

11         So the problem with the videos, Your Honor --

12    perhaps this one, and certainly the Insurgence USA --

13    is that you have a lot of statements by people who have

14    nothing to do with Mr. Strand's case; where the people are

15    cussing, cursing, calling politicians' names, just basically

16    doing things and saying things that have nothing to do with

17    Mr. Strand other than they were all on the Capitol grounds

18    that day.

19         So it's highly prejudicial.  It's unfairly

20    prejudicial in our view, and, you know, especially with this

21    overlay "Insurgence."

22         I guess I can picture myself, you know, playing a

23    video where, you know, some right-wing organization prepared

24    a video montage of January 6th and they had overlaid, you

25    know, "Innocent First Amendment Free-Speechers," you know,

1   displayed across the whole thing, and I'm pretty sure the

2   government wouldn't like that.  So I just have a problem

3   with that.

4          I get that it's pretty much impossible or maybe

5   somebody technically could remove those words, but aside

6   from those words, it's just everybody else's actions.  And

7   Insurgence USA is on the West Side of the Capitol, not on

8   the East Side where Mr. Strand was, so there's another

9   relevance issue there.

10          THE COURT:  Let me just cut you off.  I mean, to

11   the extent the government wants to play videos that

12   accurately depict the scene that was present and that that

13   depiction is relevant to the charge and where Mr. Strand

14   entered and what was going on around him or before or after

15   when he entered to go to his state of mind, that's obviously

16   all admissible.

17          To the extent the, you know, stray comments by

18   third parties are not being offered for their truth, those

19   can come in, too, if they are part of what was going on that

20   day.

21          You can suggest an instruction that I might give

22   the jury, and I will certainly entertain that.  And, you

23   know, the introduction to those videos is also subject to

24   cumulativeness and duplicativeness, and I trust the

25   government will streamline their presentation.

1          Ms. Ayers-Perez, if you cannot find a way to

2     redact or cover up or obscure the watermark, Mr. Brennwald,

3     I would be happy to instruct the jury about that as well.

4          MR. BRENNWALD:  Okay.

5          MS. AYERS-PEREZ:  Yes, Your Honor.

6          THE COURT:  All right.

7          MS. AYERS-PEREZ:  And --

8          THE COURT:  But the scenes are what they are.

9     That's part of the case.

10          MS. AYERS-PEREZ:  Right.  And these are videos

11     where the defendant is actually present in the videos.

12     They're not from the West Side where the defendant -- we

13     don't have any evidence thus far that he went over there.

14          And this long shot video from the East Side, the

15     defendant is in the video.  You can see him in the video.

16          The other video, the Insurgence USA video, that's

17     a video that's actually quite lengthy, but we're only

18     playing the part, the snipped-out part of 13 minutes where

19     the defendant is.  And that video is from a reporter

20     actually, but it's outside the House Chamber door, and the

21     defendant is present within the video.

22          Actually there's two different videos, but in all

23     of these open source videos, the defendant's present in

24     there.

25          Yes, there are words being thrown around, but it's

1    in the middle of a riot, and that's what's happening in that

2    moment.

3              THE COURT:  Mr. Brennwald, any other sort of

4    general categories of specifics or specific exhibits that

5    you are particularly concerned about?

6              MR. BRENNWALD:  Yes, Your Honor.  There are the --

7    and I'm glad the Court raised this.  I think their series

8    900 exhibits.  Let me double-check.

9              You know, 300, I think.  It's 300.  It's basically

10   text messages between Mr. Strand and various people where

11   other people make statements.  I understand the state of

12   mind where somebody says, you know, "Mr. Strand, what were

13   you thinking?" and he says something, "Well, I was thinking

14   this."

15             But there are some -- I don't have all that in

16   front of me, but there are some statements by different

17   people where they make comments of their own, and Mr. Strand

18   responds.  But those comments that were made, from what I

19   recall, were offensive or were just --

20             THE COURT:  That's not a hearsay objection.  It's

21   a 403 objection.

22             MR. BRENNWALD:  Well, it is both.  It's both.  I

23   get the --

24             THE COURT:  Are you offering, Ms. Perez, any other

25   people's statements for the truth?

1           MS. AYERS-PEREZ:  No, Your Honor.  These are just

2     conversations where the focus is on what Mr. Strand is

3     saying contextually.  There are questions and answers there,

4     but those aren't being offered for the truth of the matter

5     asserted; they're just part of the text exchange.  The focus

6     is on his words.

7           MR. BRENNWALD:  And, Your Honor, while we're

8     discussing this, if I may, the government's provided all of

9     these exhibits.  I emailed the government, I believe, and

10    told them that, you know, I may want to use some of their

11    exhibits as well.

12          I did not submit a specific exhibit list because

13    it would pretty much duplicate what the government has

14    listed here.  I may have one or two other exhibits that

15    are -- again, I think these are all part of what the

16    government submitted to us, frankly, so I don't think I have

17    any different exhibits from what they have.

18          I might take a picture of a certain area and blow

19    it up, but that's about it.  Again, that's everything that

20    they already have.

21          I just want to make sure that we don't get to a

22    point in trial where I try to play part of a video or

23    introduce part of a text message, maybe the part -- a part

24    that the government didn't introduce but is part of their

25    exhibit list, and the government objects because they didn't

```
1    know I was going to try to introduce it.

2              MS. AYERS-PEREZ:  We're not introducing it.

3              MR. BRENNWALD:  Okay, fine.  That was easy.

4              THE COURT:  As a general matter, the Court

5    will introduce authenticated text messages that reflect

6    Mr. Strand's intent.

7              And if there are particular messages that you

8    think are so inflammatory or out of bounds that it would

9    inflame the jury unnecessarily or create some undue

10   prejudice, I'll take a look at it.  But as a general matter,

11   those will come in, assuming they can be authenticated.

12             MR. BRENNWALD:  Right.

13             THE COURT:  All right.  Any others, Mr. Brennwald?

14             MR. BRENNWALD:  Let me just look through the

15   exhibit list here.  Some of these I don't believe I've seen

16   before.  I'm just looking at the exhibit list that the

17   government submitted today, I believe.

18             THE COURT:  You mentioned a sign, a "Keep Out"

19   sign or something like that.

20             MR. BRENNWALD:  Right, Exhibit No. 1, "No Entry"

21   sign.

22             Yes, I mean, Officer Mendoza or Capitol Police

23   Officer Mendoza is going to testify about it, so I will

24   withdraw my objection to that.  I'll just -- I'll just argue

25   about it, but I'm not going to object to it specifically.
```

1          If I could just have a second?  I'm just looking

2     through the exhibit list.

3          Again, there's -- I'm seeing here for the first

4     time Exhibits 208, 209, 210.  I've never seen those before.

5     It refers to radio run recordings, three different ones.

6     I've never heard them.  I doubt that they would be

7     objectionable if it's Officer Mendoza calling for help or

8     doing something; but, again, I have not seen or didn't know

9     of the existence of these, so I'm sure the government will

10    send them to me.

11          MS. AYERS-PEREZ:  Mr. Brennwald, you have them.

12    And this is -- the exhibit list I just sent over today is

13    not new.  I just realized I hadn't sent it to the Court.

14    It's one that I had previously sent you earlier this week,

15    so it hasn't changed.

16          The one I sent you earlier this week where I

17    denoted the ones that we were not planning to introduce,

18    this is the same list.  I just hadn't sent it to the Court

19    yet.

20          MR. BRENNWALD:  All right.  Well, I will go back

21    and take a look.

22          I am still going through these, Your Honor.  Give

23    me one second.

24          I don't believe we have any objections to the

25    closed-circuit television videos.  I told Ms. Gold [sic]

1    yesterday and Mr. Manning in an email that we also have

2    additional video from inside the Rotunda doors that start a

3    couple of minutes earlier than theirs, and I think it's

4    important that we play that.  So that was part of their

5    request for stipulations about the authenticity of these

6    videos, and I said that I would not have any problem with

7    that as long as they also agreed to allow this two-minutes-

8    earlier video from what they were showing on the inside of

9    the Rotunda doors.

10            I haven't heard back, but I'm assuming that

11    wouldn't be a problem.  It's a legitimate video.

12            MS. AYERS-PEREZ:  As long as it's not irrelevant,

13    we have no issue with CCTV footage from inside the Capitol

14    being played.

15            MR. BRENNWALD:  All right.  I'm looking through

16    Series 500.

17            MS. AYERS-PEREZ:  And I believe, from your

18    objection motion, you also mention No. 103, the restricted

19    perimeter map.

20            MR. BRENNWALD:  Right.  We did not agree to

21    stipulate to that.  I suspect the government would just call

22    a witness to testify about that type of thing, and hopefully

23    that won't be an issue.

24            If it's a new witness that's not listed among the

25    witnesses here, then we don't have a problem with that.

1           MS. AYERS-PEREZ:  It's -- as indicated on our

2     exhibit list, it is Captain Mendoza.

3           MR. BRENNWALD:  Okay.  That's fine.

4           THE COURT:  With that, then, why don't we move on.

5     If there's nothing else, Mr. Brennwald?

6           MR. BRENNWALD:  I'm still standing by my

7     objections.

8           THE COURT:  Understood.

9           MR. BRENNWALD:  Okay.

10          THE COURT:  You can certainly assert any

11    objections at trial you'd like.

12          Why don't we move to the witness list.

13          The government's -- I'm just going to tick down

14    the list, and give me a sense of generally what each person

15    intends to testify to and how long do you think you'll need

16    with them on direct.

17          MS. AYERS-PEREZ:  Yes, Your Honor.

18          THE COURT:  So Ms. Mendoza?

19          MS. AYERS-PEREZ:  Captain Mendoza is going to

20    testify, Judge, to an overview of the Capitol, the grounds

21    security, perimeters, Capitol CCTV, and things of that

22    nature.  We'll probably need, I'd say, maybe an hour and a

23    half on direct for her.

24          THE COURT:  And I don't limit lawyers.  I don't do

25    a chess clock or anything like that.  But I want you to give

1    me realistic estimates of time so that I can, you know,

2    churn out how long this will last so that I can give the

3    jury accurate information about scheduling.  Okay?

4             MS. AYERS-PEREZ:  Yes, Your Honor.

5             THE COURT:  Kyle Jones?

6             MS. AYERS-PEREZ:  Kyle Jones was the assistant

7    House parliamentarian.  He will testify to being on the

8    House Chamber floor that day, and he will also testify to

9    the Electoral College procedures and certification and vote

10   and what that is.

11            I anticipate he will be about -- also about an

12   hour and a half, and that's for direct.

13            THE COURT:  That's a long time for describing the

14   electoral process.

15            MS. AYERS-PEREZ:  Well, we did talk to him

16   yesterday, and it did take about an hour and a half, but

17   perhaps an hour might be more realistic, Your Honor.

18            THE COURT:  Now that you know what he's going to

19   say, you can streamline it, right?

20            All right.  I'm going to put down an hour.

21            MS. AYERS-PEREZ:  Okay.  Yes, Your Honor.

22            THE COURT:  Ms. Glavey?

23            MS. AYERS-PEREZ:  Yes, Ms. Glavey is with the U.S.

24   Secret Service.  She'll testify to the restricted perimeter,

25   to the vice president being inside -- being inside the

1   restricted perimeter and things of that nature.  I would say

2   45 minutes for her, and that's being generous.

3            THE COURT:  And you're going to review videos of

4   the count, then the adjournment and all that with Mr. Jones?

5            MS. AYERS-PEREZ:  Yes, Your Honor.

6            THE COURT:  Okay.

7            MS. AYERS-PEREZ:  And that's another reason he's a

8   little lengthy.

9            THE COURT:  Pollard?

10            MS. AYERS-PEREZ:  Yes.  Officer Pollard, he's an

11   officer on the East Side.  And if Your Honor remembers from

12   Ms. Gold's sentencing, there was an officer who was pulled

13   down in front of the defendant, Ms. Gold.  That is Officer

14   Pollard.

15            He will testify about being on the East Side.  He

16   will testify about his experience that day.  He will testify

17   about being pulled down in front of Ms. Gold and Mr. Strand.

18            There are a couple of exhibits that will be

19   introduced through him, and that includes that open source

20   East Side of the Capitol video that's about nine minutes in

21   length, and so I anticipate him to be closer to an hour and

22   a half, just being generous.

23            THE COURT:  Officer Vargas?

24            MS. AYERS-PEREZ:  Officer Vargas is -- he was

25   stationed between Statuary Hall and the House Chamber.  He

1   was in front of a line of Capitol Police officers who were

2   attempting to keep the mob out of the House Chamber, and he

3   had direct conversations with those in the mob, including --

4   or Mr. Strand was there headed towards the front of that

5   group.  He'll talk about his experiences that day.  He'll

6   talk about what he saw there in the mob.

7          We also have an open source video, the Insurgence

8   USA video, with him.  That video captures that time where

9   there's about five to six minutes where they hold the line

10  there, and then he and his fellow officers get pushed into

11  the vestibule area right outside of the House Chamber door.

12  That's all caught on video.  You see him leaving that area,

13  and then the video continues for a while more.  I believe

14  it's about 13 minutes in length.

15         So for him, I would say probably about an hour to

16  an hour and a half as well because of the length of the

17  video.

18         MR. BRENNWALD:  If I could just ask in this

19  respect, Your Honor, while we're doing this?  I am assuming

20  that -- I'm not assuming, I'm concluding that Officer Vargas

21  will not be making any statements or presenting testimony

22  about any statements Mr. Strand allegedly made since they

23  have not been disclosed to me.

24         MS. AYERS-PEREZ:  I'm not aware of Officer Vargas

25  knowing of any statements that Mr. Strand made.

 1             MR. BRENNWALD:  Thank you.

 2             THE COURT:  Pitts?

 3             MS. AYERS-PEREZ:  Officer Pitts was inside the

 4     vestibule outside the House Chamber door, and he will --

 5     there are three open source videos that we will introduce

 6     through him.  All three are about a minute in length, so

 7     they're not very long; and he'll testify to what he saw

 8     there outside that House Chamber door.

 9             He also does not recall any statements by

10     Mr. Strand, but we'll talk about that general area.  I would

11     say about 45 minutes for him.

12             THE COURT:  And Officer McGoff.

13             MS. AYERS-PEREZ:  Yes, Officer McGoff was

14     in Statuary Hall when Ms. Gold was making her speech and

15     Mr. Strand was recording that speech.  We will introduce the

16     video that was taken off of Mr. Strand's phone of Ms. Gold

17     making that speech.  That video is, I believe, about two to

18     two-and-a-half-minutes long, and Mr. -- and Officer McGough

19     will just talk about trying to get them out of Statuary

20     Hall.

21             I would also say about 45 minutes for him.

22             THE COURT:  Brockwell?

23             MS. AYERS-PEREZ:  Officer Brockwell was inside the

24     House Chamber while Mr. Strand and Ms. Gold were outside the

25     House Chamber door.  We will go through the Capitol CCTV

1    footage and the path through the Capitol with Officer

2    Brockwell, so that will take a little bit of time, although

3    we will streamline that as best as possible, Your Honor.

4            We will also go through video from inside the

5    House Chamber during that time which picks up around 2:44

6    p.m.  I believe that video is about 10 to 15 minutes in

7    length, but it does show Officer Brockwell and others as

8    they have their weapons drawn inside the House Chamber on

9    the other side of the door from the defendant and Ms. Gold,

10   and so I would put him at maybe an hour and 15 minutes to be

11   generous, Your Honor, because he does have a lot of video

12   for that -- this particular witness.

13           THE COURT:  Okay.  FBI Special Agent Turner.

14           MS. AYERS-PEREZ:  Special Agent Turner is -- he is

15   the one who will testify to the phone extraction and the

16   Tweets, and so these are Series 300 and Series 900, and so

17   he will go through all of those exhibits.

18           He can also -- he will also talk about the

19   execution of the search warrant and getting the electronic

20   device that we have here that's the basis of the exhibits in

21   Series 300.  So he is going to take a while as we go through

22   all of those, depending, of course, upon objections or

23   rulings, but I would put him at closer to two to two and a

24   half hours, to be generous.

25           THE COURT:  So assuming all of these folks

```
 1    testify, two and a half days?
 2               MS. AYERS-PEREZ:  Yes, Your Honor, I think
 3    that's -- I think that's accurate.
 4               I would -- depending on when we start, we kind of
 5    in our mind thought we would probably finish by the end of
 6    the day Wednesday.
 7               THE COURT:  You're not going to start openings
 8    until Tuesday morning.
 9               MS. AYERS-PEREZ:  Right.
10               THE COURT:  So that's a day and a half.
11               MS. AYERS-PEREZ:  Okay.  Yes, maybe more Thursday
12    morning.
13               THE COURT:  Obviously there's cross-examination
14    and everything, but let's try to get it in in two days, by
15    end of the day Wednesday, if we can.
16               Obviously --
17               MS. AYERS-PEREZ:  Yes, Your Honor.  We're going to
18    try to make that happen.
19               THE COURT:  Okay.
20               All right.  Mr. Brennwald, we've spoken about
21    Ms. Strand, but assuming -- I'm sorry, Ms. Gold.  Assuming
22    you do put on a case, how many witnesses do you anticipate?
23               MR. BRENNWALD:  One to three, Your Honor.
24               THE COURT:  That are not on the government's list?
25               MR. BRENNWALD:  We may call Mr. Strand.  That
```

1    could take a while.  I know the Court might like a better

2    sense of it.  It could be two hours to two and a half hours

3    on direct.  There's a lot of cover.

4         I know this -- I don't know what the Court's

5    thinking, but I know looking from the outside I would think

6    that this is not that complicated a case.  But it's an

7    incredibly complicated case from Mr. Strand's point of view

8    and from Dr. Gold's point of view, and it's taken me way

9    longer than I ever expected to deal with all of this, which

10   is fine.  It is what it is.

11        Aside from that, there was talk about calling

12   character witnesses.  I know that's been something that some

13   judges haven't allowed, so I don't know if that would

14   happen, but if it did, it would be brief, at least on

15   direct.  The government would probably take a little bit

16   longer, but --

17        THE COURT:  I permit character witnesses.  They

18   just can't testify about, you know, "I don't think he's

19   capable of committing the offense."

20        MR. BRENNWALD:  So I appreciate the Court saying

21   that because this came up with a whole bunch of January 6th

22   defense lawyers last week, and I am trying -- I want to make

23   sure I understand what the Court would allow character-

24   witness-wise.  Character trait of nonviolence, character

25   trait of honesty, those are the two obvious ones that come

1    to mind.  Is there some reason that that would not be

2    allowed?

3              THE COURT:  This came up -- I tried

4    Mr. Robertson's case, the law enforcement officer from West

5    Virginia, and he called at least one character witness, I

6    believe, and I gave some instructive guidance.  And I'd be

7    happy to pull that and let you know Monday what the ground

8    rules would be.  Okay?

9              MR. BRENNWALD:  That would be very helpful, Your

10   Honor.

11             Other than that, I don't think I have anything

12   else.  Introducing some of these exhibits, but that would be

13   through Mr. Strand, I believe.

14             THE COURT:  Any demonstratives?  If there are,

15   just let the other side know before Monday morning.

16             MR. BRENNWALD:  Yes, Your Honor.

17             THE COURT:  Excuse me, before Tuesday morning,

18   before openings, if you're going to use any demonstratives

19   in openings.

20             MS. AYERS-PEREZ:  Yes, Your Honor.

21             MR. BRENNWALD:  Okay.  If I could just raise this,

22   Your Honor.  The government has provided us with a video

23   that is designated "Strand Montage."  I believe it's 12-and-

24   a-half-minutes long.

25             If I could ask the government through the Court

1    whether that is a video that they intend to play either in

2    opening or at some point, closing, if they know which one

3    I'm talking about?

4            MS. AYERS-PEREZ:  Do you have an exhibit number?

5            MR. BRENNWALD:  Let's see.

6            MS. AYERS-PEREZ:  And really, there is only two it

7    could be, Mr. Brennwald.  One would be what we call our

8    Capitol montage, which is the video that shows various

9    scenes within the Capitol and what's happening as we go

10   chronologically through.  That one is actually lengthy, but

11   we have pared it down for this trial to only show the scenes

12   that are around where Mr. Strand and Ms. Gold were or

13   anything contextual to that.

14           So if that's what the question is, that's not

15   going to be part of the opening statement, but that would be

16   introduced through Captain Mendoza.

17           The only other montage would be the congressional

18   montage.  That would be through Mr. Jones, the

19   parliamentarian witness.  And that shows the proceedings

20   within the House and the Senate and how they went throughout

21   the day.  I think that one's shorter than the 12 minutes you

22   just described, so I'm guessing you're talking about the

23   Capitol montage.

24           MR. BRENNWALD:  Correct, okay.

25           MS. AYERS-PEREZ:  But that shouldn't be in the

1    opening or closing.  It would just be through Captain

2    Mendoza.

3                 MR. BRENNWALD:  All right.  Thank you.

4                 THE COURT:  All right.  Let's move to voir dire.

5                 I've reviewed your proposed questions, and, you

6    know, most of them are identical or very similar to ones

7    that are -- that I've used in my standard questionnaire

8    previously.  I will include a suggested question about

9    whether they've ever seen or heard or watched any videos

10   about Dr. Gold as well as whether they've heard about

11   American Frontline Doctors.

12                I'll also -- I'm willing to ask if they have

13   formed any opinions, to the extent they have heard of them,

14   about either the defendant or Dr. Gold.

15                I will include the proposed question about

16   subpoenas for text messages and the like.

17                There are a couple of questions that overlap

18   with my standard questions, and I'm somewhat hesitant to

19   include -- hold on one second.

20                I will ask the question, "Do you have such strong

21   feelings about the events of January 6th that it would be

22   difficult for you to follow the Court's instruction and

23   render a fair and impartial verdict if you were chosen as a

24   juror?"

25                You all proposed a couple of additional questions

1   along those lines:

2           "Do you believe that people who were charged with

3   criminal offenses or their participation in January 6th are

4   likely to be guilty?"

5           "Do you have an opinion about people who believe

6   that the 2020 presidential election was stolen?"

7           Your 24, "Do you have an opinion about people who

8   strongly support Donald Trump?"

9           Those are more specific subsets of the general

10  question.  If a juror were to express concerns based on the

11  general question, there would be opportunity for follow-up

12  at the bench on more specific issues, but I'm not, at least

13  at first blush, convinced that we need to ask every single

14  one of those in the general voir dire.

15          Ms. Ayers-Perez?

16          MS. AYERS-PEREZ:  I have no objection to just

17  asking the general one and not going into the specific

18  questions.

19          THE COURT:  Mr. Brennwald?

20          MR. BRENNWALD:  I mean, obviously I would like

21  those specific questions because people may not think of

22  those issues as they're answering the general question.  But

23  a question I did have, Your Honor, is, I think, if I'm not

24  mistaken, that I had asked for a question about whether

25  jurors had viewed January 6th hearings.

```
 1                 THE COURT:  Yes.
 2                 MR. BRENNWALD:  That's obviously --
 3                 THE COURT:  I will include that.
 4                 MR. BRENNWALD:  Okay.
 5                 THE COURT:  But I will not refer to them as the
 6      "so-called hearings."
 7                 MR. BRENNWALD:  I didn't mean to -- that was poor
 8      wording, if I said that.
 9                 THE COURT:  Yes, that was poor wording.
10                 MR. BRENNWALD:  Well, I think I said "so-called"
11      because people are calling them January 6th hearings.  I
12      mean, I think there's a name for them as select committee.
13                 THE COURT:  I get it.  But yes, I'm happy to
14      include that.
15                 MR. BRENNWALD:  Thank you.
16                 THE COURT:  And I will think about those other
17      three.
18                 So, Ms. Jenkins, how many jurors have we summoned?
19                 THE COURTROOM DEPUTY:  Your Honor, we have 50
20      jurors.  Actually, give me one second.  I believe we may
21      have increased that.
22                 THE COURT:  I thought we had a few more than that.
23                 THE COURTROOM DEPUTY:  Yes, I think so.  Give me
24      one second, Your Honor.
25                 We have 75 that's coming in.
```

1          THE COURT:  And we're doing the general

2     questioning in our courtroom; is that right?

3          THE COURTROOM DEPUTY:  Yes, Your Honor, we are

4     splitting it between our courtroom and the courtroom next

5     door.

6          THE COURT:  And we'll have a feed in the courtroom

7     next door?

8          THE COURTROOM DEPUTY:  I apologize.  We don't have

9     a feed in the courtroom next door.  We will have all jurors

10    sitting in our main courtroom, and then we -- if the judge

11    will not use them, we will place them in the other

12    courtroom.

13         THE COURT:  So we will -- I use the note card

14    method.  Mr. Brennwald, you have not had a case with me,

15    have you?

16         MR. BRENNWALD:  No, Your Honor.

17         THE COURT:  All right.  I use the note card

18    method.  We'll bring all 75 jurors into my courtroom.  We'll

19    give each one of them a note card.  I'll run through all of

20    the questions.  I try to keep it below 40 questions just

21    for, you know, efficiency.  Each question will be a yes or

22    no.  If they have a yes answer, they will write the question

23    number on the card.

24         We'll collect all of the cards, and then we'll put

25    most of the jury in a different courtroom, and we'll call

1    them up to the stand individually, and I will review the

2    answers to the -- review any questions that they responded

3    to.  I'll ask follow-up.  I'll invite each side to ask

4    follow-up on that particular question.

5           If I think a juror should be excused for cause, I

6    will say, "Any objection, Counsel?"  And then that's my cue

7    for them to sit down, and I will strike them.

8           Otherwise I'll ask whether you have any

9    challenges.  If you have a challenge for cause, you should

10   make it before we call the next juror in line up to the

11   bench.  All right?

12          We'll ask for -- excuse me.

13          MR. BRENNWALD:  Could I ask the Court, some judges

14   have a practice of calling in jurors who didn't answer any

15   question at all.

16          THE COURT:  I voir dire everybody, and if they

17   didn't answer a question, I will ask them whether they

18   understood the questions, and if so, why they didn't give

19   any answers.

20          Once we get enough qualified jurors, we will

21   then -- I use what's called the Arizona method.  The defense

22   gets ten strikes; the government gets six.  You'll exercise

23   those at the same time against the nonalternate seats.  We

24   will pick the alternate seats in advance so you will know

25   which seats are alternate seats.

 1          We will -- you'll exercise those peremptories

 2     first, then we'll do the musical chairs with the regular

 3     jurors, and then you'll each get one strike against the

 4     three alternates.  I did three the last time.

 5          Any need to do any more than three?

 6          MR. BRENNWALD:  I don't think so.

 7          MS. AYERS-PEREZ:  I don't see any need, Your

 8     Honor.

 9          THE COURT:  Okay.  And I'll explain all of this

10     again on Monday just so that we're all on the same page.

11          And that's about it.  I suspect we will pick a

12     jury by Monday afternoon and probably knock off and give you

13     folks time to prepare your openings for Tuesday morning.

14          Any questions on that?

15          MS. AYERS-PEREZ:  No, Your Honor.

16          I did want to revisit the motion in limine real

17     quick, if you have a moment.

18          THE COURT:  Yes.

19          MS. AYERS-PEREZ:  There is one thing we wanted to

20     add that just occurred this past weekend with Ms. Gold,

21     should she testify, that we would think is not relevant

22     under 403, and that's when she was released from BOP over

23     the weekend, she was greeted by a Congressman, given a flag

24     flown over the capitol, and a certificate of sorts.

25          We don't think that's relevant to this case.  The

1   jury shouldn't know about it.  And that would be -- we filed

2   our motion in limine before that, but that would be

3   something we'd bring up should she testify.

4            THE COURT:  Mr. Brennwald?

5            Is silence agreement, Mr. Brennwald?

6            MR. BRENNWALD:  Oh, yes, Your Honor.  I didn't

7   hear you say anything.  I definitely would not want to raise

8   that myself, so I'm glad the government doesn't want to do

9   so either.

10            THE COURT:  Well, that obviously won't come in.

11            MR. BRENNWALD:  I do have two issues, if we're

12   done with everything else.

13            THE COURT:  Let me talk a little bit about

14   courtroom logistics.  You know, this has been kind of a

15   moving target since we resumed jury trials.

16            The last trial I did I spread -- we sat jurors

17   both in the box and in the first few rows of the right side

18   of the gallery so that they could be socially distanced.  I

19   will consult with my colleagues, but I believe the last

20   couple of trials we've had we've -- judges have filled up

21   the box to leave the gallery free for the press and the

22   public.

23            There's obviously a mask mandate throughout the

24   courthouse.  That is established in conjunction, you know,

25   with our court, the Court of Appeals, the probation office,

1    the Marshals Service, and all of the other tenants of the

2    courthouse.

3         Generally speaking, procedures in each courtroom

4    are left to the judge.

5         You know, we are bringing jurors in.  We're

6    summoning jurors who don't have a choice but to come here.

7    They will all be masked.  And generally our juries expect

8    that other members of the -- or other people in the

9    courtroom will also adhere to COVID precautions, including

10   being masked.

11        We have Plexiglas set up to protect folks at the

12   advice of an immunologist that we have consulted with, and

13   there are all these precautions that we have taken.

14        One of the voir dire questions I will ask -- I

15   will, you know, explain to the jury the precautions that

16   we've taken and ask them, "Notwithstanding those

17   precautions, do you have any concern about serving on a jury

18   for a week during the pandemic?"

19        And by and large jurors have been incredibly

20   public spirited and have carried out their duties admirably,

21   but we take all the precautions that we can for them as well

22   as for the Marshals and for court staff who have no choice

23   but to be present.

24        Mr. Brennwald.

25        MR. BRENNWALD:  So here's a big problem.

1  Mr. Strand, for very strong religious reasons, objects to

2  wearing a mask.

3          THE COURT:  And I'm sorry, but what religion would

4  that be?

5          MR. BRENNWALD:  He's a Catholic, I believe, and

6  he's expressed to me for months that he can't wear a mask,

7  that it's idolatry, et cetera.

8          I've talked to him about it.  I expressed the fear

9  that if he doesn't -- I told him that at least at counsel

10  table he could probably remove it if there's Plexiglas

11  around, but coming through security and moving about the

12  courtroom, he would at least have to put it on.  Most judges

13  I've dealt with in federal court let you take it off when

14  you're speaking at the lectern or otherwise.

15          THE COURT:  Yes.

16          MR. BRENNWALD:  But I'm really concerned, and I

17  explained to him that the Court -- I'm hoping this doesn't

18  happen, obviously, because I've worked hard on this case for

19  a long time, but the Court could find that he's voluntarily

20  chosen to absent himself and try the case in absentia

21  because he won't wear a mask and even through security.

22          I don't know what to say.  I mean, he's consulted

23  with a couple of lawyers who apparently the lawyers who --

24  not to get too deep into this, but the lawyers who filed a

25  lawsuit that resulted in the FAA no longer being able to

 1   require passengers on airplanes to wear masks.

 2          So he really has very strong beliefs about it.

 3   I've had very -- a number of heart-to-heart talks with him

 4   about it, and I guess the only thing I could find as a

 5   potential solution or something is if he somehow presented

 6   the Court every morning with a PCR test that showed that he

 7   was negative every day.  Because I'm really concerned about

 8   this.

 9          I mean, he's very serious about it.  It's not

10   something that just came up.

11          I did mention it to the Court I think back in July

12   when we had a little brief hearing, and obviously that

13   wasn't really a good time to talk about it.  But I'm really

14   concerned about that; and I don't want to have a trial where

15   my defendant's not here because of that issue.  But he

16   really, really, really feels strongly about it.

17          That's the only reason I wish that he was at this

18   hearing, because he would just tell you what I've told you

19   already.  So I'm very concerned about that.

20          Dr. Gold -- just to be clear for the record,

21   Dr. Gold is not anti vaccine.  She's anti forced vaccine or

22   anti if you don't have a vaccine you can't go into a store

23   and things like that.  She wore a mask when she was at the

24   Capitol.  Mr. Strand did not.  And when they came up for

25   Dr. Gold's sentencing, they drove up here from Florida

1    because they weren't going to get in an airplane -- well,

2    actually, I think the mask mandate was gone by then.  I

3    think there were some FAA issues there with whatever.

4            Anyway, I don't know how to address this.  And,

5    you know, once he's in the courtroom and he's sitting behind

6    this Plexiglas, I assume the Court would not have a problem

7    with him taking a mask off.  But he's indicated to me he

8    can't put the mask on.  It's like an idolatry issue for him.

9            So I'm trying to come up with a solution because

10   otherwise this is not going to be good.

11           THE COURT:  And he has not been vaccinated, I take

12   it?

13           MR. BRENNWALD:  I don't believe he has, on top of

14   all that, as if that wasn't enough.

15           I know that the Court does have discretion in its

16   own courtroom about how to handle things.

17           THE COURT:  First of all, I don't have -- as I

18   said, I don't have discretion at all in the courthouse

19   generally.  Those aren't my rules.  And he'd have to -- even

20   if I were to accommodate him in some way, he's got to enter

21   the front door every day, and that's outside of my

22   jurisdiction.

23           So that's your first problem.

24           MR. BRENNWALD:  Right.  We have to address it to

25   Chief Judge Howell.

1          The interesting thing is -- and this may or may

2    not be of any interest to you -- I was in the federal court

3    of Alexandria two weeks ago for a case, and there it's

4    optional.  And so we all walked in, and nobody was wearing a

5    mask and stuff.  There was one or two.

6          I mean, it's nine miles away, and they're handling

7    it differently in the courthouse in Alexandria.

8          THE COURT:  You ain't in Virginia.

9          MR. BRENNWALD:  I'll talk to him about it.  I

10   don't know what the solution will be if he says, "I can't

11   wear a mask."  I mean, the Court, I guess could have him

12   arrested and ordered to be here because he's ordered to be

13   here, but I'd rather not have that happen.

14          So I don't know.  I'll keep talking to him about

15   it.  I'm just not sure what I can do.

16          THE COURT:  Ms. Ayers-Perez or Mr. Manning, would

17   you like to -- I'm sorry, Mr. Brennwald, were you finished?

18          MR. BRENNWALD:  I was just saying, I have enough

19   issues in this trial besides that that I'm trying to deal

20   with, but it is what it is.

21          THE COURT:  And for witnesses who testify and who

22   prefer -- who would still like to wear a mask, we have clear

23   masks available.  Is that an option for Mr. Strand?

24          MR. BRENNWALD:  I don't think it is, but I'll ask

25   him.

```
1            THE COURT:  So what is the nature of the objection

2    then?

3            MR. BRENNWALD:  I think it's an idolatry issue.  I

4    don't quite get it myself because I don't think that way.

5    It's an idolatry issue.  You're -- I don't know how to

6    phrase it, frankly.

7            THE COURT:  How does it offend his beliefs?

8            MR. BRENNWALD:  I guess that he's told me it's an

9    idolatry issue where you're bowing to the state instead of

10   to God who gives everybody the right to breathe freely,

11   something like that.

12           So, you know, there's a text in the book of Acts,

13   I think, 1529, which says we should obey God rather than

14   men, and a lot of people follow that a little farther

15   perhaps than it might have been intended, but...

16           THE COURT:  How did Mr. Strand get to Washington

17   on January 6th?

18           MR. BRENNWALD:  He flew.

19           THE COURT:  And did he violate the mask mandate

20   when he flew?

21           You don't have to answer that.  But anyway...

22           Ms. Ayers-Perez?

23           MR. BRENNWALD:  I don't know.

24           MS. AYERS-PEREZ:  What I've told Mr. Brennwald

25   from the beginning is this is really between him and the
```

1   Court.  I mean, we're going to comply with the mask mandate,

2   of course, but I don't -- I don't see how he gets into the

3   building without a mask.

4        And, I mean, furthermore, every single other

5   person in that courtroom is going to be complying with this,

6   this mask -- whatever rules that you have for your personal

7   courtroom and for the entire courthouse, including the

8   government and all of our witnesses.  So I don't know what

9   the solution is, Your Honor.

10        MR. BRENNWALD:  Your Honor, will jurors be wearing

11   a mask as they sit there and listen to the evidence?

12        THE COURT:  Yes.

13        MR. BRENNWALD:  Okay.  That's something I've had

14   an issue with personally before, personally -- not

15   personally legally before because it's obviously more

16   difficult to determine what jurors are thinking about

17   certain evidence when they're masked.

18        Other than that, Sameera Ali, Attorney Sameera Ali

19   is on the line with us as well.  With the Court's

20   permission, she would be sitting at counsel table with me.

21   She sat with me at a trial three years ago maybe before

22   Judge Lamberth, and she also sat at counsel with me at a

23   trial before Judge Boasberg about three years ago.  She

24   certainly would not be ready to take over the case if

25   something were to happen to me.  She's there as a very smart

1   person who has technical capabilities that I have never come

2   close to having.

3           I am just asking the Court if it has any issue

4   with her being --

5           THE COURT:  Of course not.

6           Welcome to the case, Ms. Ali, and I look forward

7   to meeting you in person next week.

8           And, Mr. Brennwald, I hope you're not expecting

9   anything to happen to you between now and Monday.

10          MR. BRENNWALD:  Right.  I hope not.

11          THE COURT:  All right.  So, look, I mean, you

12  know, you have to make a decision, and we will see what you

13  decide on Monday, but I can't relieve him from the rules of

14  the United States District Court for the District of

15  Columbia.

16          MR. BRENNWALD:  Can I ask the Court at what time

17  you would like us there on Monday morning?

18          THE COURT:  The jury will show up at 9:00.  Let's

19  get there at 9:00 and be ready to go.  Given some of the

20  discussion today, there may be some preliminary issues; and

21  then on Tuesday we'll probably push that back to 9:30.

22          MR. BRENNWALD:  All right.  And I just -- I've

23  heard -- and the Court probably knows this, but I've heard

24  that there are going to be six trials on Monday.

25          THE COURT:  Right, which means there are a lot of

 1    members of the public who are here, you know, against their

 2    will.

 3                MR. BRENNWALD:  Right.

 4                THE COURT:  Which is all the more reason to adhere

 5    to all of the CDC recommendations that govern places like

 6    this.

 7                MR. BRENNWALD:  I was just saying --

 8                THE COURT:  It's not like going to the grocery

 9    store.

10                MR. BRENNWALD:  I was just pointing it out for

11    Ms. -- just as a courtesy to Ms. Ayers and Mr. Manning

12    because it's going to take a lot longer to get in here on

13    Monday probably than it normally would take.

14                THE COURT:  That's probably right.

15                All right.  Anything else, Counsel?

16                MR. MANNING:  Your Honor, for the government we

17    just have one issue to raise, which goes back to the

18    question of witnesses and the rule of witnesses.

19                We've instructed all of our witnesses on the

20    general rule of witnesses and that they will be excluded

21    from the court before they testify, with the exception we'd

22    ask that Special Agent Eric Turner, who is the FBI case

23    agent who arrested Mr. Strand and Ms. Gold and has been on

24    the investigation from the beginning, be permitted to sit at

25    counsel table.

1          THE COURT:  Remind me what it is he's going to

2    testify about.

3          MR. MANNING:  He's going to introduce the texts

4    and Tweets and other communications of Mr. Strand that were

5    seized from Mr. Strand's phone.

6          THE COURT:  Any objection to that, Mr. Brennwald?

7          MR. BRENNWALD:  No, Your Honor.

8          THE COURT:  That's fine.

9          MR. MANNING:  And the other point we'd make as

10    to the witnesses, Your Honor, is that to the extent that

11    Ms. Gold remains a potential trial witness, we ask, like

12    anybody else, that she then be excluded from hearing any of

13    the testimony until after her own testimony.

14          THE COURT:  So ordered.  If you release her,

15    Mr. Brennwald, then she can feel free to attend.

16          MR. BRENNWALD:  Absolutely.

17          THE COURT:  All right.

18          All right.  We will see you Monday morning.

19          MR. BRENNWALD:  Thank you, Your Honor.

20          MR. MANNING:  Thank you.

21          MS. AYERS-PEREZ:  Thank you.

22          THE COURT:  Have a good weekend.

23          (Whereupon a recess was taken at 3:04 p.m.)

24          THE COURT:  Good afternoon, everyone.  Thanks for

25    calling in.  We are back on the record in the case.

 1          Mr. Strand is still not with us, Mr. Brennwald?

 2          MR. BRENNWALD:  Yes, Your Honor.  I didn't

 3    actually contact him about this.

 4          THE COURT:  Well, do you waive his presence?

 5          MR. BRENNWALD:  I do.

 6          THE COURT:  Okay.  So in thinking more about the

 7    mask issue, while I am somewhat skeptical of the motivations

 8    for the request, I think it would be best to avoid any legal

 9    issues with respect to any trial by absentia or anything of

10    that nature.  So I think I have a solution for you folks,

11    and I've consulted with our chief judge.

12          There is a rapid PCR test called the Lucira, L-U-

13    C-I-R-A, that will provide 98 percent reliable results

14    within 30 minutes.  It is available on Amazon Prime for

15    Monday delivery.  And if Mr. Strand takes a test every

16    morning, and Mr. Brennwald observes him taking the test, and

17    if he reports negative, and Mr. Brennwald, as an officer of

18    the Court, relays that report to the Court every morning

19    beginning on Monday, we will allow Mr. Strand not to enter

20    the courthouse or the courtroom with a mask.

21          And we can get word to the Marshals to permit him

22    to come in the courthouse unmasked, and I will permit him to

23    sit at counsel table unmasked.

24          So, Mr. Brennwald, you can -- these tests are

25    readily available.  Just by reference, the Circuit for oral

1    arguments has a similar rule.  They are requiring folks to

2    report negative rapid PCR tests before appearing before the

3    Circuit.

4             And so that's -- it's a consistent policy, and we

5    will apply it here.  So please convey that, and I think that

6    should solve the issue.

7             MR. BRENNWALD:  I areally appreciate that, Your

8    Honor.  I'm sorry that Your Honor went through that.

9             THE COURT:  And let Mr. Strand know that we are --

10   we and the court as a whole are bending over backwards for

11   him.

12            MR. BRENNWALD:  I will, Your Honor.

13            I'll even take a picture of the test results.

14            So I need to take the test -- I need to be there

15   when he takes the test, get the results, and email them to

16   chambers?

17            THE COURT:  Or just -- you don't need to email

18   them.  I will trust you as an officer of the court --

19            MR. BRENNWALD:  Okay.

20            THE COURT:  -- to accurately report the results of

21   any negative test.

22            MR. BRENNWALD:  I'll take a picture of the device

23   just to cover myself.  Thank you, Your Honor.

24            THE COURT:  All right.  Anything else?

25            MR. BRENNWALD:  No.

1          THE COURT:  All right.  We'll see you on Monday.

2          MR. BRENNWALD:  Thank you.

3          MS. AYERS-PEREZ:  Thank you.

4          (Whereupon the hearing was

5           concluded at 4:37 p.m.)

6

7

8          **CERTIFICATE OF OFFICIAL COURT REPORTER**

9

10          I, LISA A. MOREIRA, RDR, CRR, do hereby

11     certify that the above and foregoing constitutes a true and

12     accurate transcript of my stenographic notes and is a full,

13     true and complete transcript of the proceedings to the best

14     of my ability.

15        **NOTE:**  This hearing was held remotely by Zoom or some

16     other virtual platform and is subject to the technological

17     limitations of court reporting remotely.

18          Dated this 3rd day of August, 2022.

19

20                          /s/Lisa A. Moreira, RDR, CRR
                            Official Court Reporter
21                          United States Courthouse
                            Room 6718
22                          333 Constitution Avenue, NW
                            Washington, DC 20001
23

24

25