```
1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2
    - - - - - - - - - - - - - - - x
3   THE UNITED STATES OF AMERICA,
                                        Criminal Action No.
4                Plaintiff,             1:21-cr-00085-CRC
                                        Thursday, June 1, 2023
5   vs.                                 2:11 p.m.

6   JOHN HERBERT STRAND,

7                Defendant.
    - - - - - - - - - - - - - - - x
8

9   _____

10              TRANSCRIPT OF SENTENCING HEARING
       HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                UNITED STATES DISTRICT JUDGE
    _____
    APPEARANCES:
12  For the United States:       APRIL HOLLY AYERS-PEREZ, ESQ.
                                 U.S. ATTORNEYS OFFICE
13                               Southern District of Texas
                                 11204 McPherson Road
14                               Suite 100a
                                 Laredo, TX 78045
15                               (956) 723-6523

16                               JASON MANNING, ESQ.
                                 DOJ-CRM
17                               1400 New York Avenue NW
                                 Washington, DC 20005
18                               (202) 514-6256
                                 jason.manning@usdoj.gov
19
    For the Defendant:           STEPHEN F. BRENNWALD, ESQ.
20                               BRENNWALD & ROBERTSON, LLP
                                 922 Pennsylvania Avenue, SE
21                               Washington, DC 20003
                                 (301) 928-7727
22
    Court Reporter:              Lisa A. Moreira, RDR, CRR
23                               Official Court Reporter
                                 U.S. Courthouse, Room 6718
24                               333 Constitution Avenue, NW
                                 Washington, DC  20001
25                               (202) 354-3187
```

```
1                    P R O C E E D I N G S
2              THE COURTROOM DEPUTY:  This is Criminal Case
3    21-085-1, United States of America vs. John Herbert Strand.
4              Starting with the government, please approach the
5    podium and state your appearance for the record.
6              MS. AYERS-PEREZ:  Good afternoon, Your Honor;
7    April Ayers-Perez and Jason Manning for the government.
8              THE COURT:  Ms. Ayers-Perez, good to see you
9    again.
10             Mr. Manning.
11             MR. BRENNWALD:  Good afternoon; Steve Brennwald
12   for Mr. Strand.  Unfortunately I don't have Ms. Sameera Ali,
13   or we wouldn't have had the technical issues you're aware
14   of.
15             THE COURT:  Good afternoon, Mr. Brennwald.
16             Mr. Strand, good to see you.
17             THE DEFENDANT:  Yes, Your Honor.
18             THE PROBATION OFFICER:  Good afternoon, Your
19   Honor; Robert Walters from probation.
20             THE COURT:  Okay.  Good afternoon, Mr. Walters.
21             All right.  Have we resolved the technical issues,
22   or should we take a break before discussing the 3553(a)
23   factors so that you can get set up?
24             MR. BRENNWALD:  Your Honor, I understand that the
25   technical folks in the courthouse do not have an adaptor
```

1    that will work with the computer I have.

2              THE COURT:  Okay.

3              MR. BRENNWALD:  It's an Apple.  Apparently they

4    don't like Apples.  So I can only trust that the Court saw

5    the video.

6              THE COURT:  Well, I just received it this morning,

7    and I have not had an opportunity to review it.  I've been

8    in court all day.  It would have been nice to receive it

9    before then, but perhaps we can send it either to the

10   government or to one of the Court's staff, and we can queue

11   it up from their computer.  Will that work?

12             MR. BRENNWALD:  Yes, Your Honor.  I emailed it --

13   I think I forwarded it -- I just forwarded the link actually

14   to Hilary, last name unknown, and I sent it to Mr. Manning

15   as well.

16             Mr. Manning was kindly contemplating helping me

17   with that, but they apparently saved their exhibits to the

18   desktop and cannot do that.

19             THE COURT:  Okay.  Well, let's get started.  We'll

20   take a break for you to resolve that issue when the time

21   comes.

22             All right.  The Court has read the documents that

23   have been submitted:  the presentence investigation report

24   and recommendation; the memorandum from both the government

25   and the defense in aid of sentencing; and the supporting

1    exhibits, although I have not viewed all of the recent video

2    exhibits.  I also received and reviewed a letter from the

3    defendant.

4            And I don't believe that there were any other

5    letters.  Is that right, Mr. Brennwald?

6            MR. BRENNWALD:  That's correct, Your Honor.

7            THE COURT:  Okay.  There have also been one or two

8    letters from members of the public in support of the

9    defendant.

10           Any other written materials for the Court's review

11   at this time?

12           MS. AYERS-PEREZ:  Nothing from the government,

13   Your Honor.

14           THE COURT:  Mr. Brennwald?

15           MR. BRENNWALD:  No, Your Honor.

16           THE COURT:  Okay.

17           All right.  Let's start with the factual findings

18   in the presentence investigation report.  And by the way,

19   I'm not going to get into the dispute as to whether the

20   defendant made himself available to probation or whether

21   that was a miscommunication with counsel, but, you know, I'm

22   happy to hear from the defendant.  I've read his letter.

23           But I don't believe that probation received a

24   financial affidavit or financial disclosure.  Is that

25   correct, Mr. Walters?

```
1                THE PROBATION OFFICER:  That's correct, Your
2      Honor.
3                THE COURT:  Okay.  Obviously that goes to the
4      government's recommendation and probation's recommendation
5      for a fine in this case; and the Court always likes to know
6      what the defendant's financial condition is so that it can
7      assess whether and to what extent a fine is appropriate.  So
8      unfortunately I don't have that information.
9                I know there are objections to the calculation of
10     the guidelines range, which I will get to.
11               But, Mr. Brennwald, any unresolved objections to
12     the factual portion of the PSR concerning the circumstances
13     of the offense?
14               MR. BRENNWALD:  Well, as I said in my memorandum
15     actually...
16               As I said in my memorandum, the Paragraphs 17 to
17     33 of the government's -- of the presentence report was
18     written by the government.  We don't agree with all of the
19     statements there.  It would take too long to basically
20     rewrite the entire narrative.  I don't know how the Court
21     would want to handle that.
22               THE COURT:  Okay.  I'd like to handle it this way:
23     I'm not going to go through each one.  The bulk of those
24     objections really consist of sort of competing
25     interpretations of what the trial evidence showed.
```

```
1                MR. BRENNWALD:  Right.

2                THE COURT:  The Court sat through trial and

3      generally finds that the circumstances set forth in the PSR,

4      putting aside the guidelines calculations, is consistent

5      with the trial evidence.  But all of your objections are

6      noted for the record.

7                So with that, Mr. Strand, have you been satisfied

8      with Mr. Brennwald's services in this case?

9                THE DEFENDANT:  Yes, Your Honor.

10               THE COURT:  Okay.  And has he reviewed all of the

11     materials with you, and have you reviewed the presentence

12     investigation report?

13               THE DEFENDANT:  Yes, I have.

14               THE COURT:  All right.

15               So with that, the Court accepts the factual

16     findings in the presentence investigation report regarding

17     the circumstances of the offense; and, therefore, those

18     facts as stated in the PSR will be adopted by the Court for

19     purposes of sentencing.

20               And, again, Mr. Brennwald, your objections to the

21     factual summary will be noted.

22               All right.  Moving to the calculation of the

23     guidelines range.  There were five counts of conviction,

24     three of them are subject to the guidelines:  Count 1,

25     obstruction of an official proceeding under 1512(c)(2);
```

1    Count 2, entering and remaining in a restricted building

2    under 1752(a)(1); and Count 3, disorderly conduct or

3    disruptive conduct in a restricted building under

4    1752(a)(2).  Two of the offenses were a Class B

5    misdemeanor -- Count 4, disorderly conduct on Capitol

6    grounds or buildings, and Count 5, parading or demonstrating

7    in a Capitol building or grounds -- that are not subject to

8    the guidelines.

9         Under Guidelines Section 3D1.2, the probation

10   office grouped Counts 1 and 2 because they both involve the

11   same victim, namely Congress, and then grouped Count 3 with

12   the others because it involved conduct that is treated as a

13   specific offense characteristic of the other two counts.  So

14   there's only one group.

15        To that group, probation applied the guideline for

16   the 1512(c)(2) offense, which is the obstruction of justice

17   guideline found at Section 2J1.2A of the guidelines.  That

18   guideline carries a base offense level of 14.  Probation

19   applied two specific offense characteristic enhancements:

20   One under 2J1.2(b)(1)(B), and an eight-level enhancement on

21   the ground that the offense involved causing or threatening

22   to cause physical injury to a person in order to obstruct

23   the administration of justice.

24        It also applied a three-level enhancement under

25   2J1.2(b)(2) because the offense resulted in a substantial

1    interference with the administration of justice.

2          It then applied a two-level obstruction of justice

3    adjustment on the ground that the defendant provided false

4    testimony at trial.  That resulted in an adjusted offense

5    level of 27.  There was no reduction for acceptance of

6    responsibility.

7          Mr. Strand had no criminal history, which placed

8    him in Criminal History Category 1.

9          So offense level 27 at Criminal History Category 1

10   resulted in an advisory guideline range of 70 to 87 months,

11   including supervised -- plus supervised release of one to

12   three years on Count 1, a fine of $25,000 to $250,000 on

13   Count 2 -- I'm sorry, on Count 1, and a fine of $25- to

14   $100,000 on Counts 2 and 3.

15         All right.  I'll hear from you on the objections,

16   but did the Court get the probation office's calculations

17   correct?

18         MS. AYERS-PEREZ:  Yes, Your Honor.

19         MR. BRENNWALD:  Yes, Your Honor.

20         THE COURT:  Okay.

21         The government has objected, as it has in most

22   cases these days, on the sequencing of the grouping

23   analysis.  I have not weighed in on that.  I've recommended

24   to other AUSAs and to the probation office that perhaps they

25   should get some guidance from the experts at the Sentencing

1    Commission so we don't have to, you know, rehash this and

2    waste paper on it in every case.  As in most cases, it does

3    not affect the calculation of the range, and so I will just

4    leave that aside.

5            And, Mr. Brennwald, you've obviously raised

6    objections to a number of the enhancements, so why don't you

7    start with the plus-eight enhancement.

8            MR. BRENNWALD:  Thank you, Your Honor.

9            I cited in my lengthy memorandum the decision by a

10   fellow judge in this courthouse last week who found that

11   under similar circumstances the eight-level enhancement --

12           THE COURT:  So you cited, I believe, hearsay

13   testimony from a lawyer who --

14           MR. BRENNWALD:  Well, I don't have a transcript of

15   that -- of her sentencing, unfortunately.

16           THE COURT:  And it was Judge Jackson?

17           MR. BRENNWALD:  Yes, Your Honor.

18           THE COURT:  And she did not apply it on legal

19   grounds or factual grounds?

20           MR. BRENNWALD:  Both.

21           THE COURT:  Okay.

22           MR. BRENNWALD:  I said in my memo, and I think --

23   I want to make sure I'm clear about that.  It was a bench

24   trial before her.  She found the defendant in that case not

25   guilty of obstruction of an official proceeding but said,

1    according to Mr. Fleckinger, that if she had found him

2    guilty, she would not have applied that eight-level

3    enhancement or three-level enhancement --

4         THE COURT:  So there wasn't even a sentencing

5    proceeding?

6         MR. BRENNWALD:  Yes, he was sentenced last week.

7         THE COURT:  But not on that count?

8         MR. BRENNWALD:  Not on that count.  And I guess

9    you can say it was dicta in the sense of she was talking

10   about what she would have done, but I thought it was

11   interesting that she said that in her view either under the

12   law or under the facts in that case the eight-level

13   enhancement -- neither the eight- nor the three-level

14   enhancement applied.

15        In this case I've argued that it does not apply

16   legally speaking, and it certainly does not apply -- there's

17   not a single video --

18        THE COURT:  Let's take one at a time.

19        MR. BRENNWALD:  Yes, Your Honor.

20        THE COURT:  You've made your record, preserved

21   your record on the legal issue.

22        I am on record as having held in the *Barnett*

23   sentencing a week or two ago that it -- I believe it does

24   apply as a legal matter because there are aspects of the

25   certification proceedings that are adjudicatory in nature,

```
 1    as a number of other judges have found.  And so, you know,
 2    it's an interesting question.
 3              The Court of Appeals may end up coming out the
 4    other way.  I understand that and respect Judge McFadden's
 5    decision in the Seefried case, which I didn't know about the
 6    Judge Jackson decision, but that at the time, at least, it
 7    was the only decision that came out that way, and I disagree
 8    with it.  So I will --
 9              MR. BRENNWALD:  And I phrased it --
10              THE COURT:  I think it applies as a legal basis.
11              MR. BRENNWALD:  Okay.  I phrased it in my footnote
12    carefully because I didn't want to mislead the Court.
13              THE COURT:  Understood.  Understood.  No, you've
14    got to make your record.
15              Let's talk about the facts though.
16              MR. BRENNWALD:  Okay.  So looking at the language
17    of the statute or of the guidelines itself, the enhancement,
18    it talks about causing or threatening to cause personal
19    injury or physical injury.  And my argument is quite simple.
20    The evidence on video never shows Mr. Strand assaulting a
21    police officer.  It never shows him threatening an officer.
22    He's in a crowd, but he's never at the front of the crowd.
23              The video that the government is going to play in
24    a few minutes -- that's about 13 minutes and 32 seconds --
25    shows Mr. Strand at best in the third row on the side in the
```

1    hallway inside -- outside the House Chamber.  Again, three

2    rows back, on the side, not shouting, not yelling, literally

3    craning his head to try to see over the people in front of

4    him.

5            So unless everybody in the crowd is guilty of

6    causing or threatening to cause an injury because they were

7    there, even if they're not pushing, as Mr. Strand clearly

8    was not pushing --

9            THE COURT:  Okay.  Let me cut you off.  I'm

10   familiar with the videos.  I saw them at trial.  I recall

11   them.

12           MR. BRENNWALD:  Okay.

13           THE COURT:  And I don't read the government's

14   position to be that the defendant or his co-defendant, for

15   that matter, assaulted anybody or threatened anybody, in the

16   colloquial sense of that word.  But they point to the

17   relevant conduct provision of the guidelines in Section 1,

18   which is 1B1.3(a)(1)(A) and (a)(1)(B), and (a)(1)(A) says

19   that relevant conduct encompasses not only the defendant's

20   actions but those of others that he aided, abetted, induced,

21   caused, et cetera.  And they focus on the "aided and

22   abetted" language.

23           And (a)(1)(B) says that relevant conduct also

24   includes, quote, all harm that resulted from, unquote, the

25   acts of the defendant or the acts of any others engaged in

1    joint criminal activity.

2           So the question here is:  Why don't those

3    principles of vicarious liability apply?

4           MR. BRENNWALD:  Because he never aided and abetted

5    anybody, and he never conspired with anybody else to do

6    certain acts.  He was literally present when those events

7    were happening.  He was on the side in the House Chamber,

8    with Dr. Gold being in front of him, and they were standing

9    there looking.

10          THE COURT:  Okay.  So I'm sure I will hear this

11   from the government, but they were against the wall, but

12   they were among a relatively small -- maybe 50, fair enough?

13          MR. BRENNWALD:  Close enough.  Towards the front,

14   yes.

15          THE COURT:  -- group of people who were outside

16   directly the House Chamber doors.  Some were yelling.  Some

17   were banging on the door.  Some were trying to break the

18   window.

19          MR. BRENNWALD:  They were behind a railing.

20   Dr. Gold and Mr. Strand were behind a --

21          THE COURT:  Certainly that group was threatening.

22   If you asked one of the people behind that door did they

23   feel threatened by the mass, the clutch of people outside

24   the door --

25          MR. BRENNWALD:  Right.

```
1              THE COURT:  -- I'm sure they would say yes.  And

2     so the question is -- and I think you're probably right that

3     that's the closest thing that gets the government to this

4     enhancement.

5              MR. BRENNWALD:  Right.

6              THE COURT:  -- is that collective criminal

7     activity?  Did their presence aid in the threat that was

8     posed to the people on the other side of that door?

9              And I think that's the question that it boils down

10    to whether this enhancement applies or not.

11             MR. BRENNWALD:  So with that in mind, again, they

12    were behind a railing on the right side as you face the

13    House Chamber.  They were not yelling, screaming,

14    encouraging --

15             THE COURT:  Well, they were -- I didn't --

16             MR. BRENNWALD:  They were there.

17             THE COURT:  I didn't notice a railing.  Where was

18    the railing?

19             There was a vestibule.  And there was a door at

20    the other end of the vestibule, and the door led straight

21    into the chamber.

22             MR. BRENNWALD:  Right.  On the right side where

23    they were, they were next to a wall --

24             THE COURT:  Next to a wall.  But they were inside

25    the wall, right?
```

15

1          MR. BRENNWALD:  Yes.

2          THE COURT:  Where do you draw the line?

3          MR. BRENNWALD:  There is --

4          THE COURT:  Is it the first two rows or the -- you

5     know, or the first two columns?  What's --

6          MR. BRENNWALD:  So if you look at --

7          THE COURT:  What posed the threat?

8          MR. BRENNWALD:  I appreciate that.

9          If you look at the line, the first two lines of

10    people who were side by side facing the police officers,

11    Mr. Strand and Dr. Gold were at best, from what you can see

12    in the video, on the third row on the very edge of that row;

13    not pushing, not moving, just basically standing there

14    looking at -- Dr. Gold at one point was looking at her

15    phone.  At one point Mr. Strand is looking to his left

16    talking to somebody next to him.  It looked like he could

17    hear what the person was saying, but they're literally just

18    there.  And so they were merely present basically.

19          I understand that a mob is a mob is a mob, but

20    that's not how --

21          THE COURT:  So the first two rows count, but the

22    third one on the far right doesn't?

23          MR. BRENNWALD:  Your Honor, if they had been doing

24    anything -- anything -- talking, physically doing something,

25    pushing, encouraging, anything that would be considered

1       typically aiding and abetting, I would agree.  But they

2       weren't.  They were literally bumps on a log.  But they were

3       there.

4               And whether they were there or not obviously is

5       an issue, but they were there.  And Mr. Strand was behind

6       Dr. Gold and not actively doing anything to tell anybody to

7       do anything or not even -- he never chanted "Stop the

8       Steal."  He never chanted "USA" when they were in that

9       hallway.

10              You'll see -- maybe you haven't seen the video

11      that was sent by the government today yet, but there's a

12      woman in gray hair who was very loud right up against the

13      police.  There was an older white gentleman who was trying

14      to reason with the police for some reason; I don't know what

15      he was thinking he could do.  And there were people who were

16      being very loud and very pushy and very threatening and

17      scary.

18              Meanwhile, Mr. Strand and Dr. Gold are off to the

19      side almost as if they were planted there by some kind of a

20      beam, you know, beamed down from somewhere, and they're just

21      on the side, and there they are.  So unless everybody in

22      that crowd, even those who were silent, even those who did

23      nothing physically to help them, is guilty, then the

24      enhancement would apply, but I just don't see it that way.

25              THE COURT:  Okay.  Ms. Ayers-Perez, why don't you

1    respond to that.

2            MR. BRENNWALD:  I just have one more thing I would

3    argue to the Court, that the rule of lenity should apply

4    when it's not clear what their conduct was.

5            THE COURT:  I don't think the rule of lenity

6    applies to ambiguous facts.  It applies to ambiguous laws.

7            But anyway...

8            MS. AYERS-PEREZ:  Okay.  Thank you, Your Honor.

9            I think there are two instances here.

10           THE COURT:  Okay.

11           MS. AYERS-PEREZ:  And they occur in close

12   proximity to one another where we get to the plus-eight

13   enhancement.

14           And the first is when Gold and Strand are in that

15   corridor between Statuary Hall and the House Chamber.  We

16   heard testimony from Sergeant Vargas about this at trial.

17   He was in the front of the line of Capitol Police who was

18   trying to stop this mob from getting closer to the House --

19           THE COURT:  Okay.  You say "this mob," but, you

20   know, who are you talking about?  Where were they in

21   comparison to the folks who directly interacted with him or

22   may have threatened him either verbally or not verbally?

23           MS. AYERS-PEREZ:  So the interesting thing about

24   the way people were standing in this area is that they went

25   pretty far deep.  Mr. Strand began at the back, but he made

1   his way to the front.  By the end, he was probably about

2   three rows back when they were able to overtake Sergeant

3   Vargas and the line of Capitol Police officers who were

4   behind the line of Sergeant Vargas.  And it was overtaking

5   them that got them into the vestibule area outside that

6   House Chamber door that we've been talking about now.

7         Sergeant Vargas was injured during that time.  He

8   testified at trial about hitting his head on a statue within

9   the vestibule area outside the House Chamber door.  That

10  injury occurred as that group of people -- and Strand being

11  about three rows back in that group of people -- lunged

12  forward, went past the Capitol Police officers, and then a

13  group or a smaller group of them, including the defendant,

14  then get into that vestibule area outside the House Chamber

15  door.

16        THE COURT:  So same question.  Three rows back

17  counts, but ten rows back wouldn't?

18        MS. AYERS-PEREZ:  I don't know who was ten rows

19  back, Your Honor.  I don't want to make arguments on

20  everybody who was there.

21        But Mr. Strand, he didn't start -- or he started

22  ten rows back, and he continued to make his way forward in

23  that group of people getting closer and closer to Sergeant

24  Vargas and the police line.  As he got about three rows back

25  is when the crowd surged forward, including Mr. Strand, and

1    during that time Sergeant Vargas was injured.

2            And then Mr. Strand then goes into this smaller

3    area.  I do agree with Your Honor that it's probably about

4    15 people who were in this vestibule area.

5            THE COURT:  I thought 50.  But more like 15?  Or

6    somewhere in between?

7            MS. AYERS-PEREZ:  I think it's something more in

8    the 15 to 20 range.  Certainly by the end when Metropolitan

9    PD shows up and were able to get Mr. Strand and Dr. Gold out

10   of there, there were only a handful of people left there at

11   that point, and they were one of those.

12           THE COURT:  Okay.  But you don't disagree that

13   they were against the wall the whole time and keeping to

14   themselves?

15           MS. AYERS-PEREZ:  They were against the wall on

16   the right-hand side towards the back end of the vestibule.

17   I agree that those are the facts, Your Honor.

18           THE COURT:  Okay.

19           MS. AYERS-PEREZ:  But we also heard Officer

20   Brockwell, who is right on the other side of that door in

21   the House Chamber, and he said -- and this is a direct quote

22   from his testimony at trial -- he said -- he was talking

23   about how loud it was inside the House Chamber, that they

24   thought there were gunshots, when it was actually the

25   pounding on the glass inside the doors leading into the

1    House Chamber.  And he said, and I quote, "They were

2    actively trying to break into the House Chamber."

3            So that's what's going through the minds of the

4    Capitol Police officers who have barricaded the door with

5    furniture, and a congressman is there as well, as they're

6    screaming at this mob of people that includes Mr. Strand to

7    stop trying to break into the House Chamber.  And certainly

8    I do think that applies to the plus-eight enhancement based

9    upon both of those acts, Your Honor.

10            THE COURT:  Okay.  Thank you.

11            MR. BRENNWALD:  May I just respond for a second?

12            THE COURT:  There's no need.

13            So this is a somewhat close question in this case.

14   It's been debated in a number of other cases.  But I've

15   thought about it fairly extensively, and I do not think that

16   the plus eight applies here.

17            It's arisen in three other cases before me.  In

18   the *Robertson* case, which dealt with a fellow who had a big

19   old stick and obstructed and blocked a police officer with a

20   gas mask and a tactical vest.  It happened -- I applied it

21   in the *Egtvedt* case, which involved, you know, a scuffle, an

22   actual physical altercation with a police officer.  And I

23   recently applied it in the *Barnett* case, which involved a

24   series of verbal threats.  And, you know, each of those

25   cases involve direct conduct by the defendant.  There's no

1    similar conduct here.

2          I do agree with the government that it can be

3    applied in a vicarious way, but I think the connection

4    between the principal and the agent needs to be a little

5    closer than what it is here.  For instance, Judge Howell

6    applied it in the *Bledsoe* case on sort of a vicarious aiding

7    and abetting principle, but in that case the defendant

8    chanted things like, you know, "Where are you pieces of

9    shit?" as he initially entered the Capitol.  And he was

10   directly next to a number of people who were chanting the

11   infamous "Where's Nancy?" chant, which obviously is, you

12   know, incredibly threatening; and he was interacting with

13   the mob and sort of bolstering their conduct.

14         Judge Friedrich in the *Reffitt* case did not apply

15   it, finding that the sort of generally threatening conduct

16   was too attenuated to the administration of justice.

17         And so it is a somewhat close question, but the

18   Court, in fairness, will not follow it here.

19         In any event, as I've done in some other cases, I

20   would have varied it significantly had it been applied, and

21   so I will rule in favor of the defense on that one.

22         Next up, Mr. Brennwald?

23         MR. BRENNWALD:  So if the Court finds that --

24         THE COURT:  Or do you want to stand on your

25   papers?  It's up to you.

```
 1              MR. BRENNWALD:  With that gigantic hint, which I'm
 2    not saying is going one way or the other, but with that
 3    gigantic hint, I will stand on the papers.
 4              THE COURT:  Okay.  The Court will apply the three-
 5    level enhancement because the question is whether the
 6    defendant's sort of willing presence and participation with
 7    others, you know, in the mob along with that of other
 8    members resulted in substantial interference with the
 9    administration of justice.  And framed in that manner, I
10    think that it did both in terms of the delay that the riot
11    caused to the certification proceeding as well as the
12    expenditure of substantial resources that were necessary to
13    fix the damage done to the Capitol.  And this is consistent
14    with the findings of a number of other of my colleagues,
15    including Judge Moss in the *Matthew Miller* case and Judge
16    Howell in the *Greg Rubenacker* case.
17              Mr. Brennwald, you advocated for a reduction for
18    minimal or minor role --
19              MR. BRENNWALD:  Yes.
20              THE COURT:  -- I believe.
21              You know, that applies generally in conspiracy or
22    under sort of joint undertaking cases.  You know, as -- you
23    know, the same for the plus-eight enhancement.  I don't
24    think Mr. Strand was operating with anyone else or in
25    concert with anyone else besides his co-defendant; and, you
```

1    know, I'm not convinced that he played a minimal role with

2    respect even to her because, you know, there's no evidence

3    of him discouraging her or him not knowing where he was.

4    And he was, you know, right up there on the statute of

5    General Eisenhower with her.  So I don't think that

6    qualifies for a minimal role reduction.

7              MR. BRENNWALD:  If I could just throw something on

8    the record there for a second.

9              THE COURT:  Sure.

10             MR. BRENNWALD:  And this is just me talking.

11   it's just me proffering to the Court.  But anybody who knows

12   Dr. Gold knows that one does not tell her what she can do

13   and what she cannot do.  And I had told Mr. Strand before

14   today that, you know, although he was -- he felt compelled,

15   for personal reasons and for professional reasons, to follow

16   her and to make sure she was safe, that I'm guessing that

17   it's the old cliche, if she had jumped off a bridge, he

18   wouldn't have done it for the sake of personal duty, but --

19             THE COURT:  He's a grown man.  Okay?

20             MR. BRENNWALD:  Right.  I understand.

21             THE COURT:  I guess finally, there was the two-

22   point enhancement for obstruction of justice based on his

23   trial testimony.  You have urged me not to apply that.

24             Do you want to be heard on that or stand on your

25   papers?

24

```
1              MR. BRENNWALD:  Well, I acknowledge that I'm
2    swimming upstream.  There's no question about that.
3              The Court -- the government in this instance used
4    as an example one of five, I think, examples or four
5    examples of Mr. Strand's failure to talk to the probation
6    officer.  So just to put on the record, Mr. Strand was never
7    given a date and time by me or anybody else to participate
8    in an interview.
9              I've told the government face to face that that's
10   the case, and I'm happy to testify under oath about that, if
11   I have to.  But the fact is Mr. Strand was shocked when he
12   was told that he supposedly has been uncooperative with
13   probation when that is not true at all.  I have a few pages
14   of notes from my emails back and forth with the probation
15   officer, and that's just not accurate.
16             THE COURT:  Okay.  The Court makes no finding with
17   respect to his interactions with probation, nor does it make
18   a finding with respect to his testimony regarding whether he
19   knew that the certification was going on or whether he
20   intended to interfere with it.
21             I'll get to this later, but, you know, there was
22   certainly evidence of that.  It was indirect.  I think the
23   jury could reasonably infer from that evidence that he did
24   know and that he did intend to obstruct, and that was
25   obviously their verdict.
```

1          I think the evidence was sufficient to support

2     that verdict, but it is very difficult to know what someone

3     knows or what someone intends to do, obviously, and there

4     was no direct evidence, at least, of that, unless the

5     government corrects me.

6          But with respect to his testimony that he was

7     not -- or that he was pushed into the Capitol, you know, I

8     think that that was -- that was false testimony.  I think

9     the evidence was clear, the video, that he took advantage of

10    Officer Pollitt either falling or either being pushed in

11    front of him and went in voluntarily.  And so on that score,

12    at least, I think there's a basis for the obstruction

13    enhancement.

14          MR. BRENNWALD:  I would just note that -- I think

15    I mentioned this in my memo.  I submitted it about 4:45 on

16    Tuesday morning after having worked all night and having

17    worked until 2:30 the night before and all weekend, so I

18    can't recall exactly everything that's in there, but I think

19    I mentioned that -- I think I've had about a dozen of these

20    cases, and I'm shocked by the number of people on the east

21    steps who all thought they were being shoved in by some kind

22    of a stampede at the Hajj.

23          THE COURT:  Right.  Because knowingly going into

24    the Capitol is an element of the offense, and in order to

25    refute that element, they have to say they were pushed in,

1    and that's why they say it.

2              MR. BRENNWALD:  That's possible.  I understand the

3    Court's ruling.

4              THE COURT:  All right.  So with that, without the

5    eight-level enhancement, that reduces the base offense level

6    to 19.  At Criminal History Category 1, that results in an

7    advisory Sentencing Guidelines range of 30 to 37 months.

8              Mr. Walter, if you could come forward.

9              So probation recommended a sentence of 70 months,

10   but that was based on your calculation of the range, which

11   was 70 to 87.

12             Based on a 30 to 37 range, as the Court has found,

13   would probation still recommend a bottom-of-the-guidelines

14   sentence or an above-guideline sentence?

15             THE PROBATION OFFICER:  Your Honor, I'd recommend

16   the bottom-of-the-guidelines sentence as it's calculated by

17   the Court.

18             THE COURT:  Okay.  So the probation recommendation

19   is 30 months.

20             THE PROBATION OFFICER:  Yes, sir.

21             THE COURT:  Thank you.

22             THE PROBATION OFFICER:  Just for your edification,

23   Your Honor, the new fine range now becomes $10,000 to

24   $100,000 as well.

25             THE COURT:  Thank you.  So the fine range is

1    reduced to $10,000 to what?

2              THE PROBATION OFFICER:  $100,000.

3              THE COURT:  $100,000?

4              THE PROBATION OFFICER:  Yes, Your Honor.

5    Guidelines Level 19.

6              THE COURT:  Okay.

7              All right.  Ms. Ayers-Perez, would you like to be

8    heard on the sentencing factors?

9              MS. AYERS-PEREZ:  Yes, Your Honor.

10             THE COURT:  And will you be playing any of the

11   videos for me?

12             MS. AYERS-PEREZ:  Just very, very briefly, Your

13   Honor.

14             THE COURT:  Okay.

15             MS. AYERS-PEREZ:  I'm aware that the Court has sat

16   through a long trial of lots of videos in this case, and I

17   trust you remember all of them.

18             THE COURT:  Don't bank on that.

19             MS. AYERS-PEREZ:  There are just a couple I want

20   to play, under a minute for each.

21             Your Honor, what happened on January 6th was

22   horrific.  Three years ago I don't think any of us could

23   foresee that something like that would happen, and it will

24   forever be embedded as a stain in this country's history.

25             And the defendant had no small part in that

1    conduct.  His rhetoric in the days and weeks leading up to

2    January 6th was appalling.  His conduct on January 6th was

3    horrific and criminal.  His refusal to accept responsibility

4    for his criminal conduct since then is astounding.

5              It's been a while since trial.  I wasn't planning

6    to play videos, but after reading the defendant's

7    memorandum, I realized we had a difference of opinion on the

8    facts; and so I have a few here, Your Honor, that I want to

9    play as I take you through the conduct as we know it that

10   Mr. Strand had on January 6th.

11             So on January 6th, the defendant and his co-

12   defendant arrived outside the Capitol on the east side

13   sometime prior to about 2:30.  They made their way up the

14   East Rotunda steps into the Capitol, 35 steps, with a crowd

15   of people.

16             I'm going to show you -- and I've labeled these

17   the same exhibit numbers from trial, Your Honor, just to

18   make sure our record's as clean as possible.  But this is

19   from --

20             THE COURT:  And just for the record, we'll

21   preadmit all of these into the sentencing hearing record.

22             MS. AYERS-PEREZ:  Thank you, Your Honor.

23             I'm showing what was previously marked as

24   Government's Exhibit 503.01.  And in this video you'll see

25   that there are hundreds of people streaming up these stairs

1    outside the Capitol.

2                And at the 13-second mark -- is it showing?

3                THE COURTROOM DEPUTY:  That screen right there is

4    what we're seeing, so you may need to drag it over.

5                THE COURT:  I would say ask Mr. Brennwald for

6    help, but I'm not sure that will do the trick.

7                MR. BRENNWALD:  That was almost cruel.

8                MS. AYERS-PEREZ:  Okay.

9                (Video playing)

10               MS. AYERS-PEREZ:  All right.  There we go.

11               (Video playing)

12               MS. AYERS-PEREZ:  I'm stopping it right there at

13   the 13-second mark, Your Honor.

14               And you'll see right there on the screen -- I'm

15   circling on the screen -- John Strand walking up through a

16   throng of the crowd on those East Rotunda steps.

17               (Video playing)

18               MS. AYERS-PEREZ:  Your Honor, stopping here at 21

19   seconds, Mr. Strand is here again, and he has moved up in

20   the crowd.

21               And we see on the right-hand side of the screen

22   there, those are the East Rotunda Doors leading inside the

23   Capitol building on the east side of the Rotunda right near

24   the middle of the Capitol building.

25               Strand and his co-defendant moved closer and

1    closer to those East Rotunda Doors.  And the whole time

2    they're doing that, the crowd around them is angry.  They're

3    violent.  They're shouting.  They're assaulting officers.

4    They're using weapons.  And this is not just in video, Your

5    Honor.  This is the testimony we heard from Officer Pollitt

6    at trial.

7         And Officer Pollitt spoke about the mob outside of

8    those East Rotunda Doors.  He spoke about the dangers that

9    he and his fellow officers were facing.  And he spoke about

10   what happened shortly before John Strand made his way inside

11   the Capitol building.

12        (Video playing)

13        MS. AYERS-PEREZ:  Your Honor, I'm showing you

14   504.01.  Right now we're looking at those East Rotunda

15   Doors, and the glass has been broken out of them.  Officers

16   are still trying to hold them shut against the mob.  And

17   down here in the bottom right-hand corner of your screen,

18   the head -- the hair on the head you see there belongs to

19   Officer Pollitt.

20        (Video playing)

21        MS. AYERS-PEREZ:  I've stopped it here at 21

22   seconds.  This is when Officer Pollitt is pulled down into

23   the crowd, and John Strand right there can clearly see it

24   happen.  It happens right in front of him.

25        And what John Strand does next is uses Officer

1    Pollitt no longer being in that spot to move forward closer

2    to those East Rotunda Doors and closer to inside the Capitol

3    building.

4            (Video playing)

5            MS. AYERS-PEREZ:  Shortly thereafter, at

6    approximately 2:27 p.m., Strand enters the Capitol building

7    with his co-defendant.  Within 75 seconds of entering the

8    Capitol building, he has raced through the Rotunda.  He has

9    gone through Statuary Hall.  He has not stopped.  He has not

10   tried to go to another entrance or exit.  And he gets to the

11   crowd of rioters that are forming outside of the House

12   Chamber door.

13           THE COURT:  Okay.  Let's stop there.

14           As Mr. Brennwald pointed out, you used the term

15   "beeline" a number of times in your memo.  I think you write

16   the evidence is clear that he went from Point A to Point B.

17   But what evidence is there to show why he went to that spot,

18   that he knew that that was the vestibule outside the House

19   Chamber, that that was his intended destination?  Or should

20   we just infer that?  And, if so, how can we infer that from

21   the circumstances?

22           MS. AYERS-PEREZ:  Well, Mr. Strand's rhetoric in

23   the days and weeks leading up to January 6th was about

24   stopping the steal, about this is war, about the election.

25   The counting of the Electoral College votes, which is what

1    was occurring inside the Capitol on January 6th, was taking

2    place there inside the House Chamber.

3             I don't have -- we don't have a text message from

4    John Strand saying, "Hey, I went right to the House

5    Chamber."  But John Strand went right to the House Chamber.

6    And at trial we had the Government's Exhibit 102, and we

7    pointed out the 18 different avenues John Strand could have

8    taken that he chose not to based on where he entered.

9             Officer Brockwell showed us that where he entered

10   and the path he took to the House Chamber was the quickest

11   way to get there from that door.  So I do think it is

12   reasonable to infer that he knew where he was going.  He

13   didn't attempt to go anywhere else.

14            And the message we've had from Mr. Strand has been

15   "I don't know where I was going.  I was trying to get out."

16   But he goes to this crowd of people and just stops and stays

17   there until they get into the vestibule, and then he just

18   stops and stays there for 18 minutes.

19            Why else would you do that?  There's no exit

20   through there.  And there's no reasonable belief that anyone

21   would have that that's a way out.

22            And so he just happened to be there in front of

23   the main House Chamber doors.  Those are the doors that the

24   president enters into when he's going to give his State of

25   the Union address.  And it befuddles the mind that he

1    managed to do that in 75 seconds.

2              THE COURT:  Okay.

3              MS. AYERS-PEREZ:  When Strand gets to outside the

4    Statuary Hall and in the corridor before the House Chamber

5    where Sergeant Vargas is, and he's holding the line, he is

6    at the back of a mob of people.  There are at least seven or

7    eight rows in front of him.

8              Strand leaves and then comes right back to that

9    area, and then he does the exact same thing there that he

10   did outside the East Rotunda Doors.  He starts making his

11   way forward in the crowd, going through the crowd, getting

12   to the front of the people there.

13             (Video playing)

14             MS. AYERS-PEREZ:  Your Honor, I'm going to show

15   you Exhibit 506.01.  This is the exhibit in its entirety,

16   but I'm going to fast forward to the seven-minute-and-18-

17   second mark.

18             (Video playing)

19             MS. AYERS-PEREZ:  I've stopped at seven minutes

20   and 18 seconds, Your Honor.

21             This is the mob, the crowd of people that I've

22   been discussing at this time, and here there is John Strand.

23   He has made his way up to just a few rows back from the

24   front.

25             Sergeant Vargas is just off screen trying to hold

1    the crowd back.  There is a line of Capitol Police officers

2    behind Sergeant Vargas trying to hold the crowd back, and

3    behind them is the House Chamber.

4            And, again, Strand is here near the front as part

5    of that mob continuing with the activities the mob is doing.

6    And what the mob is doing is they are trying to overtake the

7    officers, which they do -- which they end up doing.

8            I'm going to fast forward to 7:56.

9            (Video playing)

10           MS. AYERS-PEREZ:  Your Honor, I've started playing

11   here at the 7:55 mark, and you will see this line of

12   officers.  Sergeant Vargas is here on the left-hand side of

13   the screen in the hat.  And you will see them being

14   overtaken by this mob that includes Mr. Strand.

15           (Video playing)

16           MS. AYERS-PEREZ:  And, Your Honor, at that point

17   Mr. Strand has already gone into the vestibule.  Numerous

18   members of this group of people are scattering off in other

19   directions.  They don't have to go in there.  But Mr. Strand

20   chooses to go in there.

21           He was inside that vestibule for 18 minutes; 18

22   minutes that we heard from Officer Brockwell on the other

23   side of the vestibule that they barricaded congressmen

24   inside, civilian staffers inside, Capitol Police officers

25   inside, with furniture inside the House Chamber of the U.S.

1    Capitol building.  And I say that because I think it's easy

2    after all this time for me even to sometimes become numb to

3    that.  We've seen so many videos of what happened, and to

4    forget the horror we felt about January 6th, about what was

5    happening.  But they were barricading the doors of the House

6    Chamber, and John Strand was mere feet away on the other

7    side as they did that.

8            After the 18 minutes and after Sergeant Pitts

9    was able to finally get Mr. Strand out -- and if you

10   remember from trial, Sergeant Pitts said he didn't even

11   believe Mr. Strand spoke English because, as he was

12   instructing him to leave, Mr. Strand had no reaction to him.

13           After he finally left, Mr. Strand and his co-

14   defendant stopped in the Statuary Hall so that Ms. Gold

15   could give a speech.  Once again, Capitol Police officers

16   had to force them out of that area, and they forced them

17   into the Rotunda.

18           And while in the Rotunda, we see this, Your Honor.

19           (Pause)

20           Well, Your Honor, it's in my sentencing memo on

21   Page 20.  But we see Ms. Gold; Mr. Strand standing on a

22   statue.  Ms. Gold has a bullhorn.  Mr. Strand has cupped his

23   ear getting the crowd's attention, continuing in the melee

24   of what's happening that day, continuing to bring a mob of

25   people around them to listen to a speech.

1           THE COURT:  Let me ask you this:  In addition to

2     the goal of interfering with the certification -- and I

3     agree that there was sufficient evidence from which the jury

4     could infer that that was one of the goals -- do you think

5     another of the goals may have been to give a speech on the

6     floor of the House or the floor of the Senate and that

7     that's why they were there?

8           MS. AYERS-PEREZ:  Yes, Your Honor.  I believe they

9     were there for multiple reasons, but they wanted the most

10    public attention they could get, and they were there -- in

11    fact, Mr. Strand discusses that, about trying to find the

12    most amount of people who can listen to them.  And one of

13    the places you can do that is not just inside the Capitol,

14    but inside those super sensitive areas of the Capitol of

15    which they were standing right outside of.  So I believe

16    they were there for multiple reasons, Your Honor.

17           From there, after their speech at the Rotunda,

18    they finally left the Capitol 48 minutes after they

19    initially entered the Capitol.  Almost one hour inside.

20           They did not leave immediately the premises.  We

21    saw the video at trial of Capitol Police officers in a line

22    leaving the Capitol, and John Strand's shaking his fist at

23    them as they walk by.  He's claimed he was clapping.  He was

24    shaking his fist, Your Honor.

25           At the end of the day, I'm really befuddled by

1    some of the things that Mr. Strand has -- is now claiming

2    and the lack of remorse that we're hearing from Mr. Strand

3    about the conduct that he took -- that he had on January 6th

4    and the conduct of those around him.

5         Strand isn't just another defendant who got

6    discovery and looked at it and pled guilty and went to a

7    sentencing.  He sat through a trial.  He sat through video

8    after video, photographs, and live testimony of people

9    talking about what happened to them on January 6th.

10        He listened as Officer Pollitt discussed the

11   horror of being pulled into the crowd directly in front of

12   Strand and his fear that the rioters around him would grab

13   his gun.

14        He listened as Sergeant Vargas described trying to

15   hold the mob back, being pushed by the mob towards the House

16   Chamber.  He heard Sergeant Vargas describe hitting his head

17   on a statue inside that vestibule.

18        He heard Kyle Jones, a civilian staffer inside the

19   House Chamber, describe the utter fear of being in that

20   House Chamber while Strand and the other rioters had

21   surrounded them.  Kyle Jones feared for his life that day,

22   and he also feared for democracy.

23        Strand heard Officer Brockwell describe piling

24   furniture to barricade doors inside our House Chamber during

25   what should be the peaceful transfer of power.  He heard

1    Officer Brockwell describe the sounds of rioters beating on

2    the glass and beating on the doors.  He heard Officer

3    Brockwell say they were actively trying to break into the

4    House Chamber.  He listened as Officer Brockwell described a

5    sitting congressman who was trying to negotiate with the mob

6    that Strand was a part of for them to get away from the

7    House Chamber.

8            He saw pictures of Capitol Police officers with

9    their guns drawn at a door that was mere feet away from him.

10           These officers who were testifying at trial, they

11   weren't testifying at random.  They were testifying because

12   they had run-ins with Mr. Strand.  They were in proximity to

13   Mr. Strand.

14           This isn't the description of abstract events that

15   are occurring away from Strand and outside Strand's purview.

16   This is what Mr. Strand experienced on January 6th.

17           So that's why it's so shocking that despite all

18   that Strand now says, of the approximately 1,000 individuals

19   who entered the United States Capitol on the afternoon of

20   January 6, 2021, John Strand is, if culpable at all,

21   certainly the least culpable of them all.

22           That's appalling, Your Honor.  It is appalling to

23   see what happened to the people who were the actual victims

24   on January 6th, to see what they went through, and to say

25   that you're not culpable, but if you are, you're certainly

1     culpable the least of all.

2            Part of understanding criminal conduct is taking

3     responsibility for your conduct, for showing remorse about

4     what your conduct did that day.  We have not seen that from

5     John Strand.  We're not going to see that from John Strand.

6     It is 28 months later, and he's still denying his

7     culpability.

8            And it's hard when you listen to someone like Kyle

9     Jones, his riveting and painful account of January 6th, and

10    then to hear that.

11           And so, Your Honor, because of that, because of

12    his actions on January 6th, because he spent almost one hour

13    inside the Capitol, because he tried to get into the most

14    sacred of all areas inside the Capitol, because he actively

15    took part in the delay of the peaceful transfer of power in

16    this country, we ask that John Strand be sentenced to

17    prison.

18           We have a new guideline range, 30 to 37 months.

19    We're asking for 37 months.  His conduct has been atrocious,

20    and he certainly had conduct that at least made it a close

21    question as to the plus-eight enhancement.  And because he

22    took part in that -- his active taking part; not passive,

23    not in the back, not sitting there wondering what's going to

24    happen -- we think he should serve 37 months in prison.

25           We're asking for a fine, Your Honor, and we

1    attached some exhibits to our sentencing memo.  John Strand

2    has been running a website since trial in which he has been

3    making money and building finances based upon his criminal

4    conduct.  His website actually says "From Gucci to Guilty"

5    on it.  He has raised over $17,000 between September of 2022

6    and April of 2023.

7              THE COURT:  And let me just stop you there.  We

8    did not get a financial disclosure from the defendant

9    unfortunately.

10             MS. AYERS-PEREZ:  That's correct.

11             THE COURT:  And I authorized the issuance of a

12   subpoena to some financial institutions for information

13   regarding the solicitations and donations to the site.  I

14   did not -- I saw these records.  I didn't try to make heads

15   or tails of them.

16             What do they say, and what conclusions do you draw

17   from them?

18             MS. AYERS-PEREZ:  Yes, Your Honor.  So the records

19   are divided into one-month periods.  So we have a record

20   for September, October, November, December, et cetera,

21   through April of 2023.  And the records list how many

22   donations Mr. Strand received and the total amount of those

23   donations.  And we went through and calculated that amount

24   and came up to the final total of $17,300 -- $17,326, Your

25   Honor.

1          THE COURT:  And do you have the corresponding

2     outflows from those transactions, what he spent the money

3     on?

4          MS. AYERS-PEREZ:  No.

5          THE COURT:  Okay.  Or how much remains in the

6     account now?

7          MS. AYERS-PEREZ:  I don't have any knowledge of

8     how much remains in the account now, Your Honor.  I just

9     know how much he has raised.

10          THE COURT:  Was he spending it on expenses related

11     to this case?  I believe Mr. Brennwald is appointed and not

12     retained.  I may be wrong about that.

13          MS. AYERS-PEREZ:  It is my understanding that

14     Mr. Brennwald is court-appointed and taxpayer-funded, and so

15     I do not know what expenses from this case Mr. Strand could

16     be spending that money on when it is the taxpayers who are

17     funding his attorney.

18          THE COURT:  Okay.  And you are recommending a fine

19     of $50,000.

20          MS. AYERS-PEREZ:  Yes, Your Honor.

21          THE COURT:  How do you come to that amount?

22          MS. AYERS-PEREZ:  Well, we went higher than the

23     amount he had raised, and also we pointed out that he is

24     living in an over $3 million house at the moment, although

25     he doesn't own that house.  But we were also flying blind

```
1    without the financial disclosure because that interview had
2    not occurred.
3              THE COURT:  Okay.
4              All right.  Anything else?
5              MS. AYERS-PEREZ:  No, Your Honor.
6              THE COURT:  Okay.  Thank you.
7              Mr. Brennwald, do you need a minute to get hooked
8    up, or are you ready to go?
9              MR. BRENNWALD:  I'll need a few minutes to hook
10   up.
11             THE COURT:  Why don't we take a break.  We'll take
12   one break, we'll get ready to go, and we'll finish up.
13   Okay?  So we'll stand in recess for about five minutes while
14   Mr. Brennwald gets prepared.
15             (Recess taken)
16             THE COURT:  Getting there?  Do you need some more
17   time?
18             MR. BRENNWALD:  No, I think we're okay, Your
19   Honor.
20             THE COURT:  Okay.  We're a full service court,
21   Mr. Brennwald.
22             MR. BRENNWALD:  Yes, Your Honor.  Like I said,
23   that's why I had Ms. Ali here last time.  It's pitiful.
24             (Pause)
25             THE COURT:  Ready when you are.
```

```
 1              MR. BRENNWALD:  Thank you, Your Honor.

 2              I wrote this sentencing memo.  Mr. Strand did not

 3      write the memo.  I'm the one who wrote in the first

 4      paragraph that of all the approximately 1,000 people who

 5      went into the Capitol that day, his conduct was among the

 6      least culpable.

 7              The Court has experience with these cases.  The

 8      Court knows that there were different levels of involvement

 9      by people in the Capitol that day, and I know that you won't

10      be shy to interrupt me, if you want to, but I invite the

11      Court's questions throughout my allocution.

12              There were people there in camouflage outfits,

13      ballistic helmets, who had talked for weeks about not just

14      the election was stolen, but about an insurrection.

15              THE COURT:  And guns and knives.

16              MR. BRENNWALD:  Correct.  Not Mr. Strand.

17              There were people who went into the Capitol that

18      day who got up right in the faces of police and shouted at

19      them.  Not Mr. Strand.

20              There were people who had weapons, who threw

21      flags, who hit officers.  One gentleman was trying to help a

22      person who was being arrested by pulling him away from the

23      police.  Mr. Strand didn't do any of that.

24              People were chanting over and over.  He didn't

25      engage in a single chant.
```

1          Nothing about him said that he was there that day

2     to stop the certification before it all happened.

3          What the government seems to not remember is that

4     Dr. Gold and Mr. Strand never had any intent to go inside

5     the Capitol that day.  Their speech was supposed to be

6     outside.  And it was a spur-of-the-moment decision when they

7     found out the speech was cancelled.

8          And the speech included a whole bunch of people.

9     I sent an exhibit to the Court.  I don't know if it saw it,

10    but I wanted to make sure I referenced this.

11         This is not just some made-up story that they talk

12    about a speech.  There's an actual poster that shows the

13    speakers who were supposed to speak that day, and it talks

14    about The Ellipse, and it talks about the Capitol, meaning

15    outside the Capitol in a permitted area.

16         Among the speakers -- and I realize this is a

17    political situation, so some of these names will not be

18    some of the most popular names ever in this courthouse, but

19    Dr. Gold was on that poster, her face and her name, Ali

20    Alexander, several congresspeople, and others.  This was

21    something that was planned weeks ahead of time and that they

22    were supposed to do.

23         And then things changed as they walked towards the

24    Capitol.  They were told for whatever reason things were

25    cancelled.

```
 1              So this was not a plan that was going on for weeks

 2       like the Oath Keepers, the Proud Boys, the Three Percenters

 3       and everybody else.

 4              Dr. Gold, when her purposes were thwarted, made

 5       the split-second decision to be heard elsewhere.  She

 6       couldn't be heard at the stand where they were supposed to

 7       be talking.  So I think that's critical because that also

 8       distinguishes them from a lot of people.

 9              I think most people who went there on that day did

10       not plan on doing that either, frankly.  It wasn't until the

11       former president told people to go to the Capitol that

12       people started to go there.

13              THE COURT:  And they were at that speech?

14              MR. BRENNWALD:  I don't know if they were.  I

15       real -- honestly, I don't know.  I think that they were in

16       that area.  I know they came from The Ellipse.

17              I've also talked to a lot of the people that they

18       couldn't hear what was being said by everybody because they

19       were a ways back, and the speakers were buzzing because it

20       was so loud; so I believe they were at the Ellipse, so that

21       is a fact.

22              Anyway, they ended up walking towards the Capitol.

23       On the way they found out that this wasn't going to happen,

24       and Dr. Gold decided to go towards the Capitol.

25              Mr. Strand had no reason personally to go towards
```

1        the Capitol.  It wasn't his speech.  He was there to help

2        her.  He was being paid to protect her.  Why?  Because her

3        position on medical freedom is not popular, and so she's

4        received threats.  And so she had Mr. Strand there.

5               He was hired initially months earlier to help.

6        Their relationship developed, I think unexpectedly for both

7        because there's an age difference between them, but that was

8        never his thought.

9               So yes, he was upset about the election.  Yes, he

10       was of the mind that the election was fraudulent, but that

11       wasn't why he was there.

12              And I think what's critical --

13              THE COURT:  Well, I hear you.

14              Regardless of what may have brought him to

15       Washington in the first place --

16              MR. BRENNWALD:  Right.

17              THE COURT:  -- or the extent to which his co-

18       defendant led him to enter the Capitol, based on his Tweets

19       before, his actions within, and his Tweets later -- I don't

20       know if they were Tweets, but social media posts --

21              MR. BRENNWALD:  Sure.

22              THE COURT:  -- you could not -- the government

23       convinced 12 people beyond a reasonable doubt that at least

24       one of his intentions was to affect the certification

25       somehow.  So you're stuck with that.  I'm stuck with that.

```
1                MR. BRENNWALD:  No, I understand, Your Honor.
2                I mean, again, we who were at the trial all know
3      that the jury literally sent a note out because they didn't
4      have any evidence that he planned to do this ahead of time;
5      and, therefore, they couldn't really find that he had
6      intended to block the certification, and so they sent a note
7      to the Court saying:  Can a person do something without the
8      intent to do it but later say he did have the intent?
9                THE COURT:  I don't -- we can get it out.  I don't
10     read that note -- I didn't read that note that way.
11               MR. BRENNWALD:  Okay.
12               THE COURT:  How I read the note is that can they
13     assess someone's intent beforehand based on something that
14     happens later?  And I said yes.
15               Now, that's on -- you can appeal that, but...
16               MR. BRENNWALD:  Sure.
17               THE COURT:  And I'm not -- I don't recall what
18     your position was on that note at trial, but I think that
19     that remains an appropriate way to respond to that note.
20               MR. BRENNWALD:  I understand, Your Honor.
21               The note talked about whether a person went out
22     for a walk, not to get exercise, just to go for a walk, and
23     later said, "Oh, I actually did go out for exercise."  That
24     was the note that they sent.
25               But the point is, it was difficult for that jury
```

1    to find anything ahead of time that would have confirmed it.

2    It wasn't until three hours after he leaves the Capitol when

3    the buzz was that the certification had been delayed that he

4    tries to then in some way take credit for it.

5         THE COURT:  He took credit for it, and like

6    virtually every defendant I've had thus far that has any

7    social media, it's:  Well, they were bragging.  They were

8    huffing.  And maybe so; maybe no.

9         The jury didn't buy that.  Right?

10        MR. BRENNWALD:  Right.  I understand.

11        Well, he actually never said that on the stand

12   because I don't think he wanted to say that.

13        Anyway, but here's what I was going to say about

14   where they went, the House Chamber, et cetera.  When he

15   sent the note or the text to his brother, I believe it was

16   after -- not three hours later.  When he sent the text to

17   somebody afterwards, he said, "I didn't know exactly where

18   we were.  I don't know if we were outside the place where

19   Cruz or Congress meet."

20        Cruz.  Cruz is not a congressperson.  Cruz is a

21   senator.  So he is thinking:  I don't know if we were

22   outside the Senate Chamber, not the House Chamber.  And so

23   that's critical, because the government keeps talking about

24   this beeline to the House Chamber as if he knew exactly

25   where this was going to happen; and if he had known that, he

1    wouldn't have said Cruz, he probably would have said Pence

2    in the first place because former Vice President Pence was

3    in charge of that, and Senator Cruz was just a guy who was

4    there.  But he was going to be on the Senate side, as far as

5    Mr. Strand knew.

6         So when he talks about "I didn't know where we

7    were," not thinking anybody would ever see that text later,

8    he's not lying about that.

9         He doesn't talk about Pelosi.  He doesn't talk

10   about all the, quote-unquote, boogie people, you know, of

11   the right.  You know, the people they hate.  He talks about

12   Cruz.

13        So that tells you right there he's not even

14   thinking about that process.  It's almost like, "I wonder if

15   Senator Cruz is in here now, maybe we can go meet with him

16   and talk about this election."

17        So I think it's important to keep in mind what his

18   text was.

19        The government talks about his conduct being

20   horrific.  His conduct -- looking at the evidence in a light

21   most favorable to the government, his conduct was

22   unacceptable and was illegal according to, again, looking at

23   it in the light most favorable to the government, which is

24   that he was in there and should not have been in there.

25        But unless everybody who was in there that day,

1    even those who said nothing and did nothing, engaged in

2    horrific conduct, I think that that is hyperbole reminiscent

3    of the former president.

4              Your Honor talked with --

5              THE COURT:  So address the -- I mean, you've

6    talked about some of the texts, "I didn't know where I was,"

7    whether Cruz was there or not.

8              But there are also texts prior to the

9    certification.  "There's no doubt about the truth of the

10   2020 election.  The only question is will you act upon that

11   truth?  Will you stand firm?  The moment will define our

12   country, our generation, and our national destiny.  It's now

13   or never.  This is what literally the Insurrection Act is

14   for.  This is war."

15             Now, you're right, that is not necessarily

16   referring to the certification, but nor is it referring to

17   "I want to go to Washington and get into the Capitol so that

18   my co-defendant can give a speech."  It's about the

19   election.  It's about stopping the steal.

20             I agree with you that term is used in many

21   different contexts.  But certainly there is evidence from

22   which this jury could reasonably infer that at least part of

23   his intention of going in that building was to stop the

24   steal.  This is the moment.  It's now or never, right?

25             MR. BRENNWALD:  Right.  I understand, Your Honor.

```
 1              THE COURT:  So it's not like there's an absence of
 2      evidence.  You can take -- you can interpret separate
 3      evidence differently, but that's why there's a trial.
 4      Right?
 5              MR. BRENNWALD:  Right.
 6              THE COURT:  Okay.
 7              MR. BRENNWALD:  People are complicated.
 8              THE COURT:  I'd say.
 9              MR. BRENNWALD:  And I think those three words --
10      those three words, Your Honor, "people are complicated," I
11      think is something that everybody in this country needs to
12      think about.  And I say that because I have my political
13      leanings, which are not Mr. Strand's, and yet when I go out
14      west, which is three or four times a year, Idaho, Montana,
15      Colorado, Wyoming, I meet dozens and dozens of people who
16      believe like he does and who think very differently than me.
17      And they're very nice people.  They're not racists --
18              THE COURT:  Mr. Brennwald, spare me.  I mean, I
19      get that.
20              MR. BRENNWALD:  No --
21              THE COURT:  I get that.  And we're not here
22      because of what his politics are or who he supported.  Trust
23      me.
24              MR. BRENNWALD:  I understand.
25              THE COURT:  All right.  But I have to take texts
```

1    like this and say, well, what brought him here and what led

2    him to do the things that he was convicted of.

3              MR. BRENNWALD:  Right.

4              THE COURT:  Right?  And so it's an indicator of

5    motivation and intent in a legal sense regardless of the

6    politics of it.  All right?  Believe me.

7              MR. BRENNWALD:  I understand.

8              THE COURT:  All right.

9              MR. BRENNWALD:  So the question then becomes,

10   would Mr. Strand have come here if Dr. Gold wasn't giving a

11   speech?  And we don't know the answer to that question.  But

12   that's really the critical question, because if he was

13   expressing his frustration and throwing things out on social

14   media because he's angry, as a lot of people did, then if he

15   later came on his own or with some buddies and went inside

16   the Capitol, you would expect him to be in a certain combat

17   mode or combative mode where he would exhibit different

18   behavior.

19             But the question is:  Did he and Dr. Gold come

20   here and create these posters and engage in all these things

21   because they had thought, "Well, maybe we'll be arrested for

22   this some day so let's come up with a cover story?"  I mean,

23   that's absurd, right?

24             And so the question is:  Did he -- would he have

25   come here had it not been for Dr. Gold?  And the answer is

1    no.  And so that tells you exactly why he was here that day.

2           And he had strong feelings about the election.

3    And that's what's so confusing to everybody about it.  Well,

4    if you felt that strongly about it and you were here, you

5    must have planned all this.  And it wasn't a last-minute

6    change of plans because the speeches were cancelled; it was

7    something you really wanted to do the whole time.  And

8    that's not true.

9           I think if he's going to be judged and sentenced,

10   he should be judged and sentenced for the conduct, not for

11   guesses or conjectures or --

12          THE COURT:  Okay.

13          MR. BRENNWALD:  -- what if.

14          THE COURT:  But even if all of that is correct,

15   it's hard to escape the conclusion that he knew that a

16   proceeding was going on in the Capitol of some sort, whether

17   he knew where the House Chamber was.  And he went in, and he

18   spent 49 minutes, and he did what he did.  We saw all of the

19   videos.  That certainly obstructed the certification in a

20   major way.

21          MR. BRENNWALD:  I realize that being -- you know,

22   basically the argument I've heard from --

23          THE COURT:  Whether, you know, he was -- there

24   were two motivations or, you know, his co-defendant was a

25   but-for cause of his presence there, you know, he was there,

1    and he obstructed --

2            MR. BRENNWALD:  Right.

3            THE COURT:  -- the count.

4            MR. BRENNWALD:  If we look at it basically like as

5    long as anybody who was inside they were obstructing it.

6            THE COURT:  No, not just anybody.  Not folks who

7    came in and said -- you know, like a lot of other defendants

8    I've had, who come in and say, "Look, this ain't cool, I'm

9    going to leave and go out," or who, you know, walked through

10   and out.

11           I agree with you.  There are all sorts of levels.

12   And whoever paints with a broad brush one way or the other

13   is mistaken and hasn't been sitting in these trials and plea

14   hearings.

15           MR. BRENNWALD:  Okay.  So timing-wise, what I want

16   to emphasize is that when they were trying to leave the

17   Capitol that afternoon, as we saw in the video at trial,

18   they literally waited in the vestibule outside the East

19   Rotunda Doors to exit for about 13 to 14 minutes of those 49

20   minutes.  And so I think that's important.  They literally

21   were waiting and waiting and waiting.  People kept streaming

22   in.  Some people got out; other people were coming in.  And

23   they just stood there waiting for the opportune moment to

24   get out.

25           As far as the other timing that the government

1    talks about, when they went into the building and walked

2    through the vestibule and then made a left into the Rotunda

3    and then eventually went back towards the Statuary Hall and

4    then went through Statuary Hall, they were literally right

5    outside Statuary Hall for minutes.  They didn't go towards

6    that House -- they didn't go to that House Chamber at that

7    point.  They were in that little hallway right outside the

8    Statuary Hall.

9           When they saw that it was blocked off, they came

10   back, and you can see them inside the Statuary Hall standing

11   there.  Dr. Gold was looking at her phone, and he's just

12   standing there kind of looking around for minutes.  For

13   minutes.

14          And then when people kept coming in and it didn't

15   look like anybody -- it didn't look like the inflow was

16   getting any better such that they could leave, they went

17   back in that hallway.

18          So I think when we parse out the number of

19   minutes --

20          THE COURT:  So they were trapped for 45 minutes?

21   They couldn't have left at any point?

22          MR. BRENNWALD:  I think he felt that way.  I think

23   he didn't know.

24          He didn't want to go down hallways that didn't

25   look like they were public hallways.  There were people

1    here, so maybe this is a way out.

2              I understand that, you know, looking back and with

3    the benefit of a bird's eye view and the benefit of

4    hindsight and a lot of experience that we've all had with

5    these cases, that we can -- we know a lot more than he did

6    then.

7              THE COURT:  Well, a lot of people did leave.  Not

8    everyone spent 49 minutes in.  Some people spent two.  Some

9    people spent five.  Some people spent ten.  Right?

10             MR. BRENNWALD:  The people who came into the East

11   Rotunda Doors, as far as my experience is, were in there the

12   longest.  The people who came in the west side were able to

13   get out more quickly.  I have a client -- two clients that

14   got out after 11 minutes, but they were not at that East

15   Rotunda door where it was just a mess.

16             The sentence the government is asking for, 37

17   months, is over 17 -- let me make sure I did that right --

18   18 times the sentence that Dr. Gold got.  18 times.

19             THE COURT:  Where does it compare to other

20   defendants who went to trial and were convicted of a felony?

21             MR. BRENNWALD:  Well, as far as people who were

22   convicted of obstruction of justice, I know --

23             THE COURT:  Of that felony, yes.

24             MR. BRENNWALD:  Right.  I know that there was one

25   person -- for some reason I think it was Your Honor, but it

```
 1    could have been another judge -- who sentenced a person to

 2    nine months.

 3              THE COURT:  All right.  Let's talk about that.

 4              MR. BRENNWALD:  Right.

 5              THE COURT:  Disparities are obviously a factor.

 6    That case -- I want to get this right, so let me look at my

 7    notes.

 8              Mr. Michetti, I believe.

 9              MR. BRENNWALD:  Right.

10              THE COURT:  Right.  So he pled.  The government

11    recommended only 18 months, and that case was unique, which

12    is the danger of comparing these cases just based on the

13    filings in court.

14              MR. BRENNWALD:  Right.

15              THE COURT:  He was arrested, and when the FBI

16    arrested him, they searched his home, and they found a gun.

17    And it turns out that his possession of that gun violated a

18    domestic violence protective order, so he was ordered to

19    serve pretrial -- his pretrial detention in home

20    confinement.  So by the time he got to sentencing he had

21    served 18 months of home confinement, and that's why I

22    sentenced him to the nine months.  And that was below the

23    government's recommendation.

24              So I hear you, but I don't think that case is

25    analogous.
```

```
 1                MR. BRENNWALD:  Okay.

 2                THE COURT:  At least that sentence is not

 3      analogous.

 4                MR. BRENNWALD:  Mr. Strand's been on pretrial

 5      release for 28 months.

 6                THE COURT:  But not home confinement.

 7                MR. BRENNWALD:  Not home confinement.

 8                THE COURT:  He's traveled all over the country.

 9      He's made speeches.  We won't go into that now, but...

10                MR. BRENNWALD:  Right.  The lack of acceptance of

11      responsibility is already factored into this.  It makes a

12      difference under the guidelines.

13                THE COURT:  Is that right?

14                MR. BRENNWALD:  I'm sorry?

15                THE COURT:  Is that right?

16                MR. BRENNWALD:  He's faced -- the guidelines that

17      were calculated were 30 to 37 months.  If he had pled guilty

18      under these circumstances he would be looking at 21 to 27

19      months, so it makes a difference of nine to ten months at

20      the bottom and top of the guidelines range.

21                THE COURT:  Right.

22                MR. BRENNWALD:  So the lack of acceptance is

23      already factored into the fact that he's looking at 30 to 37

24      months.

25                I have some video here I could play, but I just
```

1    want to make some statements to the Court, and then the

2    Court can tell me whether it believes it's necessary to

3    spend time on that.

4              THE COURT:  Sure.

5              MR. BRENNWALD:  The government, in our view,

6    because it didn't have any -- it didn't -- nothing showed

7    Mr. Strand being violent or yelling or chanting, came up

8    with two snippets of video, one of which was discussed

9    today, one of which wasn't.

10              The first one was where outside the steps of the

11    East Rotunda when they were towards the top on the right

12    side you can see a person shaking his fist left -- his left

13    hand rhythmically with the crowd chanting, and they told the

14    jury that was Mr. Strand.  That was something very powerful

15    because that showed him being part of this mob.

16              The problem was it wasn't true.

17              THE COURT:  He was wearing the glove.  The other

18    guy wasn't.

19              MR. BRENNWALD:  Correct.

20              THE COURT:  And I believe you brought that out on

21    cross-examination.

22              MR. BRENNWALD:  Correct.  And so we corrected the

23    government and proved to the jury that he was wearing a

24    glove, and that was not him.  So there's one example of

25    Mr. Strand maybe doing something other than standing around

```
 1      that indicates he's with these people.  No, not happen -- it
 2      didn't happen.
 3                The second example --
 4                THE COURT:  I recall.
 5                MR. BRENNWALD:  And the Court even made an OJ
 6      reference in its comments without using that word or those
 7      letters.
 8                And the second one, which Ms. April Ayers
 9      mentioned today, surprisingly is that he was shaking his
10      fist at these officers as he was walking down the steps
11      after this happened.  And you can see him actually clapping.
12      We played the entire video for the jury, not just the clip,
13      but showed him mid-clap.
14                So, again, when you have to search that
15      desperately for anything to pin on somebody to basically
16      emotionally sway the jury in your favor, that tells you
17      there's not really a lot there.
18                And I'm happy to play that part for the Court.
19                THE COURT:  I recall it.
20                MR. BRENNWALD:  You recall that?
21                THE COURT:  I recall it.
22                MR. BRENNWALD:  All right.  So Mr. Strand, to this
23      day, feels the way he feels about things.  And when I say
24      that, what I mean is he thought that he made the best
25      decision he could at every moment in that event.
```

1          Obviously the Court doesn't agree with that.  When

2    Dr. Gold goes towards the Capitol steps, he goes.  When she

3    goes up the steps, he goes.  He's always behind her.

4          Going into the Capitol, again, that's something

5    that --

6          THE COURT:  You make it sound like he was under

7    duress, that...

8          MR. BRENNWALD:  I have spent -- and I hope the

9    Court will let me say this -- I have spent dozens and dozens

10   of hours with both Mr. Strand and Dr. Gold, and I have

11   observed the dynamic, and I can tell the Court it's not a

12   balanced relationship.

13         So he also is younger.  He was being paid by her.

14   He was depressed in the months and years before that because

15   his employment opportunities were not what he wanted, and he

16   could not afford in his mind to lose this client who was

17   helping him out.

18         At this point, Your Honor, would the Court allow

19   me and the government to approach to discuss private matters

20   that relate to the fine?

21         THE COURT:  We haven't used these in a while.  We

22   usually go to the bat phones, which we weren't -- hold on.

23   Let's see.  Come on up.

24         THE COURTROOM DEPUTY:  I can clear the courtroom.

25         THE COURT:  No, I don't want to clear the

1    courtroom.

2              Just keep it on the record, if you -- say what you

3    want to say on the record about his finances.

4              This part of the transcript will be sealed.

5              (The following is a bench conference held

6               outside the hearing of the gallery)









1

2

3

4

5

6

7

8

9

10

11

12

13

14

15          (This is the end of the bench conference)

16          THE COURT:  All right.  Apologies, ladies and

17   gentlemen.

18          MR. BRENNWALD:  The website, by the way, Your

19   Honor, has been up for ten years.  It's not something he

20   started after January -- after the trial in September.

21          THE COURT:  I'm not sure I noticed anything on the

22   website other than January 6th.

23          MR. BRENNWALD:  Right, but that site he has has

24   been up for ten years is what I'm telling the Court.

25   Whether it was changed, whether there were some

1    modifications to it after January 6th or after the September

2    trial, that's something I don't know.

3              THE COURT:  Okay.

4              MR. BRENNWALD:  In any event, Your Honor, we

5    discussed the different levels of conduct in the Capitol

6    that day, and he is among the folks who went in who,

7    according to the evidence, shouldn't have gone in but did.

8    Nothing else other than that.  In other words, he didn't

9    shout.  He didn't chant.  He didn't scream.  He didn't push

10   police officers.  None of that stuff.

11             He literally went in, followed Dr. Gold.  They

12   went out in the hallway, went back in.  Eventually they left

13   when they were able to get out the door.  That's what he

14   did.

15             He was there.  According to the evidence, he

16   shouldn't have been there.  But that's the level of his

17   conduct.

18             And I don't know of any other defendants, frankly,

19   in this case, even the ones who came and left and decided it

20   wasn't a good idea, who weren't wearing Trump paraphernalia

21   or carrying a flag or doing something else that indicated

22   that they were going there for a reason; that was not

23   protecting somebody else who was going to give a speech.

24   And so that's why I say he's unique in all of these cases.

25             He's a very unique defendant.  We knock out the

1    Oath Keepers.  We knock out the Three Percenters, the Proud

2    Boys.  I just finished a seven-week Oath Keeper trial.  You

3    know, there's so much evidence there of preplanning for

4    months, since November 3rd.

5            We have other people who were not Oath Keepers,

6    not part of those groups, who were doing all sorts of

7    maligned things that day.  We have people who were clearly

8    part of the group who were singing, chanting, everything

9    else.  None of that happened with Mr. Strand.

10            This demonstrates to the Court that this was a

11   spur-of-the-moment decision.  And he was there looking like

12   he was going all Hollywood with his aviator glasses and his

13   leather jacket.

14            And it was a very, very bad situation to be in,

15   and he could have taken steps to change things, according to

16   the evidence.  But that's what we have.

17            And so it concerns me that the government -- and

18   frankly I deleted so many footnotes in my memo that were

19   excoriating of the government for saying what they did in

20   the memo.  You know, he was at the front.  It seems like

21   everybody was at the front.  Every memo I've read there's a

22   person at the very front in the middle, like they all melded

23   into one person, and there was nobody behind him.

24            He was never at the front.  He was never any of

25   that.  He was at the side being there.  And so it was

1    infuriating, and even at 4:45 in the morning, when I was

2    finishing my edits, I just deleted a whole bunch of things

3    that I had written because I didn't want to engage in the

4    hyperbole that I was reading myself from the government.

5           So I'm asking the Court -- and we're fortunate --

6    and I know this is going to sound like pandering, and I

7    really don't mean that at all.  We're fortunate that you

8    have experience in these cases and that you are, in my

9    experience, you know, temperamentally -- you're not going to

10   get caught up in all of this, but you recognize what has to

11   be done.  You're balanced, and I really appreciate that.

12   And it's almost like I'm throwing Mr. Strand on the mercy of

13   the Court because I know the Court will make a judgment that

14   it considers to be fair.

15           THE COURT:  Okay.  Thank you.

16           MR. BRENNWALD:  And that's something that I can't

17   always say.

18           THE COURT:  All right.  Will Mr. Strand be

19   addressing the Court?

20           MR. BRENNWALD:  Briefly, Your Honor.

21           THE COURT:  All right.  Mr. Strand, step right up.

22           MR. BRENNWALD:  And after he's done --

23           THE COURT:  And I did read the letter.

24           MR. BRENNWALD:  Okay.  Thank you.

25           After he's done with that, Your Honor, when the

1    Court imposes the sentence, we would like to discuss

2    location and things like that.

3                THE COURT:  Sure.

4                THE DEFENDANT:  Thank you, Your Honor, for reading

5    the letter.  I appreciate that.  And thank you for the

6    opportunity to address the Court.

7                I want the Court to know that I was listening

8    intently at my trial, and my eyes were opened as to how

9    other people experienced what went on that day.  I heard the

10   stories of the police officers as they testified, and my

11   heart went out to them.  It still does.

12               I learned that many of these officers and other

13   officials were put in danger and even harmed.  And I

14   remember the parliamentarian describing the fear and anxiety

15   that they all felt, and I felt terrible about that.

16               I would never condone violent behavior, and I

17   would never want to be the source of pain and injury for any

18   person.  I was there, as you know, as a security guard for a

19   scheduled speaker, so it wasn't just myself that I had felt

20   responsible for.

21               I did my best to make sound decisions at the time,

22   but I'm not a perfect human being.  And I know there have

23   been statements about my political views, but actually I

24   really appreciate that you've worked so hard to separate

25   that and just make it a fact-based trial.  So thank you.

1          And I do wish I could have prevented my client

2     from walking up the steps.  She felt an urgency to try to

3     address the people and give a speech in some form, and I

4     felt responsible for her safety at that point.  So I know

5     the evidence does reflect that throughout my time there I

6     was trying to protect her.  At all times that was my only

7     concern.

8          But there's no doubt that, you know, other people

9     there were harmed, endured serious injury and distress.  And

10    that's not something that I take lightly or excuse.  In

11    fact, it grieves me when anyone chooses to act with violence

12    or physical animosity.

13         I'm extremely distressed that people around me at

14    that time, some of whom might share my political views, that

15    they made terrible choices and acted in a violent or

16    otherwise inappropriate manner, placing innocent police

17    officers and others in danger.  And that also contradicts

18    the values and beliefs that I stand for and the peaceful and

19    lawful behavior that we should all stand for obviously.

20         So I know the government has alleged many times

21    that I'm in denial or indifferent to the pain and tragedy of

22    the event, but that's not the case.  Since that day I've

23    also learned even more about many officers who were harmed

24    and also just the extent of the distress.  And so it really

25    saddens me, truly.  I mean, I hope we all are, but I know I

```
1    certainly am about the events of that day.

2            So -- yeah.

3            Despite what my words have been made to sound

4    like, I would never want to minimize the tragedy of January

5    6th, and I will not do that.

6            It was a tragedy.  I don't overlook that or

7    disrespect the memory of those that were harmed.  And I

8    specifically want you to know that I truly heard the

9    officers and others relay how awful that day was for them,

10   and that grieves me.

11           I'm just asking you to see me as an individual and

12   also to give me grace and understanding that I'm not perfect

13   despite what my decisions were.  I'm trying to do the best

14   that I could, and I pray that you would consider a stay of

15   my -- of any sentence pending my appeal.

16           But most importantly, I hope that you will

17   understand that my earnest account of my mindset is not in

18   any way dismissal or lack of empathy, and that the violence

19   and injury caused that day truly does fill me with sadness

20   and burdens me to ensure that such a harmful event will

21   never happen again.

22           THE COURT:  Thank you.

23           THE DEFENDANT:  Thank you.

24           THE COURT:  All right.  You can have a seat with

25   your counsel, and I'll ask you to stand when I pronounce the
```

1      sentence.

2              MR. BRENNWALD:  And I just wanted the record to

3      reflect that I had nothing to do with that statement

4      whatsoever.

5              THE COURT:  All right.  So I have any number of

6      these cases now, and while sentencing may be more art than

7      it is science at the end of the day, I want you to know that

8      there is a lot of rigor and a lot of time and effort that

9      goes into not only these rote calculations of the guidelines

10     range, which I know are impenetrable to lay people, but also

11     applying all of the relevant factors.  All right?  And there

12     are a myriad of factors that the Court has to consider.

13             Each defendant's role is different.  Your

14     particular involvement has been discussed at length at

15     trial, in the sentencing papers, and again here today.  And

16     I assure you that I've tried to consider all of the relevant

17     factors as they apply to you specifically.

18             I'm not going to go over everything, but I do want

19     to make a few observations.

20             We have to start with that guidelines range.

21     Right?  That's our starting point in all sentencing.  Here

22     it's 30 to 37 months.  That's a fair amount of time, but

23     it's a lot less than what it would have been had we applied

24     the eight-level enhancement, which, as I said, was a fairly

25     close call, but I don't think that it applies in this case.

1          It would have been even lower had you accepted a

2     plea, not gone to trial, and not made what I view as was at

3     least one false statement or one area of false statements

4     from the stand.

5          And you often hear that:  Well, there shouldn't be

6     a trial penalty.  A defendant should not be punished for

7     exercising their Sixth Amendment right to a jury trial.  But

8     this is not a trial penalty.  You're not being punished for

9     exercise of your constitutional right.  That guidelines

10    range is rather a reflection of the fact that a jury

11    convicted you of a felony offense -- right? -- and found

12    that your testimony was not truthful.  Because had they

13    found that it was truthful, you would not have been

14    convicted, and that's two levels for not accepting

15    responsibility for your actions.

16         And so all of those things I can lawfully

17    consider, and they all are appropriately incorporated in the

18    guidelines range.  So I don't -- I don't want anyone to

19    think that you're being punished because you went to trial.

20    Your guidelines range is driven by what you were convicted

21    of and the other circumstances that go into those

22    calculations.

23         You know, we obviously take into account what you

24    did; and it is true, as Mr. Brennwald said, you didn't

25    assault anybody.  You didn't engage in any violence.  You

1     didn't damage any property apart, perhaps, from desecrating

2     the statue of General Eisenhower.  You didn't coordinate, as

3     far as I know, with anybody else except your co-defendant.

4              But that's -- you know, you weren't charged with

5     any of those things.  Okay?  You weren't charged with

6     assault.  You weren't charged with, you know, civil

7     disorder.  And so many of the offenses that others had been

8     charged with you weren't, in recognition of those facts.

9              So I think your conduct does fall somewhere in the

10    mid-range of defendants that we see for all the reasons that

11    Mr. Brennwald said.  But that doesn't mean that they were

12    not serious or dangerous.

13             And I hear it all the time, right?  I'm innocent,

14    and I shouldn't have been charged because I wasn't violent,

15    because I didn't hurt anybody.  Right?  And that's a false

16    dichotomy.  All right?

17             You know, take the 1752, entering and remaining

18    and disruptive conduct offenses.  Those are misdemeanors,

19    right?  But the reason that those offenses are on the books

20    is because they involve restricted places, and restricted

21    places are places where the Secret Service is guarding the

22    president or the vice president or some other protected

23    person.  Right?

24             And you might not think that it's -- that it

25    should be illegal to, you know, waltz into the Capitol while

1    the Secret Service is there trying to protect the president

2    of the United States or the vice president of the United

3    States, but it is.  And it's illegal for a very good reason.

4    People want to assassinate presidents and vice presidents,

5    and we saw that on January 6th.  "Hang Mike Pence," right?

6    And unfortunately, sometimes people try to do that, and

7    tragically they've succeeded.

8              And so the Secret Service is there to keep that

9    from happening, and I can't imagine a more difficult job.  I

10   mean, one mistake could change the course of history.  And

11   it makes their job even harder if any Tom, Dick, or Harry

12   can just enter a restricted building and interfere with

13   their ability to protect the president or the vice

14   president.

15             And that's exactly what happened on January 6th.

16   The mob, which you willingly joined, put the vice

17   president's safety at risk and the safety of the agents

18   protecting him by entering and remaining and engaging in

19   disruptive conduct in the Capitol.  And that's exactly what

20   that law is intended to prevent.  All right?

21             And so I've heard defendants say -- and you may

22   have said it, too -- well, I was just -- it was only a

23   trespassing offense.  Right?  Misdemeanor trespassing.

24   Right?  And you've probably said that.  I've seen some of

25   the clips of your appearances.  I can't remember if you've

 1    said it exactly, but I wouldn't be surprised.  All right?

 2    I've heard it a thousand times.

 3           And it is true that part of the statute involves

 4    trespassing, but it's not like cutting across your

 5    neighbor's lawn.  Okay?  The statutes are there for a very

 6    important reason.

 7           The same is true for the obstruction offense.

 8    It's serious, not only for the delay that it caused and its

 9    effect on the police officers that the government

10    referenced, but more importantly the stain that it left on

11    our democracy.

12           I've heard many defendants -- and I think

13    including you -- talk about, you know, well, this was just a

14    First Amendment protest.  Right?  But you are not being --

15    you were not convicted for helping your co-defendant give a

16    speech.  All right?  You were convicted for entering the

17    Capitol, knowing you weren't supposed to be there regardless

18    of whether you followed your co-defendant or not, and

19    joining the mob, passing through the police lines.  In other

20    words, it was not your words or your associations or your

21    views or your boss's views about COVID restrictions, but it

22    was your conduct that violated these very specific statutes.

23           Now, let's turn to acceptance of responsibility.

24    You obviously chose to go to trial.  That is certainly your

25    right.  And as a result, you get no guidelines credit for

1    acceptance of responsibility; and to the contrary, you've

2    not accepted responsibility in a pretty remarkable way.

3                You have professed not just that the government

4    didn't prove its case, but you have professed your innocence

5    numerous times.  And I've seen you on these programs doing

6    it to all of the charges.  But the evidence was clear.

7    Okay?

8                You know, let's just take that 1752 charge that I

9    just clicked off.  There are only two elements to that

10   charge.

11               One, that you entered and remained in a restricted

12   building without lawful authority.  The camera showed you

13   were there.  Obviously you didn't have lawful authority to

14   be there.

15               And, two, that you did so knowingly.  All right?

16   And those things were clearly proven.  Right?  And to say

17   that "I'm innocent" is -- it's delusional.

18               And as I referred to your lawyer, the only way

19   that you were innocent, as you've been explaining to

20   everybody who will listen, is that it was not a knowing

21   violation, that you were somehow pushed in.  And I'll get to

22   that in a minute.

23               On the obstruction count clearly it was a closer

24   question, a harder charge.  Right?  The jury had to infer

25   your intent.  I think the evidence was sufficient to support

1    that inference judging the evidence in the light most

2    favorable to the government, but clearly a much harder

3    charge to prove.

4              With respect to your intent, either you were

5    helping your co-defendant give a speech or you wanted to get

6    in there to somehow protest the certification, but those

7    things aren't mutually exclusive.  It could have been both,

8    and I think it's likely that that's what the jury found.

9              And while we're on the jury, in some of your

10   appearances you complain that you knew the result was going

11   to be guilty from the beginning; that it was all, you know,

12   preordained; that you didn't get a fair trial from a jury of

13   your peers.  Let me just say that I think that's hogwash.

14   All right?

15             As an initial matter, as I said in the pretrial

16   motion, if you come to D.C. and you commit a crime, you

17   should expect to be tried by a jury in this town.  Okay?

18   Just as if I go to LA or to Naples, I would expect juries

19   there to hear my case.  And I think you did have a fair

20   jury.

21             And I've got to put in a plug for our D.C. juries.

22   You know, as I think we talked about prior to trial, there

23   are -- you know, there are folks that are inside the bubble,

24   like we all are that follow politics, but there are -- you

25   know, there's official Washington, but there's also real

1   Washington.  Right?  And we get jurors from all walks of

2   life, and we did in this case, and we select the ones that

3   we think will give you and any defendant a fair trial.

4          And so I looked back at the jury roll before I

5   came in today, and there were two that had some connection

6   to the federal government, but the vast majority of them

7   didn't.

8          We had a scheduler in a hospital radiology

9   department.  We had two IT guys; one at a grocery store

10  chain, and I forget where the second one worked.  We had a

11  specialist in adult education who referred people to adult

12  education centers.  We had a retired real estate agent, a

13  paralegal, a folk life specialist at a museum.

14         These were not partisans.  These were not

15  advocates.  None of them had any particular axe to grind.

16  Okay?  And their service should be honored and not

17  denigrated by saying that this was a -- or suggesting that

18  this was a kangaroo court and that you didn't get a fair

19  trial.

20         And as I said, except for the obstruction count

21  perhaps, these were slam dunks.  Okay?  I am fully confident

22  that a jury in Beverly Hills, which is where you came from,

23  I think, when you came to D.C., would have come to the same

24  result.  All right?  So I wanted to commend those folks, as

25  they should be.

1          So why would you go to trial and continue to

2    proclaim your innocence in the face of such strong evidence

3    to the contrary?  Either it's self-delusional, but I don't

4    think that it is -- my sense of you is that you're smart;

5    you're clever; you're a resourceful guy -- or it could be

6    that, you know, maybe you're trying to delude others for

7    your own benefit.

8          You know, it seems to me that you want to be

9    perceived as a J6 political prisoner, as your website says,

10   or as some sort of a martyr or the face of the J6 movement.

11   And I think you want to cultivate and profit from that

12   perception by raising money on your website, by making

13   appearances at all these conferences and these podcasts,

14   peddling in the idea that you didn't break any laws and that

15   you didn't get a fair trial and, you know, leveraging your

16   49 minutes of infamy into media appearances and financial

17   donations.

18          Now, I may think that's unseemly, as I think I

19   commented at your co-defendant's sentencing, but I recognize

20   that you have a right to do that.  Everybody's got an angle,

21   and if you want to work that angle, unless it's illegal,

22   it's no concern of mine.

23          But when you take advantage of your notoriety it

24   does go to acceptance of responsibility, which dovetails

25   into deterrence, both specific and general, and the need for

1    the sentence imposed to promote respect for the law.  All of

2    those things are in the statute books, and I have to

3    consider them when I impose the sentence, and that outlook

4    and those actions are relevant to that.

5              With respect to specific deterrence, you know,

6    it's how likely are you to do something like this again.

7    That's hard.  On the one hand, you don't have any criminal

8    history, and January 6th, God willing, was a very unique

9    occurrence that is hopefully unlikely ever to happen again.

10   And as you've said, your presence there resulted from, you

11   know, a confluence of events I think it's fair to say.

12             On the other hand, I think you enjoy the

13   notoriety, and if you don't think you did anything wrong, it

14   may suggest that you would be willing to do it again.

15   Right?  Or something like it.

16             More importantly, there's general deterrence,

17   which is what your sentence says to other people, and there

18   may be -- I don't know what sort of following you have, but,

19   you know, there are probably a lot of people out there

20   watching you on all these podcasts and all these conferences

21   and on social media, and you've used that platform to peddle

22   the misconception that you and other J6ers are somehow

23   political prisoners who are being persecuted for their

24   beliefs as opposed to their conduct.

25             So to all those folks who may believe that, based

82

1   on what you're telling them, they need to know that nothing

2   like this can happen again, and if it does, folks will

3   receive fair but substantial sentences.

4           We have to consider your history.  You know,

5   you're a really interesting guy, you know.  Very interesting

6   personal background, a colorful work history.  Nothing

7   explains why you're sitting here today.

8           Finally, we talk about disparities.  I know there

9   were a lot of cases cited in the papers by both sides.  What

10  I've tried to do is sort of isolate cases involving

11  defendants who have gone to trial on very similar charges

12  and who did not get the plus-eight enhancement for whatever

13  reason.  And the ones that I have focused on, there's the

14  *Seefried* case, Judge McFadden, 24 months; the *Dustin*

15  *Thompson* case, Judge Walton, 36 months; the *William Reid*

16  case, Judge Friedrich, 37 months.

17          There was a lot of play on the *Hale-Cusanelli*

18  case.  I agree with the defense that that one is somewhat of

19  an outlier given his unique motivations as well as his

20  direct altercations with law enforcement.

21          We talked about the *Richard Michetti* case, which

22  was before me, which was nine months, but those were very

23  unique circumstances.

24          So, you know, all of those sentences with trial

25  defendants with similar profiles, and some may have done

1    lesser things, but others may have accepted responsibility

2    in ways that Mr. Strand has not, those all bunch around the

3    37 to -- the 30 to 37 guideline.

4              So with all of that, Mr. Strand, if you could

5    stand.

6              MR. BRENNWALD:  Do you want him at the podium,

7    Your Honor?

8              THE COURT:  No, you can stay there.

9              Pursuant to the Sentencing Reform Act of 1984 and

10   in consideration of the provisions of 18 USC 3553 as well as

11   the advisory Sentencing Guidelines, it is the judgment of

12   the Court that you, John Herbert Strand, are hereby

13   committed to the custody of the Bureau of Prisons for a term

14   of 32 months as to Count 1, 12 months as to each of Counts 2

15   and 3, and six months as to each of Counts 4 and 5, with all

16   counts to be served concurrently for a total of 32 months.

17             You are further sentenced to serve a 36-month

18   period of supervised release as to Count 1 and a 12-month

19   period of supervised release as to Counts 2 and 3, with all

20   counts to be served concurrent, for a total of 36 months.

21             In addition, you are ordered to pay a special

22   assessment of $100 -- excuse me, $170 in accordance with 18

23   USC 3013.

24             While on supervision you shall abide by the

25   following mandatory conditions as well as all discretionary

1    conditions recommended by the probation office which are

2    imposed to establish the basic expectations for your conduct

3    while on supervision.  These mandatory conditions include:

4            You must not commit another local, state, or

5    federal crime.

6            You must not unlawfully possess a controlled

7    substance.

8            You must refrain from any unlawful use of a

9    controlled substance.

10           You must submit to one drug test within 15 days of

11   placement on supervision and at least two periodic tests

12   thereafter as determined by the Court.

13           You must cooperate in the collection of DNA as

14   directed by the probation officer.

15           You must make restitution in accordance with 18

16   USC 3663 and 3663A or any statute authorizing a sentence of

17   restitution.

18           You shall also comply with the following special

19   conditions:

20           You are ordered to make restitution to the

21   Architect of the Capitol in the amount of $2,000.  The Court

22   determines that you do not have the ability to pay interest

23   and, therefore, waives any interest or penalties that may

24   accrue on the balance.

25           Ms. Ayers-Perez, does the Court need to make

```
1      findings with respect to the restitution?

2                MS. AYERS-PEREZ:  No, Your Honor.  I do not

3      believe you do.  I know that in a previous case you've asked

4      about the letter to the Architect of the Capitol.  I do have

5      it, if you want it.

6                Having said that, I would ask that it be under

7      seal.

8                THE COURT:  I don't think that I need it.

9                MS. AYERS-PEREZ:  Okay.

10               THE COURT:  The Court finds that one of the counts

11     of conviction for 1752(a)(1) triggers mandatory restitution

12     under the Mandatory Victim Restitution Act.

13               The government has shown by preponderance of the

14     evidence, including its proffers as well as the letter from

15     the Architect of the Capitol that the Court has seen in

16     other January 6th cases, that the riots caused over I

17     believe at this point $3 million in damage at least.  The

18     Court finds that those -- that the Architect of the Capitol

19     was the victim or a victim of the riots as contemplated by

20     the statute.

21               The government has further established that $2,000

22     is a reasonable estimate of how much of that damage should

23     be apportioned to the defendant.  And that is what is

24     consistent with what folks who have pled guilty to that

25     offense have been assessed.
```

1           With respect to the fine, the Court will accept

2     the probation office's recommendation for a fine of $10,000.

3     The Court determines that you do not have the ability to pay

4     interest and, therefore, waives interest or penalties that

5     may accrue on that balance.

6           And I will say that part of the determination

7     regarding the fine is based on the defendant's failure to

8     submit a financial disclosure that would allow the Court to

9     make any other determination apart from what the government

10     has presented.

11           You must pay the financial penalty in accordance

12     with the schedule of payment sheet in your judgment.  You

13     must also notify the Court of any change in economic

14     circumstances that might affect the ability to pay this

15     financial penalty.

16           Having assessed your ability to pay, payment of

17     the total criminal monetary penalties is due as follows:

18     payment in equal installments of $500 per month over a

19     period of 24 months to commence after the date of this

20     judgment.

21           You must also provide the probation officer access

22     to any requested financial information and authorize the

23     release of any financial information.  The probation office

24     may share this information with the U.S. Attorney's Office.

25           You must not incur new credit charges or open

1   additional lines of credit without the approval of your

2   probation officer.

3           You must submit to substance abuse testing to

4   determine if you have used a prohibited substance.  You must

5   not attempt to obstruct or tamper with the testing methods.

6           Within 45 days of release from incarceration, you

7   will appear before the Court for a reentry progress hearing.

8           Actually, let's -- we won't order a hearing at

9   this point.  The Court will order the probation office in

10  the district you are supervised to submit a progress report

11  to the Court within 30 days of commencement of supervision;

12  and upon the receipt of the report, the Court will determine

13  whether a hearing is necessary.

14          Restitution payments shall be made to the Clerk of

15  the Court for the United States District Court, District of

16  Columbia, for further disbursement to the Architect of the

17  Capitol.  The address will be in the judgment.

18          Financial -- the special assessment is immediately

19  payable to the Clerk of the Court for this court.

20          Within 30 days of any change of address, you shall

21  notify the clerk of the change until such time as the

22  financial obligation is paid in full.

23          Finally, the probation office shall release the

24  presentence report to all other appropriate agencies,

25  including the probation office in the approved district of

1    residence, in order to execute the sentence of the Court.

2    Treatment agencies shall return the presentence report to

3    the probation office upon the defendant's completion or

4    termination from any treatment.

5           You have the right to appeal your conviction to

6    the United States Court of Appeals for the D.C. Circuit.

7    You also have a statutory right to appeal your sentence to

8    the D.C. Circuit under certain circumstances, including if

9    you think the sentence was imposed in violation of law or as

10   a result of an incorrect application of the Sentencing

11   Guidelines or is more severe than the maximum established in

12   the guidelines range.

13          You may also appeal your sentence if you believe

14   you received ineffective assistance of counsel at

15   sentencing.

16          Under 28 USC 2255, you also have the right to

17   challenge the conviction entered or the sentence imposed to

18   the extent permitted by that statute.

19          Any notice of appeal must be filed within 14 days

20   after entry of judgment or within 14 days of the filing of a

21   notice of appeal by the government.  If you are unable to

22   afford the cost of an appeal, you may request permission

23   from the Court to file an appeal without cost to you.  On

24   appeal you may also apply for court-appointed counsel.

25          Any other objections for the record, Ms. Ayers-

```
 1    Perez?

 2                 MS. AYERS-PEREZ:  No, Your Honor.

 3                 THE COURT:  Mr. Brennwald?

 4                 MR. BRENNWALD:  No, Your Honor.

 5                 THE COURT:  Okay.  You can be seated.

 6                 Mr. Brennwald, do you want to be heard on

 7    placement?

 8                 MR. BRENNWALD:  Yes, Your Honor.  I would ask the

 9    Court to allow Mr. Strand to self-surrender.  We're asking

10    the Court to recommend Pensacola, Florida.  He's in Naples,

11    but that's the closest place for him.  And we would ask for

12    supervision to be transferred to the Central District of

13    Florida.

14                 THE COURT:  All right.  The Court will make a

15    recommendation to Pensacola, and we will transfer

16    supervision but not jurisdiction to the Northern --

17                 MR. BRENNWALD:  Central District --

18                 THE COURT:  Northern District of Florida, I

19    believe.

20                 MR. BRENNWALD:  Northern?

21                 THE COURT:  Three districts in Florida, I believe.

22                 MR. BRENNWALD:  Middle.  Middle, I'm sorry, Middle

23    District.

24                 THE COURT:  Pensacola is up north.  Well,

25    whichever one it is.
```

```
 1                THE PROBATION OFFICER:  He's going to reside in
 2     Naples.
 3                MR. BRENNWALD:  In the Middle District.
 4                THE COURT:  The district that encompasses Naples,
 5     which I believe is the Middle District.
 6                Ms. Ayers-Perez, position on release pending
 7     reporting?
 8                MS. AYERS-PEREZ:  Your Honor, this case has gone
 9     on for quite some time, especially since trial that occurred
10     last September.  We would ask that the defendant be remanded
11     into custody today or in the alternative an abbreviated
12     period to report.
13                THE COURT:  Okay.  The Court finds that the
14     defendant does not pose a risk of flight or a danger to the
15     community so -- Mr. Strand.
16                THE DEFENDANT:  I'm sorry?
17                THE COURT:  Sorry to interrupt, but the Court will
18     allow Mr. Strand to self-report.  He will be hearing from
19     the Bureau of Prisons.
20                Obviously it is important that you report when
21     directed.  It would not be wise not to do that.  And in the
22     meantime, all of your present conditions will remain in
23     place.
24                MR. BRENNWALD:  I've never had to do this in 37
25     years, and I don't know if it's even possible, but if it is,
```

1    if the Court has authority to do this, we're asking that the

2    Court allow or order that the surrender not occur until

3    August 1st, if possible.

4         THE COURT:  I'm not going to intercede in BOP.

5    Sentencing was postponed.  Mr. Strand has had plenty of time

6    to get his affairs in order and to prepare for this

7    eventuality.  So that's up to BOP as to when to -- unless

8    you have a very compelling reason.

9         MR. BRENNWALD:  I can submit something, I suppose.

10         THE COURT:  Okay.

11         MR. BRENNWALD:  And Mr. Strand has asked me to ask

12    the Court to stay the execution of the sentence pending

13    appeal in the *U.S. v. Fischer* case.  That's the one that's

14    being appealed on the 1512(c), the obstruction appeal that's

15    in the D.C. Circuit and going up.

16         THE COURT:  The Court decided that.

17         MR. BRENNWALD:  I'm sorry?

18         THE COURT:  The Circuit has decided that issue.

19         MR. BRENNWALD:  Right, and it's going up above

20    that now.

21         THE COURT:  No.  I will deny that motion.  The

22    Circuit panel has spoken.  Who knows if and when the Supreme

23    Court may get to that.  Okay?

24         MR. BRENNWALD:  Okay, Your Honor.

25         THE COURT:  All right.  Anything else, Counsel?

1          MS. AYERS-PEREZ:  No, Your Honor.

2          MR. BRENNWALD:  No, Your Honor.  Thank you.

3          THE COURT:  Okay.  We're adjourned.

4          (Whereupon the hearing was

5           concluded at 4:30 p.m.)

6

7

8          **CERTIFICATE OF OFFICIAL COURT REPORTER**

9

10              I, LISA A. MOREIRA, RDR, CRR, do hereby

11     certify that the above and foregoing constitutes a true and

12     accurate transcript of my stenographic notes and is a full,

13     true and complete transcript of the proceedings to the best

14     of my ability.

15          Dated this 24th day of June, 2023.

16

17

                                        /s/Lisa A. Moreira, RDR, CRR
18                                      Official Court Reporter
                                        United States Courthouse
19                                      Room 6718
                                        333 Constitution Avenue, NW
20                                      Washington, DC 20001

21

22

23

24

25